

COPY

```
 1              IN THE CIRCUIT COURT OF RIPLEY COUNTY,
                     STATE OF MISSOURI,
 2                     DIVISION I.

 3   STATE OF MISSOURI,          )
                                 )
 4          PLAINTIFF,           )
                                 )
 5      vs.                      )  Case No. 13RI-CR00907
                                 )
 6   CHARLES HAYNES,             )
                                 )
 7          DEFENDANT.           )

 8

 9                    I-N-D-E-X

10              Preliminary Hearing

11               APRIL 3rd, 2014

12   WITNESS:                    DIRECT    CROSS

13   MELINDA SUZANNE HOGG
          By Mr. Miller.....................  6, 33
14        By Mr. Moore......................       16

15

16

17

18

19

20

21
```

RECEIVED
JUN 23 2015
MISSOURI
ATTORNEY GENERAL

**PAULA D. HEFNER**

CCR, RPR, CM, CRR, CSR

264 Remington Place

Poplar Bluff, Missouri 63901    573-776-3636

phefner@semo.net

RECEIVED
JUN 2 6 2015
MISSOURI
ATTORNEY GENERAL

**EXHIBIT 5**

CERTIFICATION OF OFFICER

STATEMENT OF DEPOSITION CHARGES

(Rule 57.03 (g) (2) (a) & Sec., 492.590 RsMO 1985.)


**PRELIMINARY HEARING**


April 3, 2014

TAX COSTS TO:  CHRISTOPHER L. YARBRO, ESQ., $_____, AND CUSTODY OF ORIGINAL TRANSCRIPT


        Transcript delivery made prior to payment.  However,

it is anticipated that in the normal course of business all

charges will be paid.

        IN WITNESS WHEREOF I have hereunto set my Notary Seal

this 4th day of JUNE, 2015.

        My Commission expires:  December 21, 2018.




                              _____
                              Paula D. Hefner,
                              CSR, CCR, RMR, CRR
                              Notary Public
                              Commission No. 10554988

COPY

```
 1              IN THE CIRCUIT COURT OF RIPLEY COUNTY,
                          STATE OF MISSOURI,
 2                          DIVISION I.

 3    STATE OF MISSOURI,        )
                                )
 4              PLAINTIFF,       )
                                )
 5        vs.                    )    Case No. 13RI-CR00907
                                )
 6    CHARLES HAYNES,           )
                                )
 7              DEFENDANT.       )

 8

 9              BE IT REMEMBERED that the above entitled matter came

10    on for a PRELIMINARY HEARING before the HONORABLE THOMAS SWINDLE

11    on the 3rd day of April, 2014, at the Circuit Courtroom,

12    Division I, Ripley County Courthouse, Doniphan, Missouri, and

13    was audio taped, in a certain matter now pending and

14    undetermined in the Circuit Court within and for the County of

15    Ripley, wherein STATE OF MISSOURI is the PLAINTIFF, and CHARLES

16    HAYNES is the DEFENDANT, and the following proceedings were had:

17

18    APPEARANCES:
      FOR THE PLAINTIFF:        OFFICE OF PROSECUTING ATTORNEY
19                              COUNTY OF RIPLEY
                                Ripley County Courthouse
20                              Doniphan, Missouri
                                BY:  Christopher Miller, Esq.
21
      FOR THE DEFENDANT:        MOORE LAW OFFICES
22                              Attorneys at Law
                                433 North Main Street
23                              Poplar Bluff, Missouri
                                BY:  Daniel T. Moore, Esq.
24

25
```

```
 1                  THE COURT:  Today's date is April 3, 2014.  This
 2   is the Circuit Court of Ripley County, Missouri.  My name is
 3   Thomas Swindle, Associate Judge.
 4         The case coming on at this time is Case No.
 5   13RI-CR00907, State of Missouri versus Charles M. Haynes.
 6         For the record Mr. Haynes appears in person with
 7   counsel Mr. Dan Moore.  The State of Missouri appears by the
 8   duly appointed Prosecuting Attorney of Ripley County Mr.
 9   Christopher Miller.
10         The case is here today for purposes of Preliminary
11   Examination with respect to a three count felony complaint filed
12   by the State against the Defendant Mr. Haynes.
13                  MR. MILLER:  Your Honor, I meant to point out
14   that this morning we filed a First Amended Felony Complaint in
15   four counts.
16                  THE COURT:  Mr. Moore, are you aware of that?
17                  MR. MOORE:  Yes, I received a copy of it, Judge,
18   this morning.
19                  THE COURT:  It looks like an additional count of
20   statutory sodomy, C felony.
21                  MR. MILLER:  Yes, sir.
22                  THE COURT:  Do you wish to proceed with the
23   Prelim or are you asking for a continuance?
24                  MR. MOORE:  Let me talk to my client just a
25   moment, please.
```

4

COPY

```
1              THE COURT:  Let's go off the record.
2              (Discussion was had off the record.)
3              THE COURT:  The Court while off the record
4    received word from Mr. Moore that Defendant is ready to proceed
5    with the Preliminary Examination of the amended four count
6    felony complaint.
7              Is that right, Mr. Moore?
8              MR. MOORE:  Yes, your Honor.
9              THE COURT:  At the request of the State this
10   matter is being recorded pursuant to Supreme Court rule.
11             Mr. Miller, you may proceed.
12             MR. MILLER:  Your Honor, I would like to call
13   M.S.H.    as a witness.
14
15
                            M.S.H.
16
17   being duly sworn on her oath saith:
18                      DIRECT EXAMINATION
19   QUESTIONS BY MR. MILLER:
20             THE COURT:  Now I want to explain something to
21   you, okay.  First off I want you to relax.
22             That is a microphone and not an amplifier so I'll need
23   you to speak up so that all of us can hear you.  Okay?
24             THE WITNESS:  Yes.
25             THE COURT:  All right.
```

5

```
1              Mr. Miller, you may inquire.  Go ahead.

2                   MR. MILLER:  Thank you.

3         Q.   M.S.H.   , would you state your full name?

4         A.   M.S.H.                 .

5         Q.   M.S.H.   , how old are you?

6         A.   Fifteen.

7         Q.   What's your date of birth?

8         A.   XX,XX , '99.

9         Q.   What is your family relationship to the Defendant

10   Charles Chuck Haynes?

11        A.   He is my stepfather.

12        Q.   Is he in the counsel room here today?

13        A.   Yes.

14        Q.   Could you point him out?

15        A.   (Witness indicated.)

16                  MR. MILLER:  I would like the record to show that

17        the witness has identified the Defendant Charles Haynes.

18                  THE COURT:  This record will so note.

19        Q.   (By Mr. Miller)  Now, M.S.H.  , being your stepfather

20   -- how long has he been your stepfather and married to your

21   mother?

22        A.   They have been married since 2008.

23        Q.   Do you have any other family here in Ripley County

24   with you?

25        A.   Yes.
```

1    Q.    Who are?

2    A.    My mom and my two sisters.

3    Q.    Are your two sisters older or younger than you?

4    A.    Younger.

5    Q.    Did you all live here in Ripley County oh, for the

6    last three or four years?

7    A.    Yes.

8    Q.    Now I understand that you have several places you have

9    lived or shared living with here in Ripley County.

10         Does your mom have a separate piece of real estate, a

11   home, that was hers before she married your stepfather?

12   A.    Yes.

13   Q.    Does the Defendant, your stepfather, have his own

14   place that's not too far away?

15   A.    Yes.

16   Q.    I understand also that you are aware that the family

17   has a farm or something up near Gatewood.

18         Is that correct?

19   A.    Yes.

20   Q.    By the way, do you know how old your father is?

21         Your stepfather.

22   A.    He's fifty-four I believe.

23   Q.    The report that you gave to law enforcement about

24   various sexual contacts that the Defendant made towards you

25   lists all of them either at one of these residences, farm, or

—7

COPY

1   somewhere close by.

2          Is that correct?

3   A.    Yes.

4   Q.    That means they are all in Ripley County?

5   A.    Yes.

6   Q.    Now you basically told the law enforcement officers

7   that the Defendant had various sexual contact with you over an

8   extended period of time between December, 2011 up to and

9   including December, 2013.

10         I want you to go back and I'll ask you to recall in

11  late 2011 when these actions that turned into sexual contacts

12  began.

13         How old were you?

14  A.    Twelve.

15  Q.    What was the first instance in which you felt that the

16  Defendant's actions or touchings of you were inappropriate?

17  A.    Late summer.

18  Q.    That would have been late summer of 2011?

19  A.    Yes.

20  Q.    When was the first physical contact that occurred that

21  you thought was sexual in nature of some fashion?

22         Fondling your breasts or touching you in your genital

23  area or kissing you while that was going on:  When did that

24  first occurrence happen?

25  A.    Sometime in September.

1    Q.    Probably September of 2011?

2    A.    Yes.

3    Q.    Would you have been twelve then?

4    A.    Yes.

5    Q.    What type of contact was it?

6    A.    Open hand touching my boobs.

7    Q.    Now, September, 2011 that was happening.  Were you

8  able to deflect those initially?

9          Were you able to get away and not have them progress

10 any further as those things first happened?

11   A.    Yes.

12   Q.    As time went on did they become more aggressive and

13 insistent?

14   A.    Yes.

15   Q.    At any time did those touchings made by the Defendant

16 on your body include touching you in the genital area?

17   A.    Yes.

18   Q.    Did the Defendant actually use his hands, his fingers,

19 and insert them in your vagina?

20   A.    Yes.

21   Q.    Do you remember when the first time was that happened?

22   A.    It would be January, '12.

23   Q.    So you would have been thirteen at that time.

24         Is that correct?

25   A.    Yes.

9

```
 1        Q.    Now when that was happening how did you stop it at
 2   that time?
 3        A.    I said Mom is coming or I need to go to the bathroom.
 4        Q.    Did these types of sexual contacts by the Defendant
 5   continue during the time you were thirteen years old?
 6        A.    Yes.
 7        Q.    How often?
 8        A.    Quite often.   Maybe three, four times a week.
 9        Q.    Now during the course of your time as a thirteen year
10   old did those actions of his ever proceed to full sexual
11   intercourse?
12        A.    No.
13        Q.    Did they generally include touching of your genital
14   area or your breasts either through your clothing or skin to
15   skin contact?
16        A.    Yes, sir.
17        Q.    How often of the attempts he was making included skin
18   to skin contact of either your breasts or your genital area
19   without just being over your clothing?
20        A.    His clothes were never off.
21        Q.    Over your clothing, though?
22        A.    Yes.
23        Q.    Did he ever just fondle your breasts through your
24   clothing?
25        A.    Yes.
```
-10

```
 1        Q.    But, he also fondled your breasts by getting his hands

 2   up under?

 3        A.    Yes.

 4        Q.    Or removing your clothes?

 5              Is that yes?

 6        A.    Yes, sir.

 7        Q.    At some point did his sexual contacts continue to the

 8   point where he tried to induce you to engage in oral sex?

 9        A.    Yes.

10        Q.    How old were you when he tried to do that?

11        A.    Fourteen.

12        Q.    What was the first instance that he had you engage in

13   oral sex?

14              Where did it take place?

15        A.    Me for him or him for me?

16        Q.    For either.

17        A.    The first place, or the last place I can remember

18   would be in my bed about -- I don't know -- over last summer.

19        Q.    Which home were you in?

20        A.    His house.

21        Q.    Did that include contact of his mouth with your

22   genital area?

23        A.    Yes.

24        Q.    Your vagina?

25        A.    Yes.
```



```
 1        Q.    That took place in your bedroom?

 2        A.    Yes.

 3        Q.    Did you have any type of oral contact with his penis

 4   at that time?

 5        A.    Yes.

 6        Q.    Did it happen in other places as well?

 7              Did you have any other oral sex where he either went

 8   down on you or you went down on him?

 9        A.    Yes.

10        Q.    Did any of those happen out at the farm?

11        A.    Yes.

12        Q.    Now where is that farm?

13        A.    It's in Gatewood, V Highway.

14        Q.    Is there anything there except farm land and farm

15   buildings?  I mean is there a house there?

16        A.    There is an old house and a blue trailer, a corral.

17        Q.    Does that property belong to you and -- I mean your

18   parents in some fashion?

19        A.    Yes.

20        Q.    What was the first time that you had an encounter with

21   him out there that involved oral sex, either a blow job or going

22   down on you?

23        A.    In November.  Mid-November.

24        Q.    Of which year?

25        A.    This year -- or last year.  2013.
```

—12

```
 1      Q.   2013?

 2      A.   Yes.

 3      Q.   You would have been how old then?

 4      A.   Fourteen.

 5      Q.   Can you describe that incident?

 6      A.   We were out in Gatewood and it was about eight

 7  o'clock.  He pulled down the road, backed down the road and

 8  turned the lights out, and I was on my phone and he took my

 9  shirt -- asked me to take my clothes off.  And then he took my

10  clothes off, all of my clothes, and he touched my boobs and

11  sucked on my boobs and he fingered me.

12          And then he asked me to get out and walk around the

13  side of the truck so I did.  And he got out and we kissed, we

14  were kissing, and he would push my head down and I would resist

15  about three times maybe, and then he unzipped his pants and

16  pushed my head to....

17      Q.   Did you actually suck on his penis at that time?

18      A.   Yes.

19      Q.   Did he ejaculate?

20      A.   Yes.

21      Q.   What happened after that?

22      A.   Then I was spitting and I went and got a water bottle

23  and washed my mouth and then we went home.

24      Q.   Now that incident took place in November of last year.

25           A week or two later did that occur again?
```

13

```
 1        A.    Yes.   The next Sunday.

 2        Q.    The very next week?

 3        A.    Yes.

 4        Q.    Did that occur out at the farm as well?

 5        A.    Yes.

 6        Q.    What kind of sexual contact did that involve in the

 7   way of oral sex?

 8              Did he again ask you for a blow job?

 9        A.    Yes.

10        Q.    And did you actually have your mouth touch his penis?

11        A.    Yes.

12        Q.    Did he ejaculate?

13        A.    Yes.

14        Q.    Did he do anything to you?

15              Did he go down on you?

16        A.    Yes.

17        Q.    After this had happened at some point shortly

18   thereafter did you disclose this to any person, any family

19   member, any friend?

20        A.    Yes.   To my close friends.

21        Q.    Who are they?

22        A.    H.B.          and    M.T.

23        Q.    Who is the first adult you disclosed these sexual

24   contacts with?

25        A.    My older sister Mindy.
```
—14

1      Q.   Where was she?

2      A.   She is in Florida.

3      Q.   So were these by email or by phone?

4      A.   Text.

5      Q.   When you made these contacts with her did she

6 recommend that you report them?

7      A.   Yes.

8      Q.   How did you do that?

9      A.   I wrote my mother a note.

10     Q.   Your mother is Cynthia Haynes?

11     A.   Yes.

12     Q.   And you were living with her at the time?

13     A.   Yes.

14     Q.   Is that note then what informed her?

15     A.   Yes.

16     Q.   Did you talk to her after that note was given to her?

17     A.   Yes.

18     Q.   Did you describe in detail what had been going on?

19     A.   Not full detail, but....

20     Q.   Enough that she knew that you were having substantial

21 sexual contact with your stepfather?

22     A.   Yes.  Yes.

23           MR. MILLER:  I believe that's all the questions I

24    have, Judge.

25          THE COURT:  Cross examination.

1               MR. MOORE:   Thank you, Judge.

2                     CROSS EXAMINATION

3    QUESTIONS BY MR. MOORE:

4        Q.    Who did you discuss your testimony with today?

5        A.    My aunt and uncle.

6        Q.    Who are they?

7        A.    Martha "Maple" (sic) and Ken "Maple" (sic).

8        Q.    Anyone else?

9        A.    Yes.   The DFS officers.

10       Q.    Who is the DFS officer?

11             Do you know?

12       A.    I don't know.

13       Q.    Did you talk to anyone in law enforcement about your

14   testimony today?

15       A.    No.

16       Q.    Do you have this note that you gave your mother?

17       A.    No.   She does.

18       Q.    Did you keep any notes or make any notations or

19   records about any of these alleged acts that you are accusing

20   your stepfather of?

21       A.    No.

22       Q.    So if I went back and asked you any particular date

23   could you give me any particular date?

24       A.    Yes.

25       Q.    All right.   Let's start.   Give me the first particular

                                                              —16

```
 1   date, time, place, location.
 2           Which is the first one?
 3   A.    The very first one that ever happened?
 4   Q.    The ones that you can remember, that's the ones I'm
 5   interested in.
 6   A.    The last one was November twenty-four around
 7   seven-thirty in the morning.  And that's the last -- that's the
 8   last one I can give you that exact of a date.
 9   Q.    On any of the rest of them you can't give me a date?
10   A.    No, not an exact date.  Except it was Black and Gold
11   night here so I don't know when that was.  It was that night.
12   Q.    Of last year?
13   A.    Yes.
14   Q.    At what point in time did you first tell anyone any of
15   these stories?  Whether it was a friend, a school teacher, a
16   counselor, your mother.
17   A.    Sometime in 2012.
18   Q.    Summer of 2012?  The winter of 2012?
19   A.    I don't recall.
20   Q.    Who was it that you told?
21   A.    H.B.         , my best friend.
22   Q.    Where did you meet her at to tell her this?
23   A.    This was through texts.
24   Q.    Do you have copies of these texts?
25   A.    No.
```



```
 1        Q.    So tell me what you told her through text.
 2        A.    I told her that me and Chuck had been kissing and he
 3   had fingered me and things like that.
 4        Q.    I'm sorry, you have to speak up a little bit louder.
 5        A.    That he had been kissing me and fingering me.
 6        Q.    So that's the text you sent:   Hey, Chuck has been
 7   kissing me and fingering me?
 8        A.    Similar to that, yes.
 9        Q.    I'm sure it went on past that.
10              What happened after you sent that text?
11        A.    I don't know.
12        Q.    She never asked you about it?  Miss H.B.  .
13        A.    Yeah.  She would tell me that I needed to tell, but I
14   would ask her not to tell anybody, that I told her because I
15   trusted her not to tell.
16        Q.    If this was happening why didn't you tell someone
17   since you have told your friend?
18        A.    Because I was scared.
19        Q.    Scared of what?
20        A.    Of what might happen afterwards.
21        Q.    Had somebody made some threats to you?
22        A.    He had told me that we could both go to jail or we
23   could both get in trouble for this.
24        Q.    So within the summer of 2012 you are saying that your
25   stepfather told you that you could both go to jail?
```

```
 1        A.   Yes.  And he could go to jail and get in trouble and
 2    we would never see him again.
 3        Q.   That's not a threat to you.  I'm asking whether or not
 4    you were ever threatened with anything.
 5        A.   No.
 6        Q.   Why did you tell Miss H.B.  rather than the law or
 7    your mother?
 8        A.   Because I trusted her.
 9        Q.   Didn't trust your mother?
10        A.   No.
11        Q.   As a matter of fact, you had really had kind of a
12    running battle with both your mother and stepfather, hadn't you?
13        A.   Yes.
14        Q.   You wanted out of the house?
15        A.   Yes.
16        Q.   Wanted out of Doniphan?
17        A.   No.
18        Q.   You didn't want to leave Doniphan, just leave your mom
19    and step-dad?
20        A.   Yes.
21        Q.   Was that because they didn't approve of some of your
22    relationships?
23        A.   No.
24        Q.   Did you tell them that you were in a relationship with
25    another woman, another girl?
```
—19

```
 1        A.    No.
 2        Q.    Did you ever write out a statement saying that?
 3        A.    No.
 4        Q.    So you've never written out a statement saying that
 5   you loved another girl?
 6        A.    I have.
 7        Q.    In a sexual manner?
 8        A.    No.
 9        Q.    Never told your mother that?
10        A.    No.
11        Q.    There is no text to that effect?
12        A.    I don't understand.
13        Q.    There is no text messages to that effect from you
14   then, is there?
15        A.    That I have texted anyone about it?
16        Q.    Yes.
17        A.    Yes.  I have.
18        Q.    So you have texted other people that you were in love
19   with another girl?
20        A.    Yes.
21        Q.    Who did you send those texts to?
22        A.    The girl.
23        Q.    Who was it?
24        A.    B.M.
25        Q.    I'm sorry?
```

```
1        A.    B.M.

2        Q.    Didn't you also send some to this  M.T.      ?

3        A.    No.

4        Q.    So you don't have anything in writing to M.T.  ?

5        A.    Anything in writing --

6        Q.    Anything in writing that you sent to  M.T.  .

7              Did you ever write anything in that nature?

8        A.    No.

9        Q.    Did you ever write anything about M.T.  in your diary

10   or notes that you kept?

11       A.    No.

12       Q.    Would it be fair to say that by the time you were

13   twelve or thirteen that you pretty much couldn't stand living

14   with Chuck and your mother?

15       A.    Yes.

16       Q.    Did you talk to some of your friends about how you

17   were going to get out of the house?

18       A.    No.

19       Q.    You never discussed with anyone then if you made

20   accusations against Chuck or your mother that you would be

21   removed from the house?

22       A.    No.

23       Q.    You never put that in writing?

24       A.    No.

25       Q.    Why was it that you wrote a note to your mother about
```

21

```
1    your allegations against Chuck rather than talking to her?
2         A.   Because I didn't feel comfortable telling my mom that
3    I had been having sexual relationship with her husband.
4         Q.   What about sexual relationships with anyone else?
5              Did you tell your mom about that?
6                   MR. MILLER:  Objection, your Honor.
7              The Rape Shield Law will prevent --
8                   THE COURT:  Sustained.
9                   MR. MOORE:  I would like to make an Offer Of
10        Proof -- okay.  That's a Preliminary Hearing, that's all
11        right if I am not going to be allowed to ask it.
12        Q.   (By Mr. Moore)   What other methods did you try to use
13   to get removed or get away from your stepfather and mother out
14   of the house other than these accusations?  Did you do other
15   things to try to leave?
16        A.   I didn't try to get removed from my house.
17        Q.   Didn't you leave one time and essentially run away?
18        A.   No.
19        Q.   Do you have any of these texts that you are claiming
20   that you sent to anyone, including to your sister?
21        A.   Yes.
22        Q.   Where are they at?
23        A.   I'm pretty sure Jeff Johnson might have some.
24             She has some.
25        Q.   She being who?
```

```
 1        A.    Mindy, my older sister.

 2        Q.    Do you have any recordings of any of this?

 3        A.    What do you mean by this?

 4        Q.    Any recordings?  Pictures, video recordings, sound

 5   recordings?

 6        A.    Yes.

 7        Q.    Tell me what those are.

 8        A.    They are recordings of Chuck trying to get me to do

 9   things with him.  Arguments between Chuck and my mom.

10              There is a picture of his hand in my shirt.  When we

11   were driving down the road I was in the passenger seat and his

12   hand is right here.

13        Q.    Who took that picture?

14        A.    I did.

15        Q.    What did you do -- when was that?

16        A.    I believe it was sometime in 2012.

17        Q.    You say there is recordings of Chuck, the Defendant,

18   trying to get you to do something.  What recording?

19              What is recorded?

20        A.    It is him whispering.  It is like oh, you make me

21   crazy, please, just once.

22        Q.    Is that the extent of it?

23        A.    Yes.  He didn't say anything else.

24        Q.    When was that recording supposedly made?

25        A.    I don't have the date in my head, but I can get that
```

1    for you.

2        Q.   Well, I mean was it in 2013 or 2012 if you know?

3        A.   I'm pretty sure it was 2013, maybe 2012.

4             I don't know for sure.

5        Q.   One of the problems you had with your mother and Chuck

6    was that you were being home-schooled?

7        A.   Yes.

8        Q.   And you didn't like that, did you?

9        A.   I didn't feel I was getting a fair education.

10       Q.   But you didn't like being home-schooled?

11       A.   No.

12       Q.   Did you eventually start going to the Doniphan High

13   School?

14       A.   Yes.

15       Q.   What year?

16       A.   2013.

17       Q.   Have you told me every person that you allegedly told

18   about Chuck inappropriately touching you prior to going to law

19   enforcement and that was your sister, your mother, and Miss

20   H.B. ?

21       A.   Uh-huh.

22       Q.   Is that yes?

23       A.   Yes.

24       Q.   So you didn't tell anyone else about any of these

25   allegations before you actually went to law enforcement?

—24

```
1        A.    No.

2        Q.    Other than those three?

3        A.    No.

4        Q.    Who was the law enforcement officer or officers that

5   you spoke with?

6        A.    December first I talked to Jeff Johnson and I don't

7   know the name of any other one, any others.

8        Q.    Have you written out a statement for law enforcement?

9        A.    What type of statement?

10       Q.    Any type.  Did they ask you to write out what happened

11  and you wrote it out in your own handwriting?

12       A.    No.

13       Q.    Did you give a recorded statement?

14       A.    For what happened?

15       Q.    Yes.

16       A.    Yes.  I was in a forensic interview.

17       Q.    Who conducted the forensic interview?

18       A.    Christy Patterson.

19       Q.    Did you also have a physical exam?

20       A.    Yes.  I had a SAFE exam in Poplar Bluff.

21       Q.    Who did that?

22       A.    I don't know.

23       Q.    Were you told the results of the SAFE exam?

24       A.    Yes.

25       Q.    Who explained those results to you?
```
—25

```
 1        A.    The doctor that gave the exam.
 2        Q.    What, if anything, did they tell you?
 3        A.    They said that I was okay, everything was going to be
 4   fine.
 5        Q.    Did you keep a diary?
 6        A.    No.
 7        Q.    A journal?
 8        A.    No.   I was afraid that whatever I wrote would be --
 9   that someone would read so I didn't want to write anything of my
10   life that was going on.
11        Q.    Have you made arrangements to meet some of these other
12   girls in such a manner that your parents would not know about
13   it?
14        A.    Yes.
15        Q.    Did you get caught a couple of times doing that?
16        A.    Once.
17        Q.    Was the person you were attempting to meet or had met,
18   was it this    M.T.      ?
19        A.    Yes.
20        Q.    How old is she?
21        A.    She is eighteen now.
22        Q.    What is your relationship with her?
23        A.    She is one of my close friends.
24        Q.    Does she go to high school?
25        A.    Yes.
```
—26

1      Q.    I am trying to figure out if you are saying that three

2  or four times a week that Chuck had some inappropriate contact

3  with you for what period of time?

4            Beginning when, ending when.

5      A.    When did it start and when did it end?

6      Q.    Yes.

7      A.    Between like a period of years?

8      Q.    That's what I'm trying to figure out.

9            Are you telling us under oath that for the last three

10  years that three or four times every week of every year that

11  your step-dad had some type of inappropriate contact, sexual

12  contact, with you?

13     A.    Yes.   When I was in the house.

14     Q.    I'm sorry?

15     A.    When I was in the house or around him in some way.

16     Q.    But, you can't -- other than the two instances you

17  gave me you can't really pinpoint any other place or time?

18     A.    Not an exact time.

19     Q.    So give me the names of who your best friends are.

20     A.    H.B.

21     Q.    You only have one best friend?

22     A.    Yeah.   She is my best friend.

23     Q.    Have you ever talked to this   M.T.      about these

24  allegations you are making today?

25     A.    Yes.   One time I went to meet up with her and that's

—27

COPY

1    what I went to talk to her about.

2         Q.    So you did talk to her then before you talked to law

3    enforcement?

4         A.    I did.

5         Q.    When was that?

6         A.    I don't know.   Sometime in the middle of November

7    maybe.

8         Q.    Of last year?

9         A.    Yes.

10        Q.    You didn't make -- you weren't making any plans to

11   move in with her?

12        A.    No.

13        Q.    So this picture allegedly of Chuck's hand on your

14   breast was taken in 2012 by you on a camera phone I take it?

15        A.    Yes.

16        Q.    Did you keep that same phone then from 2012 until you

17   talked to law enforcement?

18        A.    Did I keep the picture on the phone, is that what you

19   are asking?

20        Q.    Yes.

21        A.    No.

22        Q.    What happened to the picture?

23        A.    I had sent it to my best friend.

24        Q.    Who was your best friend?

25        A.    H.B.

1      Q.   Did you send that at the time that you allegedly took

2   the picture?

3      A.   No.  I had sent it when I got home because it was an

4   Ipod.

5      Q.   But, at the same day or so?

6      A.   Yes.

7      Q.   Then this recording was made when?

8      A.   I don't know.  Like I said I could get you the date,

9   but I don't have it.  I don't remember it.

10     Q.   What was it made with, the recording?

11     A.   My Iphone.

12     Q.   I may have already asked you this, but when was that

13  recording allegedly made?

14     A.   I don't know.

15     Q.   Did you keep it on your Iphone until you turned it

16  over to law enforcement?

17     A.   Yes.

18     Q.   Is it only an audio recording or are there any

19  pictures with it?

20     A.   It's audio.

21     Q.   So I take it now you are out of your parents' home?

22     A.   Thankfully.

23     Q.   And you are attending school?

24     A.   Yes.

25     Q.   And you think that your situation is much better being

—29

1    away from your mom and Chuck than it was when you stayed there?

2        A.    Yes.

3        Q.    And even if Chuck was gone you don't want to stay with

4    your mother, do you?

5        A.    I do.

6        Q.    You do want to stay with your mother?

7        A.    Yes.   But, not under these circumstances.

8        Q.    What circumstances?

9        A.    When she is living with him and interacting with him

10   after she knows what's going on.

11       Q.    So if she is not living with him or interacting with

12   him you would prefer to live with your mother?

13       A.    Yes.

14       Q.    So how would you characterize your relationship with

15   your mother at the present?

16             Do you have a good relationship with her?

17       A.    Not at the moment.

18       Q.    Other than the note that you left your mother did you

19   ever discuss any of your other allegations against your step-dad

20   with your mother?

21       A.    No.

22       Q.    After your mother read the note she didn't ask you any

23   questions about it?

24       A.    Yes.   We talked about it.

25       Q.    On just that one occasion?

1      A.    Ever since she read the note we've been together up

2   until February twenty-four and we had talked about it every day.

3      Q.    So you've talked a lot about it with your mother?

4      A.    Yes.

5      Q.    Did you get into it with either your mother or your

6   step-dad over any illegal substances -- alcohol or marijuana,

7   anything like that?

8      A.    No.

9      Q.    You've never had a problem that they thought you --

10  let me strike that and ask you.

11        You've never been talked to about that, about you

12  shouldn't be drinking in the barn?

13     A.    I never.

14     Q.    You've never had that discussion?

15     A.    No.

16     Q.    Have you seen any counselors, psychologists, doctors,

17  other than this SAFE exam doctor?

18     A.    Yes.

19     Q.    Who are you seeing?

20     A.    Currently?  Sara Craig.

21     Q.    Anyone besides her since you have made these

22  allegations?

23     A.    Yes.

24     Q.    Who is that?

25     A.    Ann.  I don't know her last name.  She owns the

```
 1   Lighthouse Therapy in Moberly.
 2        Q.   Are you undergoing some type of therapy now?
 3        A.   Yes.
 4        Q.   Prior to you making these allegations had you ever had
 5   any counseling or therapy?
 6        A.   No.
 7        Q.   Did you turn over any clothing to the Police
 8   Department or the investigators?
 9        A.   No clothing.
10        Q.   Did you turn over anything that you contend that
11   implicated your step-dad with regard to any of these allegations
12   you are making?
13        A.   Yes.
14        Q.   What was it?
15        A.   There was blankets, paper towels.
16        Q.   Blankets from where?
17        A.   The blue trailer.  My younger sister's bed.
18        Q.   Any place else?
19        A.   No.
20        Q.   These paper towels:  Where were they from?
21        A.   They were from the blue trailer, too.
22        Q.   The blue trailer is located in Gatewood?
23        A.   Correct.
24             MR. MOORE:   I believe that's all the questions I
25        have, Judge.
```
32

```
 1                    THE COURT:  Any redirect?

 2              MR. MILLER:  Just one.

 3                    REDIRECT EXAMINATION

 4   QUESTIONS BY MR. MILLER:

 5        Q.    The last set of questions about what was turned over

 6   wasn't there some kind of plastic water bottle that you referred

 7   to in your testimony?

 8        A.    Yes.

 9        Q.    Didn't that get turned over to your mother to the

10   Highway Patrol up at Moberly?

11        A.    Yes.

12              MR. MILLER:  That's all I have.

13              THE COURT:  Any recross?

14              MR. MOORE:  No, Judge.

15              THE COURT:  You may step down.  Thank you very

16   much.

17          No further evidence?

18              MR. MILLER:  No further evidence.

19              THE COURT:  Any evidence from the Defendant?

20              MR. MOORE:  No.  The Defendant doesn't have any

21   evidence, Judge.

22              THE COURT:  The Court finds from the allegations

23   and the testimony that there is probable cause to believe

24   that the Defendant committed the felonies as charged.

25          The Defendant is ordered bound over to appear before
```

```
1        Judge Pritchett.
2                MR. MILLER:  Do you want to do it on the
3        twenty-first?  The ninth is getting pretty crowded for us.
4                THE COURT:  The seventh you mean?
5                MR. MILLER:  The seventh, yes.  The twenty-first.
6                MR. MOORE:  The twenty-first of April?
7                MR. MILLER:  Yes.  It is the next Pritchett day
8        after the seventh.
9                MR. MOORE:  That will be okay.
10               THE COURT:  April twenty-one at nine a.m. for
11       arraignment.
12           That concludes the record.
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                            -34
```

COPY

```
1   STATE OF MISSOURI      )
                           )   SS.
2   COUNTY OF BUTLER       )

3

4        I, Paula D. Hefner, CSR, CCR, RMR, a Notary Public

5   within and for the County of Butler, State of Missouri do hereby

6   certify that the above and foregoing **PRELIMINARY HEARING** was

7   recorded via computer-assisted means on the 3rd day of April,

8   2014, at the Ripley County Courthouse, Doniphan, Missouri, and

9   that said Preliminary Hearing was thereafter caused to be

10  transcribed and reduced to print by computer-assisted

11  transcription by myself as set forth in the foregoing pages.

12       IN WITNESS WHEREOF I have hereunto set my Notarial

13  Seal and affixed my hand this 11th day of June, 2015.

14       My Commission expires the 21st day of December, 2018.

15

16

17

18

19

20

21                        _____
                          PAULA D. HEFNER, CSR, CCR, RMR
22                        Notary Public
                          Commission No. 10554988
23
    Tax Costs to:  Defendant, $_____
24
25
```

PAULA D. HEFNER
Notary Public - Notary Seal
STATE OF MISSOURI
Butler County
Commission # 10554988
My Commission Expires: 12/21/2018