**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| CYNTHIA K. HAYNES (a/k/a Cynthia K. Randolph), individually and under the Missouri Wrongful Death Statute | ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | Cause No. **1:21-CV-00160-SNL** |
| JENNIFER WILLIAMS, individually | ) ) | JURY TRIAL DEMANDED |
| JENNIFER WILLIAMS, d/b/a WILLIAMS LAW, | ) ) | |
| SPAIN, MILLER, GALLOWAY & LEE, LLC, a Missouri limited liability company, | ) ) ) | |
| BERNICE HAYNES, individually and | ) ) | |
| CHARLES HAYNES, individually | ) ) | |
| Defendants. | ) ) | |

# AMENDED COMPLAINT FOR DAMAGES

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

JURISDICTION AND VENUE .................................................................................. 1

PARTIES
    Plaintiffs .......................................................................................................... 1

    Defendants ........................................................................................................ 2

STATEMENT OF FACTS .......................................................................................... 6

CAUSES OF ACTION ............................................................................................... 49

    **COUNT I**
    **Wrongful Death - Acting Outside the Scope of GAL Duties**
        **(Defendants Williams and Spain, Miller)** ........................................... 49

    **COUNT II**
        **Wrongful Death - Legal Malpractice**
        **(Defendants Williams and Spain, Miller)** ........................................... 54

    **COUNT III**
        **Wrongful Death - Breach of Fiduciary Duties**
        **(Defendants Williams and Spain, Miller)** ........................................... 56

    **COUNT IV**
        **Personal Claim of Plaintiff - Acting Outside the Scope of GAL Duties**
        **(Defendants Williams and Spain, Miller)** ........................................... 59

    **COUNT V**
        **Wrongful Death - Negligent Supervision**
        **(Defendant Spain, Miller)** .................................................................... 62

    **COUNT VI**
        **Wrongful Death - Negligence**
        **(Defendant Bernice Haynes)** ................................................................ 64

    **COUNT VII**
        **Wrongful Death - Sexual Assault and Battery**
        **(Defendant Charles Haynes)** ................................................................ 66

JURY DEMAND ........................................................................................................ 68

COMES NOW, Plaintiff, Cynthia Haynes, individually, and as the mother of M.H. under the Missouri Wrongful Death Statute, by and through the undersigned attorneys, and for her causes of action against Defendants states the following:

## I.     JURISDICTION AND VENUE

1.      This Court has jurisdiction over all causes of action asserted against Defendants pursuant to 28 U.S.C. 1332 because no Defendants are the citizens and residents of the same state as Plaintiff and the amount in controversy exceeds $100,000.

2.      Venue is proper pursuant to 28 U.S.C. 1402 because at all times relevant, all Defendants resided in this district and all of the wrongful acts and/or omissions complained of herein occurred in this judicial district.

## II.     PARTIES

### A.  Plaintiffs

3.      M.H., deceased, was the daughter of Cynthia Haynes.  At the time of her death, M.H. was a kind, smart and hardworking student, a loving daughter, and sister, and committed to socially just causes.  Prior to December 2016, M.H. did not suffer from depression, anxiety, or agitation according to her medical records.  M.H. took her life in Ripley County, Missouri.  M.H. was born on August 30, 2004.  M.H. died on November 24, 2018.  She was fourteen (14) years old.

4.      Cynthia Randolph is a natural person who is and at all times relevant to this claim was M.H.'s mother and is M.H.'s "heir" under Missouri's Wrongful Death Statute.  As of the filing of this suit, Plaintiff is a citizen and resident of the City of Palmetto, Fulton County, State of Georgia.

5.     Plaintiff's claims are brought individually and under R.S. Mo. §537.080, the
Missouri Wrongful Death Statute.  When M.H. died, she was not married and had no children;
she was survived by both parents.

### B.  Defendants

6.     Defendants Jennifer Williams and Jennifer Williams d/b/a Williams Law and are
citizens and residents of Missouri.  Defendant Williams is an attorney licensed to practice law in
the State of Missouri with a place of business in the City of Poplar Bluff, Butler County, State of
Missouri.  Williams was a court appointed guardian ad litem (GAL) in the Divorce Case *Charles
Haynes v. Cynthia Haynes*, 13RI-CV00554, Ripley County Circuit Court, Missouri.  (A copy of
the GAL Appointment Order dated May 6, 2016 is attached as **Exhibit 1**.)  Williams was also a
personal attorney to M.H. in the above-referenced case.  (A copy of the January 30, 2017 Order
Appointing Williams as a Personal Attorney for M.H. and her sister S.H. is attached as **Exhibit
2**.)

7.     Defendant Spain, Miller, Galloway & Lee, LLC (Spain, Miller) is a Missouri
limited liability company with its principal place of business in Poplar Bluff, Butler County.  At
all times relevant to this lawsuit, Spain, Miller engaged in the practice of law in the State of
Missouri.  Spain, Miller is a citizen of Missouri.  The causes of action asserted in this suit against
Spain, Miller arise out of their practice of law.

7.     (a)     Spain, Miller's registrations with the Missouri Secretary of State are more than
eight years old.  All of them show that its members and/or members of any
predecessor limited liability corporations resided in Missouri  (See copies of
Spain, Millers' registrations, **Exhibit 46**.)

7.      (b)      Spain, Miller's website lists three attorneys associated with the firm.  Samuel P.

Spain, Matthew B. Lee, and Karen Jolly Miller.  (See copies of portions of Spain,

Miller's website, **Exhibit 47**.)  Samuel P. Spain is a resident and citizen of the

State of Missouri.  Matthew B. Lee is a resident and citizen of the State of

Missouri.  Karen Jolly Miller is a resident and citizen of the State of Missouri.

Spain, Lee and Miller are attorneys licensed to practice law in Missouri.  They list

their office address as the office address of Spain, Miller in Poplar Bluff,

Missouri.  All three attorneys reside in Missouri.  All three attorneys have

Missouri drivers licenses.  All three attorneys are registered to vote in Butler

County, Missouri.

7.      (c)      A former "partner" in Spain, Miller, Amy Galloway, passed away in December

2014.

7.      (d)      Through discovery Plaintiff will inquire whether there are any other current

members of Spain, Miller, LLC other than the three attorneys listed as practicing

with Spain, Miller and what the citizenship of each member currently is.  There

are no public records that provide this information.

8.      From May 2016 until December 2019, Williams acted within the scope and

course of her employment, servancy and/or agency with Spain, Miller.

9.      From December 2019 until April 29, 2021, Williams was the sole proprietor and

used a fictitious name Williams Law.  During this time, Williams acted within the scope and

course of her employment, servancy and/or agency for Williams Law registered with the

Missouri Secretary of State as a fictitious entity, located in Poplar Bluff, Butler County,

Missouri.

3

10.     Williams served as a GAL in the Haynes' divorce from May 6, 2016 until M.H.'s death on November 24, 2018.

11.     Williams served as M.H.'s personal attorney in the Haynes' divorce from January 30, 2017 until M.H.'s death on November 24, 2018.  Williams' two roles created a conflict of interest for her for which she did not receive waivers from her clients or their guardians or the Divorce Court.

12.     In her position as GAL, Williams functioned for the benefit of the Court.  *State ex rel. Bird v. Weinstock*, 864 S.W.2d 376, 383 (Mo. App. E.D. 1993).  Williams was not M.H.'s and S.H.'s personal attorney in her role as a GAL.

13.     As a GAL Williams was required to conduct investigations, to interview all necessary parties, including M.H. and S.H., to ascertain their wishes, feelings, attachments, and attitudes.  R.S. Mo. §452.423.  Williams was mandated to report her findings to the Divorce Court.  *Baumgart v. Baumgart*, 944 S.W.2d 572, 578 (Mo. App. W.D. 1997).  As a GAL Williams was obligated to ensure compliance with all applicable laws, regulations, Missouri Rules of Professional Responsibility (MRPR) and the Missouri Supreme Court GAL Standards. (A copy of the GAL Standards is attached as **Exhibit 3**.)

14.     As a personal attorney for M.H. and S.H., Williams' duties were to provide quality legal services to M.H., to safeguard M.H.'s confidences, to avoid conflicts of interest, to communicate with M.H. and to pursue vigorously and zealously M.H.'s wishes, as well as to advocate for M.H.'s safety and wellbeing.

15.     At all times relevant hereto, Williams and/or Spain, Miller received money, as a result of Williams' involvement in the Haynes divorce and of Williams representing M.H. Spain, Miller controlled or had the right to control Williams' actions complained of herein.

4

Spain, Miller exercised or should have exercised oversight of Williams in the form of daily, weekly, and/or monthly reporting and monitoring.

16.     Defendant Bernice Haynes was, at all times relevant hereto a citizen and resident of the State of New Jersey, City of Cape May in Cape May County.  Bernice Haynes (Grandmother Haynes) is Charles Haynes' (Charles) mother who intervened in the divorce case to seek custody of M.H. and S.H.  Grandmother Haynes was awarded physical custody and sole decision maker responsibility for M.H. on December 22, 2016.  (A copy of that Order dated December 22, 2016 placing daughters with Grandmother Haynes and making her primary decision maker is attached as **Exhibit 4**.)  By virtue of the Divorce Court Order, Grandmother Haynes was charged with safeguarding and protecting M.H.'s wellbeing.

17.     As a custodial grandparent of M.H., Grandmother Haynes was responsible for the care and wellbeing of M.H. as well as her safety.  Grandmother Haynes was obligated to ensure compliance with the December 22, 2016 Divorce Court Order mandating her to supervise Charles Haynes' visits with her minor granddaughters, M.H. and S.H.  She failed to do that.

18.     Defendant Charles Haynes (Charles) was, at all times relevant hereto, a citizen and resident of State of Missouri and Ripley County.  Charles is the biological father of M.H. and S.H.  Charles sexually abused M.H. when M.H. was in the custody of Grandmother Haynes.  As M.H.'s parent Charles was responsible for the care and wellbeing of M.H. as well as her safety.  Charles was obligated to comply with the December 22, 2016 Divorce Court Order mandating that he not have unsupervised visits with his minor daughters, M.H. and S.H.  Charles failed to do that.

19.     Charles is currently serving a seven-year term of incarceration at the Farmington Correctional Facility in St. Francois County, Missouri for deviant sodomy of M.H.'s older

5

stepsister M.S.H. (who was between twelve and fifteen years of age at the times of the sodomy). He also sexually abused M.H. during her life.  He does not deserve to be awarded any amount from whatever sums are recovered pursuant to the Missouri Wrongful Death Statute.

### III.    STATEMENT OF FACTS

20.    Plaintiff and Charles were married on May 23, 2008 in Ripley County, Missouri.

21.    This lawsuit stems from a divorce case involving Plaintiff and her husband, Charles.  They had two daughters born of their union: M.H. Haynes born on XX.XX.2004 (deceased on November 24, 2018) and S.H. born on XX.XX.2009.

22.    Plaintiff was previously married to Paul Hogg with whom she had two daughters, M.S.H. (born on XX.XX.1999) and Melinda Hogg (born on May 18, 1993).  Both M.S.H. and Mindy lived with Plaintiff and Charles after Plaintiff's first divorce in 2008.

23.    During Plaintiff's marriage with Charles, Plaintiff and her daughters struggled through cycles of Charles' abuse.  The verbal abuse started early in the marriage, with Charles often calling Plaintiff "stupid bitch," "stupid Bible thumper," "cunt," "whore," and "dumb and lazy bitch, who deserves to die." Often, Charles's disparaging epitaphs toward Plaintiff were expressed by shouting at the top of his lungs in the presence of their minor daughters and stepdaughters.

24.    Charles abused his daughters, M.H. and S.H., and his stepdaughters, Mindy and M.S.H. physically and emotionally during his cycles of abuse.  He referred to his minor daughters and stepdaughters as "stupid," "whores," "cunts," "worthless bitches," "dumb bitches," "failure," "queer," "freak," "scum," and "sluts and cunts, just like your mother" often outside of Plaintiff's presence.

6

25. Generally, the first phase of an abuse cycle is the "honeymoon phase," where the abuser creates a safe place filled with love and a sense of security in the relationship. The victim is drawn close to the abuser by a powerful sense of belonging. The victim is enticed by the abuser's ability to say and do the right things at the right time.

26. The second phase of the abuse cycle is the "tension building phase." It begins when the victim becomes aware of the tension increasing in the relationship. The abuser uses a variety of techniques to maintain control over the victim, such as the silent treatment, jealousy, mind games, blaming, and gaslighting. The victim tries to appease the abuser in order to decrease the tension.

27. The third phase of the abuse cycle is when the abuse is exposed or the abuser feels a loss of control. This "explosive phase" begins when the victim becomes the target of extreme verbal, emotional, physical, and/or sexual abuse at the whim of the abuser.

28. Charles repeatedly cycled through all three phases of abuse.

29. Plaintiff was naïve to the fact that she was a victim of domestic and intimate partner violence as she dutifully and lovingly met her daughters' needs for emotional support, loving parenting, and access to appropriate medical and mental health treatment even while Charles was abusing all family members.

30. Throughout the time Plaintiff lived with Charles, Plaintiff continued to focus on her daughters, on their positive behaviors by motivating them to do well academically, to engage in extracurricular activities and spiritual training, to engage them with their emotions, to accept responsibilities at home, to improve their social skills, and to be respectful towards their family members.

31. Plaintiff continually attempted to provide support to her daughters to decrease the

impact of Charles's explosive anger cycles.  However, Plaintiff was not able to protect her

daughters or herself from Charles's never-ending abuse.  Plaintiff failed to end her marriage in

the early cycles of abuse.  Initially, Plaintiff was not aware of Charles' physical and sexual abuse

of her daughters.

32.     On May 7, 2011 Charles assaulted Plaintiff at their home.  Plaintiff heard Charles

screaming at his stepdaughter, M.S.H., who was playing with her friend in her bedroom with

Barbie dolls.  Charles demanded that M.S.H. open Barbie doll's legs "to do some nasty!" When

M.S.H. refused "to do the nasty," Charles started yelling and screaming at M.S.H. demanding

that M.S.H. "then do the nasty!"

33.     Plaintiff rushed into the bedroom and asked Charles to leave M.S.H.'s room.

Instead, Charles assaulted Plaintiff by punching Plaintiff's face breaking her nose and cheek

bone in front of M.S.H. and her friend.  Plaintiff, bleeding profusely and suffering a terrible

headache, rushed to the Southeast Health Center of Ripley County where she was hospitalized

and treated for her injuries.

34.     Plaintiff filed for divorce, but then Charles immediately transitioned into the

"honeymoon phase."  He begged Plaintiff to forgive him because he was "a changed man" who

would never again hurt Plaintiff and his daughters and stepdaughters.  In reliance on these

promises, Plaintiff naively dismissed her divorce with Charles.

35.      On December 1, 2013, Plaintiff's daughter M.S.H. told Plaintiff and Ripley

County law enforcement that Charles forced M.S.H. to give him oral sex and fondled her sexually

many times.

36.     Having learned of Charles's sexual abuse of M.S.H., Plaintiff moved to Randolph

County, Missouri and filed for divorce there in December 2013.  Charles then filed for divorce in

Ripley County in December 2013. The cases were consolidated into *Charles Haynes v. Cynthia Haynes*, Case 13RI-CV00554 (Divorce Case) which is still pending in Ripley County, Missouri. Since December 1, 2013, Plaintiff and Charles have not lived together as a married couple.

37.     On December 2, 2013, Charles was served with a charging document in *State of Missouri v. Charles M. Haynes*, 13RI-CR00907, accusing Charles of:

    Count I – Unclassified Felony of Statutory Rape in the First Degree
    Count II – Class B felony of Child Molestation in the First Degree
    Count III – Unclassified Felony of Forcible Sodomy in the Second Degree

based on his sexual abuse of M.S.H.

38.     On December 3, 2013, Charles posted a Fifty Thousand ($50,000.00) Dollar bond and was released from incarceration.

39.     Throughout the divorce proceedings, Charles threatened Plaintiff that if she divorced him, Charles would kill Plaintiff and "her slut daughter M.S.H." Charles also threatened that if Plaintiff and any of the daughters testified against him in the criminal case, he would take custody of S.H. and M.H. and would kill M.S.H. and Plaintiff.

40.     On April 3, 2014, M.S.H. testified at Charles's preliminary hearing stating that Charles had been sexually abusing her for three years, from 2011 through 2013. M.S.H. provided numerous and graphic details of the sexual abuse she endured such as having to give "blow jobs," "vagina licking," "vagina fingering," "boob fondling" and touching her body elsewhere. (A copy of the transcript of M.S.H.'s testimony at Preliminary Hearing on Charles' criminal charges is attached as **Exhibit 5.**)

41.     The Ripley County Prosecuting Attorney procured DNA tests confirming Charles's sperm from samples collected at numerous locations disclosed by M.S.H. where Charles sodomized her.

42.     After the preliminary hearing on April 3, 2014, the State filed an Amended

Criminal Complaint in *State of Missouri v. Haynes*, 13RI-CR00907-01 charging Charles with the

following criminal conduct resulting from his actions against M.S.H.:

> Count I – Felony of Statutory Sodomy in the First Degree
> Count II – Class B felony of Child Molestation in the First Degree
> Count III – Class C Felony of Statutory Sodomy in the Second Degree
> Count IV – Class C Felony of Statutory Sodomy in the Second Degree[1]

(A copy of the criminal charges against Charles is attached as **Exhibit 6.**)

43.     Attorney Christopher Yarbro (Yarbro) initially represented Charles in the criminal

proceedings and in the divorce.  In November 2015, Charles delivered to Yarbro Grandmother

Haynes' computer that Charles used while at his mother's house.  Yarbro discovered numerous

images of child pornography on Grandmother Haynes' computer.  Yarbro delivered

Grandmother Haynes' computer to the Prosecuting Attorney in Butler County.  Yarbro

immediately withdrew from representing Charles in his criminal and divorce cases.

44.     After November 2015, Theodore Liszewski began representing Charles in his

criminal and divorce proceedings.

45.     On April 28, 2016, Charles petitioned the Divorce Court to appoint Williams as

guardian ad litem (GAL) alleging educational neglect of M.H. and S.H. by Plaintiff who had

been homeschooling them with Charles' assistance from an early age.  Charles never previously

questioned the adequacy of M.H.'s and S.H.'s schooling.

46.     Based on Charles's allegations of educational neglect, Williams was appointed to

assist the Divorce Court and to represent the best interests of M.H. and S.H. on May 6, 2016.

(See **Exhibit 1**.)  In Missouri GALs are required to abide by Missouri statutes, case precedent,

---

[1]  Plaintiff is asking this Court to take a judicial notice of all criminal cases in *State v. Charles Haynes*, Cause No. 13RI-CR00907 and 13RI-CR00907-01 that were pending in Ripley County, Missouri.

Missouri Rules of Professional Responsibility (MRPR) and Supreme Court GAL Standards.

(See **Exhibit 3**.)

47.    Williams' GAL Appointment Order mandated that Plaintiff and Charles each pay

Williams $750.00 to compensate her for her GAL services pursuant to R.S. Mo. §452.423.

Plaintiff paid Williams that amount.

48.    After May 6, 2016, Plaintiff attempted to schedule an appointment with Williams

to discuss the safety, wellbeing, and the best interests of her children.  Williams, through her

assistant, refused to communicate with Plaintiff.  Plaintiff was told that there was no need for

Williams to talk to Plaintiff.

49.    On May 29, 2014, Plaintiff was required by court order to drive in a car with

Charles to pick up documents for the divorce proceedings.  During this ride, Charles was in the

"explosive phase" of his abuse cycle.  He threatened Plaintiff:

| | |
|---|---|
| Charles: | You won't have to worry about me a whole lot longer.  You ain't going to have to worry about a couple of others a whole lot longer either! |
| Plaintiff: | And what's that mean? |
| Charles: | Cause I ain't going out, I ain't going out of this one alone!  I'll go out of this one in a blaze of glory!  **You don't want to hold people fucking accountable, I will!  Do you think I am going to let that [M.S.H.] fuck** these kids [M.H. and S.H.] up the rest of their lives?  SHIT!  You will, **I won't!** |
| Charles: | She's [M.S.H.] too evil!  She's too evil!  She gets more evil by the day!  When she starts fucking with these other two kids, she's, she's too evil for me.  **She ought to be killed!!!** |
| Charles: | You're supposed to bury that **** [M.S.H.]!!!!  That's what you're supposed to do! |
| Charles: | **You destroy that kid** [M.S.H.] or that kid's going to destroy you!  And worse than that she's going to destroy those other two kids!!! [M.H. and S.H.].  **Those other two kids don't deserve to be in a house with a piece of shit like her!  Fucking queer!  Liar!! Thief!!!** |

11

**Sneak!!!!  Deadbeat!!!!  Find something good about her?!!!**

Charles:    This comes under the heading "is it worth it?"  **Well, you're, you're gonna have to ... I told you that you're going to have to make a choice between M.S.H. and the three of us or two of us, because I'm probably fucked. So.  You're gonna have to make the choice between a piece of garbage like her [M.S.H.] or two good kids [M.H. and S.H.].  She's trying to destroy me! She's trying to destroy you!  And she's trying to destroy those other two kids!  Is she worth that???  FUCK NO!!!**

[Emphasis added.]  (Quotes from a recording of this conversation).  (A copy of the transcript from May 29, 2016 conversation of Charles with Cynthia is attached as **Exhibit 7**.)

50.     In his abusive rant, Charles expressed that he wanted M.S.H. killed so that she would not be able to testify to his sexual abuse of her.

51.     In June or July 2016, Plaintiff told Williams that Charles has been threatening to kill Plaintiff and M.S.H. because M.S.H. disclosed to the police Charles' sexual abuse of her. Plaintiff told Williams that the Ripley County Sheriff had a recording of Charles's threats against Plaintiff and M.S.H.  That recording was lodged into the evidence in *State of Missouri v. Charles Haynes*, 13RI-CR00907-01.  Williams refused to review the video.

52.     Plaintiff assumed that as an officer of the Divorce Court and as the GAL, Williams would report Charles' threats to the Divorce Court.  Later, Plaintiff learned that Williams never reported Charles' threats to the Divorce Court.

53.     On November 9, 2016, Grandmother Haynes filed a Motion to Intervene in the Divorce case seeking custody of M.H. and S.H. because of the alleged emotional bond she had with M.H. and S.H.

54.     On December 7, 2016, the Divorce Court heard Charles's Motion for Custody Pendente Lite in which Charles alleged that Plaintiff committed educational neglect of S.H. and M.H. while homeschooling them.

55.    At that hearing, Grandmother Haynes asked the Divorce Court to award her sole legal and physical custody of S.H. and M.H. because of Plaintiff's educational neglect of them. On the stand, Grandmother Haynes admitted under oath several times that:

a.    She was turning 90 years old the next month and she was in good health with no illnesses but did not have a doctor in Missouri;

b.    She wanted custody of S.H. and M.H. and would abide by the conditions imposed by the Divorce Court with respect to S.H.'s and M.H.'s care;

c.    Charles was charged with a sex crime against a minor and was currently on $50,000.00 bond which he posted;

d.    She would supervise S.H. and M.H. and would keep them constantly in her presence;

e.    In the past she failed to supervise S.H. and M.H. and allowed them to be with Charles alone, unsupervised and allowed Charles to take the girls to ride on a four-wheeler out of her sight almost every Sunday; and that she did not think it was a problem for Charles to take the girls in the woods without telling her that he was going there even though he was charged with sexually abusing M.S.H.;

f.    Charles hoisted S.H. on a barn roof top and exposed S.H. to bare electrical lines and rusty nails and she was not around to stop Charles from doing it;

g.    She left Charles with the girls alone in Charles' house while she went to her home to let her dog out;

h.    Charles took the girls to a remote location under a bridge and she was not with them to supervise Charles;

i.    She was careless in the past by allowing Charles to be with the girls alone, but it was S.H.'s fault because S.H. is always on the go; and

j.    She would take the girls to and from school even though she was no longer driving.

56.    At the same hearing Grandmother Haynes agreed under oath to the following:

a.    She would have her eyes on the girls at all times;

b.    She understood now that it was and would be her job to advocate for making sure that the girls are safe;

13

     c.     She was and would be a supervisor and a placement provider who would be able to adequately supervise the girls;

     d.     She guaranteed that she would never leave Charles alone with the girls;

     e.     "[H]er neck was and would be on the line as the girls' "supervisor" not to let Charles to be alone with the girls; and

     f.     She understood the consequences if she failed to protect the girls from Charles.

57.     At the same hearing, under oath M.H. testified that:

     a.     "I want to live with my mother."

     b.     "Grandmother is not able to take care of me."

     c.     "I will not feel safe in her [Grandmother Haynes] care."

     d.     "Grandmother cannot get up in the morning to take us to school and she cannot drive at night."

     e.     "Grandmother allowed us to be alone with Charles and she did not go with us to see what we were doing. I was left with Charles alone in his house by grandmother."

     f.     "I do not want to see my dad more.  I don't want to see him at all."

     g.     "He [Charles] made me not like mom.  He made me not like M.S.H.  I kind of see what he does, and if you hear something for a long time you start believing it."

     h.     "I don't hate him [Charles] but I dislike the things that he does."

     i.     "No, it did not occur to me that he didn't do what M.S.H. was claiming," "Don't we have evidence in the court?"

     j.     "He did more than hurting M.S.H. I have seen him hurting my mom."

     k.     "He [Charles] and Grandma asked me to keep things from my mom."

     l.     "I am happy where I am and I, I love my mom."

58.     At the December 7, 2016 hearing Williams testified that she met with Plaintiff,

Charles, M.H., S.H., and Grandmother Haynes and reviewed all pleadings Charles provided to

Williams.  Williams also testified that she asked Plaintiff for her daughters' educational records

and that Plaintiff refused to provide them to Williams.

59.     Williams' testimony was false.  Plaintiff offered her daughters' educational

records to Williams during the previous summer and then again in fall 2016, but Williams

refused to look at the girls' educational records.  At that hearing Williams attacked Plaintiff on

the stand and falsely told the Divorce Court that Plaintiff had no educational records that

Williams requested from Plaintiff.

60.     Carl Reed, a Missouri approved home schoolteacher, who helped Plaintiff

homeschool S.H. and M.H. came to the December 7, 2016 hearing prepared to testify that S.H.

and M.H. showed consistent academic progress and were ahead of their peers academically in all

school subjects.  He was prepared to testify about S.H.'s and M.H.'s school curriculum and their

grades and homeschooling testing results.

61.     At that time, neither S.H. nor M.H. had been tested using the Missouri Public

Schools Standardized Testing.  Williams asked the Divorce Court not to hear Reed's testimony

claiming that Reed's testimony would be tainted because Reed was present in the courtroom

during Grandmother Haynes' testimony.  The Divorce Court declined to hear from Reed.

62.     At the conclusion of the hearing, Williams told the Divorce Court that being

"fairly informed" it was her opinion that "the educational endeavors of the girls have been

hindered" and "had not been pursued appropriately" by Plaintiff, based on what "I am being told

by the children." "I have great concerns about their education."  "I believe that Bernice Haynes is

in the better position to make that happen and hopefully get them caught up to where they need

to be."

15

63.     At that the time of the hearing, M.H. and S.H. excelled academically based on the testing offered by Plaintiff's homeschooling program.  Plaintiff offered these documents to Williams, who declined to review them, but instead relied on Charles' assertions in violation of Missouri law[2] and the Supreme Court GAL Standard 4.  (See **Exhibit 3.**)  Prior to the hearing, Plaintiff scheduled M.H. and S.H. to complete Missouri standardized testing, but the Doniphan School District did not have any available testing times until January 2017.

64.     Williams testified at the hearing that Plaintiff's academic records of S.H. and M.H. were not good enough for Plaintiff to overcome educational neglect allegations.

65.     On December 15, 2016, the Divorce Court issued the following Memorandum:

> After all other evidence was presented, the Guardian Ad Litem testified that, even though she has concerns about Bernice Haynes' failure to fully supervise Father's visits in the past, her recommendation is that the minor children be place with Bernice Haynes. The GAL stated that placement of the children with their grandmother is in their best interests at this time.

(A copy of the Divorce Court Memorandum from December 15, 2016 is attached as **Exhibit 8**.)

66.     On December 18, 2016, M.H. learned from Grandmother Haynes that Grandmother Haynes tried to poison Plaintiff by sending her key lime pie with rat poison.  M.H. was very traumatized and concerned for Plaintiff's health learning this.  (A copy of the text from M.H. to Plaintiff from December 18, 2016 regarding rat poisoned pie made by Grandmother Haynes is attached as **Exhibit 9**.)

67.     On December 22, 2016, based on Williams' and Grandmother Haynes' testimony, the Divorce Court granted Plaintiff, Charles and Grandmother Haynes joint legal custody of

---

[2]  "[I]t is imperative that the GAL investigate and have input on the perspective of the child's best interest and [that] *this be presented to the trial judge*."  *Portwood-Hurt v. Hurt*, 988 S.W.2d 613, 619 (Mo. App. W.D. 1999).

M.H. and S.H. and sole physical custody of the girls to 89-year-old Grandmother Haynes and ordered that Grandmother Haynes be "the ultimate decision maker with respect to the health, safety, and welfare of the minor children."  (See **Exhibit 4**.)

68.     The Divorce Court granted Charles supervised visitation and liberal supervised visitation was encouraged at Grandmother Haynes' house.  Plaintiff was awarded unsupervised visitation from Friday at 6:00 pm until Sunday noon every weekend and other times as agreed.

69.     At the time Grandmother Haynes received physical custody of M.H. and S.H., she had been suffering and treated for prolonged congestive heart failure and had been medicated heavily by prescription painkillers and sleeping pills for many years, with routine dosage increases.  Grandmother Haynes did not see well, and could not drive because of her declining eyesight.  She also had hearing problems and had difficulty hearing during the December 7, 2016 Divorce Court hearing.

70.     Prior to the December 7, 2016 hearing Plaintiff informed Williams that Grandmother Haynes was in poor health, suffered from congestive heart failure, had arthritis, did not drive because she could not see and that she was heavily medicated with prescription painkillers and sleeping drugs.

71.     Williams did not investigate Grandmother Haynes' health condition, nor did she report to the Divorce Court Plaintiff's concerns about Grandmother Haynes' health which adversely affected her ability to care for S.H. and M.H..[3] Instead, Williams told Plaintiff that she would not be easily manipulated by Plaintiff and her "fabricated stories."

72.     Before the December 7, 2016 hearing, Plaintiff did not know that pornographic

_____

[3]  In divorce proceedings, the safety and the best interests of the children are always paramount, and it is the duty of the guardian ad litem to protect these interests. *Keling v. Keling*, 155 S.W.3d 830, 834 (Mo. App. E.D. 2005)

images of underaged girls were found on Grandmother Haynes' computer that Charles used and that Charles' attorney Yarbro delivered the computer to the Prosecuting Attorney of Butler County.

73.     In early January 2017, Charles told Plaintiff that in November 2015, Yarbro delivered Grandmother Haynes' computer to the Prosecuting Attorney of Butler County after Yarbro found children's pornographic images on it.  Plaintiff informed Williams that Grandmother Haynes' computer used exclusively by Charles contained pornographic images of minor children.  (See also ¶43 above.)

74.     At no time did Williams disclose this information to the Divorce Court or that the Butler County Prosecutor had the computer.  Williams did not investigate what was on that computer.

75.     Neither the December 7, 2016 Court hearing nor at any time thereafter did Grandmother Haynes report to the Divorce Court that Charles used her computer to view and store pornographic images of children.

76.     The December 22, 2016 Divorce Court Order mandated that Grandmother Haynes enroll M.H. and S.H. in the Doniphan Public School.  There M.H. and S.H. were bullied and called "sluts" and "whores" just like their sister M.S.H. who "did the nasty with Charles."  In school M.H. was mocked and asked whether "she fucked her daddy like her sister M.S.H. had been fucking."  Some students asked M.H. if she would "fuck them."

77.     Plaintiff informed the principal of the Doniphan School which her daughters attended of them being bullied.  The school principal told Plaintiff that the School district did not have any resources to protect M.H. from students' bullying.

78.     Plaintiff continued to raise concerns with the Doniphan School District principal.

Finally, the school principal suspended one student for bullying M.H.  The school officials refused to do anything more to protect M.H. from bullying and the students' requests for M.H. "to fuck them, just like she did her daddy."  The school bullying traumatized M.H.

79.     Plaintiff informed Grandmother Haynes and Williams that M.H. was bullied by other students in school and that M.H. was very hurt by it.  Neither Williams nor Grandmother Haynes did anything to protect M.H. and S.H. from the school bullying.  Instead, Williams accused Plaintiff of spreading her "fabricated M.S.H.'s sexual abuse stories."  Williams blamed Plaintiff and M.S.H. for M.H.'s school bullying.

80.     On January 6, 2017, M.H.'s academic progress was tested through the use of the Missouri standardized Wechsler Test which confirmed that M.H. was performing on all the subjects on each scale either at "average to above average" or "above average to far above average" of her peers.  (A copy of M.H.'s Wechsler Individual Assessment Test results taken in early January 2017 is attached as **Exhibit 10**.)

81.     Plaintiff provided the Wechsler's Individual Assessment Test results to Williams as proof that Plaintiff did not neglect M.H.'s educational needs.  Plaintiff asked Williams to file the test results with the Divorce Court.  Williams told Plaintiff's attorney and Plaintiff that if Plaintiff challenged her authority and provided the test results to the Divorce Court, Plaintiff would lose her visitation time with her daughters.

82.     Plaintiff scheduled S.H. to take the same academic test as M.H. in January 2017. As soon as Williams received M.H.'s testing, Williams blocked Plaintiff's efforts to test S.H. Williams again told Plaintiff's attorney that if Plaintiff challenged Williams' authority, Plaintiff would lose her visitation rights due to Plaintiff's ongoing manipulation.  (A copy of the January 11, 2017 email from Plaintiff's attorney, Jasper Edmundson, confirming his conversation with

Williams is attached as **Exhibit 11**.)

83.     Plaintiff asked Grandmother Haynes if Plaintiff could test S.H.'s academics. Grandmother Haynes threatened Plaintiff stating that Williams told her that if Plaintiff tested S.H., Charles would get custody of S.H. and M.H. and that Plaintiff would have no more visitation with her daughters.

84.     Hearing these threats, Plaintiff's lawyer Jasper Edmundson asked Williams to recuse herself from the Haynes divorce case.  Edmundson informed Plaintiff that Williams stated, "Judge Shock will never recuse me [Williams]. Your client has already lost her custody. If she decides to disqualify me, she will lose **all** visits with her daughters."  [Emphasis added.] (A copy of the January 9, 2017 email from Jasper Edmundson to Plaintiff confirming Williams' threats is attached as **Exhibit 12**.)

85.     While M.H. and S.H. were at Grandmother Haynes' house, Charles was present and unsupervised most of the time.  Charles came into M.H.'s room in the middle of the night without Grandmother Haynes present and sexually abused her.  Some nights M.H. was so scared that she ran to Plaintiff's home very agitated.  M.H. did not disclose to Plaintiff at that time that Charles had molested her.  (See ¶¶144-145 below.)

86.     In early January 2017, M.H. told Plaintiff that she informed Williams about Charles's nightly visits to her bedroom without Grandmother Haynes present.  Williams did not investigate what M.H. told her.  Nor did she protect M.H. from Charles' visits into M.H.'s bedroom in the middle of the night without Grandmother Haynes present.  M.H. was very disheartened because Williams did not protect her.

87.     After M.H. informed Williams that she ran to Plaintiff's home in the middle of the night because she was terrified of Charles, Williams informed Charles of this fact.  Not only did

20

Williams not act to prevent Charles from being alone with M.H. in her bedroom, Williams also did not hold Grandmother Haynes accountable for not supervising Charles' nightly visits with M.H.

88.     Instead, Williams accused Plaintiff of manipulating M.H.  She ordered Charles to install four cameras at Grandmother Haynes' house to watch M.H. at night.  Williams told Plaintiff and M.H. that Williams would cut their visitation times if M.H.'s nightly outings to her mother's home continued.  M.H. told Williams and Plaintiff, "I feel like an animal in a cage." M.H. begged her mother to remove Williams from her case.

89.     Plaintiff demanded that Williams recuse herself from the Haynes' divorce. Williams told Plaintiff that she would not recuse herself and that if Plaintiff kept pushing for it, "You [Plaintiff] will lose all visits with your daughters."  On advice of her attorney, Plaintiff did not move to disqualify Williams.  Plaintiff was afraid to lose visitation time with M.H. and S.H.

90.     Williams did not report that Grandmother Haynes did not supervise Charles and that he came into M.H.'s room alone to the Divorce Court.  Williams continued to threaten Plaintiff with loss of her visitation time with her daughters if Plaintiff "interfered" with Grandmother Haynes' custodial rights.

91.     On January 11, 2017, Williams asked the Divorce Court to award her additional GAL fees for her services, which was granted on January 17, 2017.  Plaintiff, Charles and Grandmother Haynes each were ordered to pay Williams $750.00.  Plaintiff paid her share.

92.     While in Grandmother Haynes' custody, S.H. was bitten several times by Grandmother Haynes' dog while Grandmother Haynes was not present.  When S.H. showed Grandmother Haynes the dog bites on her arms and fingers, Grandmother Haynes told S.H., "Shut up and stop complaining!"

93.     Seeing the dog bites on S.H.'s body, Plaintiff took S.H. to Southeast Missouri Hospital for treatment.  Plaintiff was very upset about S.H. being injured.  Plaintiff informed Williams about Grandmother Haynes' failure to protect S.H. from her dog.  Williams' reaction was, "So what, the dog bit S.H.; why are you bothering me with this drama?"

94.     M.H. started cutting herself.  Grandmother Haynes saw the cuts, but did nothing to protect or to treat M.H.  Instead, she accused M.H. of harassing her dog.  (See the picture of M.H.'s hand and forearm from January 29, 2017 attached as **Exhibit 13**.)

95.     When Plaintiff asked M.H. how she got the cuts, M.H. refused to answer saying sadly, "Grandma and Dad told me not talk to you about it, Mom. I can't.  Mom, please don't make me."

96.     Concerned with cuts and secrets, Plaintiff rushed M.H. to Southeast Health Hospital of Ripley County where it was confirmed that M.H. was mutilating herself while in Grandmother Haynes' custody.  Southeast Health Center contacted Williams and asked her to come to Southeast Health Center, which Williams did.  When there, Williams yelled and screamed at M.H. for making ". . . me waste my Sunday on you and drive to Doniphan."  M.H. cried.

97.     Ignoring Williams, Southeast Health Hospital referred M.H. to DePaul Hospital in St. Louis where M.H. (at age 12-1/2) was hospitalized on January 29, 2017 in a locked psychiatric ward for treatment for self-mutilation behavior.  Plaintiff was devastated about M.H.'s health.

98.     On January 29, 2017, Williams authorized DePaul Hospital personnel to provide treatment and prescription medication for M.H., although Williams did not have such authority from the Divorce Court.  Williams instructed DePaul Hospital personnel to prohibit M.H.'s

22

communication with Plaintiff, although Williams, again, did not have such authority.

99.     On January 30, 2017 Williams filed a memorandum with the Divorce Court requesting an Order seeking to be appointed as the personal attorney for S.H. and M.H.  The Divorce Court granted that request without a hearing.  (See **Exhibit 2.**)  Williams did not consult with Plaintiff when she decided to become M.H.'s and S.H.'s attorney.  The essential portions the Court Order of Williams' appointment as their attorney stated:

> (1)     The Guardian ad Litem shall be the legal representative of the minor children throughout the proceedings.

> (2)     The Guardian ad Litem shall be a party to this cause.

> (4)     Upon presentation of an attested copy of this order to any agency, hospital, organization, school, person, or office, including the clerk of this court, pediatrician, psychologists, psychiatrists, or police department, the aforementioned shall permit the Guardian ad Litem to inspect and copy any records relating to the minor children and their parents.  The Guardian ad Litem shall maintain any information received from any such source as confidential, and [it] shall not be disclosed except in reports to the Court, to the parties to this case and their counsel, or as directed by the Court.

> (5)     The Guardian Ad Litem shall have an attorney-client relationship with the minor children, and all communications between the Guardian Ad Litem and the minor children shall be privileged, and shall not be disclosed by the minor children or the Guardian Ad Litem except as she shall deem appropriate in the effective representation of the minor children, and then only generally and not specifically. Neither of the parties nor their counsel shall seek to invade this privilege either directly or indirectly, or to make any attempt to seek the disclosure or confidential communications from either the minor children or the Guardian Ad Litem.

100.    On or about January 30, 2017 Williams instructed DePaul Hospital personnel not to allow Plaintiff in the hospital to see M.H. According to Williams, only Grandmother Haynes and Williams could communicate with M.H. and her doctors.

101.    As the "ultimate decision maker with respect to the health, safety, and welfare of

the minor children," (see **Exhibit 8**) Grandmother Haynes instructed DePaul Hospital personnel to communicate with Williams only.

102.    After January 30, 2017 Williams, however, openly acted as Charles' lawyer. Williams threatened M.H. that if M.H., M.S.H. or Plaintiff testified against Charles in his criminal case, Williams would not recommend to the Divorce Court that Plaintiff have custody of S.H. and M.H., but instead would recommend that they be returned to foster care. Williams repeatedly alleged that Plaintiff and M.S.H. "brainwashed" S.H. and M.H. against their father. Williams advocated for Charles to spend time with S.H. and M.H. through visits and reunification therapy. Williams persistently alleged that Plaintiff was guilty of "educational neglect."

103.    Williams' appointment as a GAL was never rescinded. Williams billed and received payment for her services as M.H.'s, S.H.'s and Charles' attorney from Charles and Grandmother Haynes in violation of Missouri Rules of Professional Responsibility (MRPR) Rule 4-1.8(f).[4] In Missouri, the MRPR have the force and effect of judicial decisions. *McVeigh v. Flemming*, 401 S.W.3d 287 (Mo. App. E.D. 2013).

104.    On January 30, 2017 Pediatric Psychiatrist, Fernando Perez-Magnelli with DePaul Hospital recorded the following, among other observations:

> Ms. Haynes [M.H.] started cutting herself when she was moved to her grandmother in December 2016. Because of the move she misses her mom. She has trouble sleeping. She lives with grandmother and father.

---

[4]   MRPR Rule 4-1.8 (f) states: A lawyer shall not accept compensation for representing a client from one other than the client unless:
    (1)  the client gives informed consent;
    (2)  there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and (3) information relating to representation of a client is protected as required by Rule 4-1.6.

- M.H. is the saddest about placement in the foster care 3 years ago[5] because her biological father molested her 18-year-old half-sister (who was 12 years at the time of molestation). He went to jail twice. She is angry at him.
- M.H. is the maddest at her father.
- M.H.'s wishes are: 1) return home [to her mother]; 2) all the court to stop; and 3) dad in jail

Psychological stressors: father molested her half-sister.

(A copy of the partial medical record from DePaul Hospital of January 30, 2017 is attached as

**Exhibit 14**.)

105.    Plaintiff asked DePaul Hospital to release M.H. to her. Williams blocked that

release, threatening Plaintiff with loss of custody and visitation rights and falsely stating that

Plaintiff and her daughter M.S.H. fabricated allegations of sexual abuse against Charles to

alienate M.H. and S.H. from their father.

106.    From after May 29, 2014 the Prosecuting Attorney in Ripley County had a

recording of Charles admitting to sexually abusing M.H.'s stepsister M.S.H. Even though

Williams knew of the recording, Williams refused to listen to it.

107.    On February 3, 2017, Williams filed a memorandum seeking an Order Amending

the Temporary Custody Order after Williams was told that DePaul would not release M.H. into

Grandmother Haynes' custody. In that pleading Williams falsely stated to the Divorce Court:

> That since the order of this Court on December 22, 2016, there has been a
> deterioration of conditions with the minor children to the extent that
> Petitioner, Respondent, Intervenor and Guardian ad litem now agree that it is
> in the best interest of the minor children that they be taken into custody by the

---

[5]  M.H. and S.H. were placed into foster care in 2014 when Charles came to Plaintiff's home
uninvited to be at Sara's birthday party. While at the party Charles threatened M.S.H. that he
would kill her if M.S.H. testified against him at his criminal trial. M.S.H. called the police. The
DFS took the children the day of the birthday party deeming that Plaintiff failed to protect them
and M.S.H. from Charles. M.S.H., M.H., and S.H. spent 18 months in foster care, during which
time they were placed with three different foster families and moved three times to different
school districts. M.S.H., M.H., and Sara were very traumatized with this DFS and foster care
experience.

25

Ripley County Juvenile Office and placed into the legal custody of Children's Division.

(A copy of the February 3, 2017 Memorandum filed by Williams is attached as **Exhibit 15**.)

108.    Williams never consulted with Plaintiff regarding placing her children into the legal custody of the Children's Division.  Relying on Williams' misrepresentation, the Divorce Court placed M.H. and S.H. into the custody of the Department of Family Services (DFS) without a hearing and giving Plaintiff an opportunity to be heard.

109.    On or about February 3, 2017, Williams reported to the DFS that Plaintiff was not a suitable parent because she neglected M.H. and S.H. educationally.  Williams' reports were false because Williams was in possession of M.H.'s Weschler test results as of January 7, 2017. (See **Exhibit 10**).

110.    On February 6, 2017, Pediatric Psychiatrist Zafar Rehmani, who was then affiliated with DePaul Hospital, recorded the following among his observations:

- M.H. is the saddest about placement in the foster care 3 years ago because her biological father molested her 18 [15 at that time] year old half-sister.  He went to jail twice.  She is angry at him.
- M.H. is the maddest at her father.
- M.H.'s wishes are: 1) return home [to her mother]; 2) all the court to stop; and 3) dad in jail.

(A copy of the partial medical record from DePaul Hospital of February 6, 2017 attached as **Exhibit 16.**)

111.    The DFS opened two juvenile cases to investigate Plaintiff's educational neglect; Case No. 17RI-JU00011 for M.H. and Case No. 17RI-JU00012 for S.H.  The DFS placed S.H. with a foster family, John and Cassandra Rideout, on February 3, 2017 and M.H. with them on February 6, 2017.

112.    Williams did not investigate why DePaul Hospital doctors refused to release M.H. to Grandmother Haynes.  Williams did not investigate why M.H. was mutilating herself. Williams did not hot line the child abuse at Grandmother Haynes' home as the MRPR, Supreme Court GAL Standards and R.S.Mo. §210.115 required.

113.    On March 10, 2017 the DFS held a monthly Family Support Team (FST) meeting with M.H., Williams, DFS Officer Theresa Whaley, M.S.H., and Plaintiff.  M.H. reported that Charles was at Grandmother Haynes' house "all the time unsupervised."  Williams showed no concern about that.  Williams, instead, insisted that M.H. and Charles participate in reunification therapy together.  Williams blamed M.S.H. for "inserting herself" in "everything."  M.H. told Williams and the DFS that she did not want to see her father and grandmother.

114.    At that FST meeting, the DFS opposed Charles and Grandmother Haynes engaging in therapy with M.H. because Charles and Grandmother Haynes had shown no concern for M.H. and S.H. since they were placed in the DFS custody.  The DFS arranged for M.H. and S.H. to see Scott Foster, a Licensed Professional Counselor (LPC).  (See excerpts from the transcript of the March 10, 2017 FST meeting attached as **Exhibit 17**.)

115.    Reluctantly, Williams agreed to Plaintiff's visits with her daughters as long as they were supervised because of Plaintiff's "educational neglect" of her daughters.  The DFS, however, noted that there was no evidence that Plaintiff neglected her daughters' education based upon the Missouri Standardized Wechsler Test results.

116.    On March 20, 2017 M.H. was admitted into Twin Rivers Regional Medical Center (Twin Rivers) into a psychiatric unit because her foster parents noticed that she again was cutting herself.  The hospital records from the admission state that M.H. cut herself the night before and that her father ". . . had legal issues involving molestation of her 18-year-old half-

sister.  Mom is asking for divorce.  ***The patient is not happy not being home***.  The patient was living at the same house [Grandmother Haynes'] in which father molested her stepsister." [Emphasis added.]  (A copy of the March 20, 2017 medical records from Twin Rivers is attached as **Exhibit 18**.)

117.    On March 21 & 22, 2017, the Twin Rivers nurse's notes show that, "Patient reports thoughts of self-harm … due to dad's trial set back" and that "Patient identifies "dad's trial" as the cause of her depression.  Patient states that the trial has been ongoing for the past three years and has been present[ly] set back again."  (A copy of the March 21, 2017 medical record from Twin Rivers is attached as **Exhibit 19**.)

118.    The Twin Rivers medical records show that the hospital personnel contacted Williams who expressed her "concerns for dad not having contact" with M.H.  M.H. was discharged on March 23, 2017 from Twin Rivers.  (A copy of the Twin Rivers notes with comment by Williams re: dad not having contact and Discharge Summary is attached as **Exhibit 20**.)

119.    On April 25, 2017, M.H.'s and S.H.'s pediatrician, Dr. Roger Bost, wrote a letter to the Juvenile and Divorce Courts stating that he has been M.H.'s and S.H.'s doctor their entire lives.  Dr. Bost continued:

> I am writing this letter on behalf of the mother who has done nothing wrong, and the guardian ad litem of these girls seems to object to their returning to mom's custody despite the girls' wish to return home to their mom.  I want to vouch for the biologic mom as being a capable and good mother for all their lives and I see no reason for the girls to go to foster care instead of returning to their mom's care.  Hopefully this can be accomplished.

(A copy of Dr. Bost's letter dated April 25, 2017 is attached as **Exhibit 21**.)

120.    Williams received Dr. Bost's letter, but she still insisted that M.H. and S.H. could

not return to Plaintiff because of Plaintiff's "educational neglect."  Williams warned Plaintiff that she would object to Plaintiff having custody of her daughters and if Plaintiff "keeps pushing it, I [Williams] will cut your [Plaintiff's] visitation times."  At that time, Plaintiff was allowed to see her daughters only one time per week for four hours based on Williams' recommendation to the DFS.

121.    Prior to April 27, 2017 the DFS Officer, Theresa Whaley, sent an email to Williams, Grandmother Haynes' attorney, all therapists involved, foster parents and Plaintiff informing them of the FST meeting and a very disturbing note that M.H. wrote about M.H. wanting Charles to "fuck her pussy."  (See copy of M.H.'s note attached as part of **Exhibit 22**.)

122.    Neither Williams nor Grandmother Haynes, nor Grandmother Haynes' attorney appeared at the April 27, 2017 FST meeting.  Theresa Whaley (the DFS), Casey Salyer (Juvenile Officer), Scott Foster (DFS appointed therapist), Judy Moss (Court Appointed Special Advocates) (CASA) Director, John and Cassandra Rideout attended.  Cassandra Rideout (Cassie) reported that S.H. and M.H. were getting straight A's in school.  Cassandra Rideout stated that M.H. was currently doing the A plus program at school[6] and that M.H. was one year ahead of her peers based on the school testing, all evidence contradicting prior allegations of "educational neglect."  (See transcript of April 27, 2017 FST meeting, **Exhibit 22** at pgs. 5 & 7 and a copy of M.H.'s note attached.)

123.    Theresa Whaley stated:

> S.H. and M.H. did fine during the [forensic] interview [with DFS], but neither of them disclosed anything that we didn't already know as far as we already knew that Grandma was allowing them access, allowing dad to have unsupervised access to them. They talked about that. S.H. talked about that their dad would cuss

---

[6]   This program allows high school students to take first-year college subjects and transfer them to a college upon college acceptance.

at them and made them cry and called them names.  (**Exhibit 22** at pg. 12.)

124.     At this meeting, M.H.'s foster parents produced a disturbing letter written by M.H. stating, "fuck me, fuck my pussy daddy."  Every adult present at the meeting agreed that Charles molested M.H.  M.H. again said that she did not want to see Charles and that at Grandmother Haynes' house she could not sleep at night because she "never knew when dad would come in."  (See generally **Exhibit 22** at pgs. 17-20).  (Although not explicitly stated in these terms; the note was not quoted verbatim in the transcript.)

125.     The Rideouts discussed that they had experience previously with a teenager who had been sexually abused and that M.H. exhibited similar behaviors.  M.S.H. stated that M.H. was hesitant to discuss what happened to her because she saw what was occurring to M.S.H. who testified against Charles.  Cassie Rideout reported M.H.'s conflicting messages from M.H.'s journal and that M.H. wrote that she was "ok" but also that she needed "HELP."  The adults concluded that M.H. had been abused by Charles.  (See **Exhibit 22** at pgs. 17 & 19.)

126.     Theresa Whaley and Plaintiff told Williams about M.H.'s note.  Williams did not discuss M.H.'s note with M.H.'s foster parents or M.H.  Williams showed no concern about M.H.'s note, why M.H. wrote it, or why M.H. was afraid to sleep at Grandmother Haynes' house.

127.     The May 26, 2017 DFS FST meeting was attended by the DFS officer Theresa Whaley, Williams, Judy Moss, CASA's Director, Angela Champion, CASA Representative Pamela Stark, a Juvenile Officer, Plaintiff, M.H., Scott Foster, and Grandmother Haynes' attorney, Siegrid Maness.  Williams talked about her "extremely serious concerns about educational neglect" by Plaintiff.  M.H. requested a new GAL.  Williams agreed to talk to M.H., but admonished that "it would not change my mind about anything."  (See excerpts from the

May 26, 2017 FST meeting attached as **Exhibit 23**.)

128.    The DFS notes state that Williams was not listening to M.H. and not putting M.H.'s concerns into her recommendations.  When Theresa Whaley asked Williams what other concerns she had, Williams stated,

> I am very concerned Mom and M.S.H. are manipulating these girls, pressuring them to take actions that are not consistent with their ages. I know that there have been times when the girls were in Grandmother Haynes' care that Mom tried to get the girls to her, specifically, M.H., to record things that were happening in the home in an attempt to manipulate them.    (See **Exhibit 23.**)

129.    Plaintiff confronted Williams regarding her persistent allegations of educational

neglect.  That following exchange took place:

> Plaintiff:     Being that M.H. is in 7th grade and her peers are in 6th grade that is like a real big red flag that they don't have educational neglect, she [M.H.] is a year advanced.
>
> Williams:     Information has come to light now based on their [S.H.'s and M.H.'s] enrollment in public school, it does help address that for me and I don't have concerns that they're not up to par in education.    (See **Exhibit 23**.)

130.    Williams never addressed Plaintiff's and M.S.H.'s "manipulation tactics" with

Plaintiff, M.S.H. or M.H.  At that May 2017 meeting, Williams demanded that Plaintiff undergo

a psychological evaluation.  Williams never asked Charles, who was accused of sexual abuse of

a minor, to undergo a psychological evaluation.  Williams never asked Grandmother Haynes for

her medical records although Grandmother Haynes was very frail, took prescription painkiller

and sleeping pills, had poor eyesight and was significantly deaf in both ears.

131.    The DFS officer, Theresa Whaley, expressed that Williams, Grandmother

Haynes' lawyer and Charles made M.S.H., a child victim, out to be "a villain."  Whaley stated,

"Children's Division considers M.S.H. a victim at this point."  Grandmother Haynes' lawyer

stated, "A victim can still profile other children and can cause other problems."  Whaley replied,

"And former perpetrators can also perpetrate on other children."  (See **Exhibit 23**.)

132.    Plaintiff asked Williams to recuse herself for Williams' failure to protect her children.  Williams screamed "I am not going to voluntarily recuse myself; absolutely not!!!!" (See **Exhibit 23**.)

133.    Scott Foster, a therapist, reported that "I don't think that M.H. is gonna open up with anybody**.…**  M.H.'s got a mental shutdown.  It's almost like you can see a curtain fall over her face and she's just that."  Except for Williams, no one at that meeting, including Plaintiff, knew that Williams threatened M.H. to keep M.H. and S.H. in foster care if M.H. testified against Charles at his criminal trial.[7]

134.    Grandmother Haynes' lawyer demanded that M.H. and S.H. have therapy with Grandmother Haynes.  The foster parents objected, stating that Grandmother Haynes contacted them once in four months and did not seem to care about M.H. and S.H.  The foster parents also reported that "M.H. is scared of Charles." "She can't see him."  Whaley stated, "I don't think they want to see her [Grandmother Haynes] because grandma has not protected them."  (See **Exhibit 23**.)

135.    On June 7, 2017, the DFS appointed therapist Scott Foster, wrote a letter to the DFS stating that Plaintiff has been compliant with all goals set by the DFS and with recommended therapy.  Scott Foster reported:

> M.H. and S.H. are insistent that they return home to reside with mother" and consistently report in sessions with him "their desire to return to reside with their mother."  "It is my recommendation, at this time, that S.H. and M.H. return to reside with mother as swiftly as possible.  Furthermore ***it is not in the best interest of the children to have contact with their father or their paternal grandmother***.    [Emphasis added].

(A copy of Scott Foster's letter dated June 7, 2017 is attached as **Exhibit 24**.)

136.    Upon receipt of Scott Foster's letter, Williams started advocating with the

---

[7]   In spring 2018, M.H. told Plaintiff that Williams had been threatening M.H. since 2017.

Juvenile Court and the DFS to remove Scott Foster as M.H. and S.H.'s therapist because he thought that "seeing Grandmother Haynes and Charles" was not an option for S.H. and M.H. (Subsequently, Scott Foster recused himself from therapy because he disagreed with Williams about therapeutic goals for S.H. and M.H.  Scott Foster believed that neither S.H. nor M.H. should be reunified with Charles and Grandmother Haynes.)

137.    On July 6, 2017 the DFS report stated that, "The girls were very excited to see mom and it was mentioned during the first couple hours of the visit that they do not want to leave and have to go back to foster care. They just want to be home."

138.    Williams refused to consider returning M.H. and S.H. to Plaintiff's custody. Williams continued to claim "educational neglect" in spite of there being no evidence of that. Williams threatened Plaintiff that if M.S.H. and Plaintiff continue "brainwashing S.H. and M.H." against Charles, Williams would keep M.H. and S.H. in foster care.

139.    Plaintiff wrote a letter to the Divorce Court and to Williams asking her to recuse herself.  Williams refused to recuse herself and, instead, continued to advocate for Charles to see M.H. and S.H. despite the healthcare professionals' recommendations against it. Williams continued to threaten Plaintiff with loss of custody and reduction in visitation hours if Plaintiff continued insisting on Williams' recusal from the Haynes' divorce.

140.    On July 7, 2017 the DFS report presented to the Juvenile Court and Williams praised Plaintiff's parental strengths and complimented her on being fully compliant with all DFS goals and recommendations. The Juvenile Court and Divorce Court proceedings were taking place concurrently and addressed the same concerns regarding S.H. and M.H.  The DFS report concluded:

> The Children's Division recommends that M.H. and S.H. be returned to
> the physical custody of their mother at this time with Children's Division

retaining legal custody.  During the past five months, there has been no
evidence or disclosures of abuse or neglect to the girls by their mother.
The separation from their mother has been devastating to them and has
likely attributed to M.H.'s depression and anxiety.  Cindy [the mother] has
been cooperative with everything that has been asked of her, and no safety
concerns have been identified.  (A copy of the July 6, 2017 DFS report is
attached as **Exhibit 25.**)

141.    On July 24, 2017, Angela Champion, a worker with CASA for the 36th Judicial

Circuit wrote a letter to the Divorce Court reporting that "on February 3, 2017 M.H. and S.H.

were placed in legal custody of the DFS, due to allegations of educational neglect."  The CASA

worker further wrote: "on January 6, 2017 M.H. was given the Wechsler Individual Achievement

Test and was within or above the appropriate grade levels as her peers.  Clearly, M.H. is not

being neglected educationally."

142.    The report further stated:

In talking with the girls, M.H. let it be known that she has felt "left out" of the
case by her guardian ad litem, Jennifer Williams.  M.H. said that Jennifer told her
"It was not her [Williams'] job to talk to her [M.H.]."  She stated that she felt as if
***"Jennifer is really my dad's lawyer."***  …. Because M.H. and S.H. aren't
communicating with their GAL and have confused feelings about the GAL, this
raises a concern for me.  I understand that the GAL represents the best interests of
the children, while a CASA volunteer represents the voice of the children, which
might not be the same thing at times in a particular case.  Because the girls have
expressed a concern about the relationship they have with their GAL, I felt it
needed to be brought to the attention of the Court.

(A copy of the July 24, 2017 Champion letter (CASA volunteer) to the Divorce Court is attached

as **Exhibit 26**.)

143.    Dr. Bost's records from July 27, 2017 show that:

M.H. got depressed while there [in Grandmother Haynes' custody] because the
dad was sexually molesting her and she [M.H.] stayed in her room to avoid dad.
She got depressed and started cutting herself and was sent to psych unit at Kennett
in February 2017 and was started on Remeron.

(A copy of Dr. Bost's medical record of July 27, 2017 is attached as **Exhibit 27**.)

144.   **After M.H.'s disclosure to Dr. Bost that Charles molested her, Dr. Bost tested M.H. for HIV, Gonorrhea, Chlamydia and HPV virus.  In the social history of Dr. Bost's records from July 27, 2017, he noted that M.H. was sexually abused.**  (See **Exhibit 27**).

145.   Concerned with M.H.'s disclosure of sexual abuse, Dr. Bost wrote a letter which was delivered to the Divorce Court, the DFS and Williams on July 27, 2017.  Dr. Bost refers to Williams' efforts "to reunify [M.H. and S.H.] with the paternal grandmother who allows biological father access to the girls when there is evidence he has sexually abused one of the daughters."  Dr. Bost continues, "It does not sound wise to permit him [Charles] or the paternal grandmother access to his daughters."  Williams ignored this letter and advocated for Charles's meetings with M.H. and S.H. while threatening Plaintiff with the loss of Plaintiff's custodial rights.  Williams never spoke to Dr. Bost about M.H.  (A copy of Dr. Bost's July 27, 2017 letter is attached as **Exhibit 28**.)

146.   The DFS July 2017 records show that Williams continued demanding M.H. have visits with Charles.  M.H. reported "having no intentions of sharing what happened between me and my dad, even if it is means being forced to have visits with him."  M.H. felt that nobody listened to her.  Both girls said they did not want anything to do with father or paternal grandmother and they wanted to be at home with their mother because "that is where we feel most safe."

147.   Williams insisted that because of Plaintiff's "educational neglect," Plaintiff should not have unsupervised visits with her daughters.  The Doniphan school records showed that "M.H. was only twelve and one year ahead of her peers in school."  (A copy of M.H.'s Doniphan school records is attached as **Exhibit 29**.)

148.   On July 27, 2017, the Juvenile Court returned M.H. and S.H. to Plaintiff's

physical custody after the DFS determined that there was no educational neglect on Plaintiff's part.  The two juvenile cases remained open since Williams insisted that Plaintiff should not have legal custody of M.H. and S.H. because of Plaintiff's prior "educational neglect."  (A copy of the Juvenile Court Order of July 27, 2017 is attached as **Exhibit 30**.)

149.    Because therapist Scott Foster LPC wanted M.H. and S.H. to be returned to their mother, Williams insisted on finding another therapist to work with M.H., S.H. and Charles.

150.    On September 2, 2017, the DFS appointed Jerry Marks, Ph.D. and Licensed Clinical Social Worker (LCSW) to work with M.H. and S.H.

151.    On September 8, 2017, Dr. Marks noted that:

> "She [M.H.] has been sexually abused by her biological father who has denied the incidents but is awaiting court action for the alleged abuse of another daughter living at the house."  She [M.H.] says that she doesn't want to go through what her sister has been through with the courts as she has disclosed that their father was sexually abusive with her [M.H.].

(A copy of Dr. Marks' letter of September 8, 2017 is attached as **Exhibit 31**.)

152.    The September 2017 DFS report reflected that the DFS had "no concerns with the girls' safety at Plaintiff's home;" "M.H. and S.H. were on the Honor Rolls at school with no behavioral issues."  "Both M.H. and S.H. were adamant that they did not want to have any contact with their father and paternal grandmother."  Williams still insisted on "therapeutic visits" with Charles.  (A copy of the April 25, 2018 DFS report that references the September 2017 DFS report is attached as **Exhibit 32**.)

153.    The October 2017 DFS report showed that "[g]irls still want no contact with father or paternal grandmother and stressed about the idea of being forced to see them in a therapeutic setting."  At the same time, M.H. confided to M.S.H. that she was scared because Williams told M.H. that "your dad won't go to jail" and "if we [M.S.H., M.H., and Plaintiff]

testify against him, Williams will put me and S.H. back in foster care." Williams instructed

M.H. not to discuss this conversation with anyone. M.H. begged M.S.H. not to testify against

her father because M.H. feared that would force S.H. and her back into foster care.

154.    During all times after January 30, 2017, Williams was not only the GAL in the

Haynes' divorce, but also representing M.H. and S.H. as their attorney. However, Williams

consistently ignored their wishes, constantly ignored findings of the DFS and professionals who

worked with the DFS, consistently ignored school records for S.H. and M.H., consistently acted

as an advocate for Charles, and consistently threatened to return S.H. and M.H. to foster care if

they testified that Charles had sexually abused them.

155.    On November 1, 2017, the DFS again found that there was no educational

neglect. The DFS report stated in pertinent parts:

> Charles:
> Charles has not participated in the team planning since the 24-hour
> meeting February 2017. CD scheduled psychological evaluation for
> Charles. The soonest evaluation date is in December 2017
>
> Cynthia:
> Cynthia has been compliant with all home visits, drug screens, team
> meetings and provided services. Cynthia obtained counseling for her and
> her children even when the juvenile office requested, she changed from
> current counselors already familiar with the family. Cynthia transports her
> children to regular therapy sessions with Dr. Jerry Marks in Washington,
> Missouri. Dr. Kennedy will update a psychological evaluation for Cynthia
> November 6, 2017 at 12:00 noon
>
> M.H.:
> M.H. is excelling at West Point Christian Academy. She reports having a
> better understanding of the material now than in public school. She makes
> A's and B's on all assignments. - Jerry Marks, DSW, LCSW is doing
> individual therapy with M.H., and she likes having an opportunity to talk
> and not bottle up emotions. M.H. is not on any medication. M.H. does not
> want visits with her father
>
> It is in the best interests of S.H. and M.H. to remain in the physical
> custody of their natural mother, Cynthia Haynes. Children's Division
> recommends the goal remain reunification with Plaintiff.

(A copy of the DFS November 1, 2017 report is attached as **Exhibit 33**.)

156.   Despite the DFS findings that Plaintiff was a safe and suitable parent, the DFS

kept its case open because of Williams' ongoing concerns with Plaintiff's alleged "educational

neglect" of M.H. and S.H.   Williams represented M.H. and S.H. during all DFS, Juvenile and

Divorce Court proceedings as their personal attorney.   Charles and Grandmother Haynes paid

Williams for her services for M.H. and S.H.

157.   On December 15, 2017, Dr. Marks wrote to the DFS:

> She [M.H.] says that when she was placed with her paternal grandmother
> it was hard because her Father was at the house daily. She knew that he
> was not supposed to be there, but she did not know what to do or say. …
> She has many memories of the multiple foster homes and some of the
> challenges that she faced with each placement. She has experienced real
> trauma in the moves to foster homes and the various schools that she
> attended. We are in the process of working through these memories and
> helping her to strengthen her coping skills about what has happened in
> these placements.
>
> M.H. admits that she had a very hard time trying to adjust to the different
> homes and to comfort her sister. S.H. is able to talk about the sadness that
> she felt being separated from her Mother. They all report that getting back
> to their mother has been good for them. M.H. has achieved an honorable
> mention on the honor roll this past term and S.H. is on the honor roll this
> term. Both girls talk about feeling happy to be back with their Mother and
> are having a hard time understanding the reason they were placed in foster
> care in the first place. They do not seem to believe that there was a good
> reason for the placements.

(A copy of Dr. Marks December 15, 2017 letter to the DFS is attached as **Exhibit 34**.)

158.   Each time Plaintiff was forced to communicate with Grandmother Haynes and

Charles, they threatened Plaintiff that if Plaintiff, M.S.H., or M.H. testified against Charles in his

criminal case, Williams would return M.H. and S.H. to foster care and Charles would get M.H.

and S.H.'s custody once he was on probation.

159.   Each time M.H. was forced to see Williams (after July, 2017 Williams came to

38

M.H.'s school weekly), Williams threatened M.H. that if Plaintiff, M.S.H., or M.H. testified in

Charles's criminal case, Williams would return M.H. and S.H. to foster care.  On several

occasions, Williams also threatened to place M.H. into "juvie" if M.H. testified against her

father.  Williams told M.H. that her dad "wouldn't go to jail."  Williams consistently ordered

M.H. to keep Williams' conversations confidential from her mother and sister M.S.H. in order to

avoid foster care.

160.    On January 29, 2018 Williams sent the following email to the DFS:

> Custody case ongoing. Girls came in to meet with me and made some very
> concerning allegations about mother, the very least of which was that
> neither of them had ever finished a full year of schooling while being
> homeschooled. Temporary Custody hearing held in which mother, in spite
> of multiple conversations between her and I putting mom on notice that I
> was concerned about the schooling issue, could still not inform the court
> of even ONE detail of the girls' lesson plans in their homeschooling. Girls
> placed with grandmother (my recommendation was based not just on the
> educational neglect, but also on the other allegations made by the girls
> about mom). Juvenile was STILL not involved at this time, and there were
> no plans to get them involved. Eventually, however, M.H. began cutting
> and ended up hospitalized. I was advised by the social worker at the
> hospital that they had grave concerns about mother's handling of the
> situation. Mother was intrusive, obstructive, and threatened to take M.H.
> out of the facility AMA even though she was no longer the legal custodian
> at that time (grandmother was). Then and ONLY then is when I was
> concerned enough to involve the juvenile office. So to say the girls were
> removed because of "educational neglect that didn't pan out" is simply
> incorrect.
>
> If we are going to keep these kids in mom's home and walk away from
> these girls, I want an updated psych eval to confirm that there is no reason
> to pursue this. I don't want to walk away without following up on that and
> something awful happen to these kids, because I don't want to have to
> explain why we asked for it, let it stall out, and never followed up on it
> when it might have prevented something awful. I understand that none of
> you have the benefit of knowing exactly what these girls reported to me
> when I first became involved in this case, and it seems to you like I'm on
> some sort of crusade here, but the things they reported to me were MORE
> than educational neglect. That is simply one of the many things they
> reported. None of the allegations were hotline-able, but were concerning,
> nonetheless. ***They ranged from flat out manipulation by mother and***

>*M.S.H., emotional abuse by mother and M.S.H., not having enough food in the home, and being severely punished for making disclosures about things that had gone on in the home in the past. As a means to protect the girls, I chose to focus a great deal on the educational neglect, because that particular allegation couldn't be held against the girls by mom or anyone else – it kept a little bit of the heat off the girls by focusing on that.* Though the girls later said dad "made" them say those things, the one thing they never did come back to me and say is that the things they said were untrue. They never said the stuff they reported didn't happen.        [Emphasis added.]

(A copy of the January 29, 2018 Williams email is attached as **Exhibit 35.**)

161.    **None of these statements were true**.  As shown by M.H.'s testing and school records there was no "educational neglect."  Nor did Plaintiff or M.S.H. manipulate M.H. to report Charles' wrongdoing and abuse of M.H.  The medical records from DePaul Hospital do not state that Plaintiff threatened to take M.H. from DePaul Hospital.  The hospital staff, not Williams, refused to release M.H. to Grandmother Haynes or Charles.  As DFS reported, S.H. and M.H. felt safe at Plaintiff's home where they were doing well.  They had been living with Plaintiff over six months when Williams wrote this email.  No DFS reports since their return to Plaintiff's home substantiated what Williams wrote.

162.    Dr. Jerry Marks concluded that there was no need to conduct a psychological evaluation of Plaintiff because Plaintiff presented no issues or concerns with child abuse or neglect.  The DFS agreed with Dr. Marks.

163.    On February 6, 2018 Dr. Bost noted that M.H. was stressed because "the GAL has put her [M.H.] in harm's way having her [M.H.] in dad's care in 2017."  (A copy of Dr. Bost's February 6, 2018 medical record is attached as **Exhibit 36**.)

164.    On March 30, 2018, Dr. Marks wrote to the DFS and the Juvenile Court:

>She [M.H.] reports to me that the GAL has been coming to see her at school. She tells me that it seems odd to her as she did not see this much of her [the GAL] when she was placed in foster care. She also tells me that

the GAL has brought two rounds of gifts to her school from her paternal grandmother and from her Dad. She is not sure what that is about, but she finds it unusual. She also reports that the GAL has been asking her about her Mother's psychological testing. I find this to be more than unusual. ***Perhaps this is just me being cynical, but it seems to me that she [the GAL] is using her access to M.H. to put pressure on her about the upcoming trial of her Father related to the sexual abuse of her sister M.S.H. It seems that I am the one who keeps reporting to you the irregularities of the process. I do not think it would be a jump in logic to say that the gifts are a way to send M.S.H. a message about her testimony in the case. I also think it is a way to put pressure on M.H. that she could be going back into foster care if she testifies against her Father***.        [Emphasis added.]

(A copy of Dr. Marks' March 30, 2018 letter is attached as **Exhibit 37**.)

165.    On May 22, 2018, Dr. Marks wrote a letter to the Assistant Attorney General for the State of Missouri assigned to investigate Charles' sexual abuse of M.S.H.  (A copy of Dr. Marks' May 22, 2018 letter is attached as **Exhibit 38**.)  In his letter Dr. Marks raised his concerns about M.H.'s safety when with Grandmother Haynes and Charles.  In Dr. Marks' opinion, the Divorce Court mishandled Plaintiff's divorce case and Williams was "tampering" with M.H.'s prospective testimony at Charles' criminal trial. Dr. Marks stated:

> The Court initially placed both M.H. and S.H. with the Paternal Grandmother. The record indicates that her Father had unsupervised access to her during that entire period. M.H. was hospitalized twice after that placement was terminated. I have spoken to her Foster Mother in the last placement who has shared with me her notes of what she says M.H. told her about her sexual abuse. Third, the psychological report has two tells, a) the examiner states that M.H. is withholding information and b) that when she was disciplined her Father would sit with her to help her deal with what the consequences of her behavior. Her Mother was left to be the "bad person". ***I believe that M.H. may soon disclose because her secret will get too hard to carry and she will need to talk about it with someone. I would like that person to be me as I believe that she can be properly protected***.        [Emphasis added.]

Dr. Marks further stated:

> My biggest concern with this case process is that it has been going on too long and the alleged perpetrator has been out on bond. It is my experience

41

that many perpetrators will have multiple victims before they are actually apprehended. I believe the research will support that the average perpetrator will have as many as 60 victims before apprehension. I once consulted on a case with two police officers who had 106 victims before they were apprehended.

My second concern is the defense strategy as it appears to be to discredit the Mother and keep the pressure on the family to prevent M.H. from disclosing her abuse. ***Apparently winning is more important that protecting the kids. If it is just about keeping the father out of prison, then how did so many people decide to compromise their own integrity, and did they really think that no one would notice***?    [Emphasis added]. (See **Exhibit 38**.)

166.    On June 27, 2018, the Juvenile Court in cases 17RI-JU00011 (S.H.) and 17RI-JU00012[8] (M.H.) terminated its jurisdiction and awarded physical and legal custody of M.H. and S.H. to Plaintiff.  (A copy of the June 27, 2018 Court Orders and the DFS request to close the case is attached as **Exhibit 39**.)  The DFS concluded "***Children's Division believes it is in the best interests of M.H. and S.H. to remain in the physical custody of Cindy Haynes and return to the legal custody of Cindy Haynes on June 27, 2018***." [Emphasis added.]  In support of its decision, the relevant sections of the DFS request state:

**The family is thriving in all areas of the Five Domains of Wellbeing.**

**Social Connectedness**
- ***The family has built a strong support group and surrounded themselves with positive, encouraging people.*** They regularly see Dr. Jerry Marks in Washington, MO for counseling, M.H. and S.H. love going to school and have a good relationship with their teacher and principal, former foster parents – John and Cassie Rideout – still have contact with the family and spend time with M.H. and S.H. and ***the family has extended family support.***
(All contrary to Williams' statements in her January 29, 2018 email to DFS.)
**Safety**
- CD and JO have been in the home with the family every month since July 2017 and have had no reported concerns regarding safety. ***Cindy has followed through in keeping Charles Haynes away from the home and the children, multiple counselors –Cindy Moses, Scott Foster, and Jerry Marks- have***

---

[8]  Plaintiff asks the Court to take a judicial notice of the complete record of the juvenile proceedings 17RI-JU00011 and 17RI-JU00012 which were pending in Ripley County, Missouri.

*reported they have no safety concerns with the emotional, physical, or mental stability of Cindy having custody of M.H. and S.H.   [Emphasis added.]*
*- M.H. has not had episodes of self-harm: cutting or hospitalization for mental instability since March 2017.*
(All contrary to Williams' statements in her January 29, 2018 email to DFS.)

**Meaningful access to relevant resources**
*- Cindy is able to meet the needs of the family.* They travel to Washington, MO monthly for counseling with Dr. Jerry Marks, the family sees Dr. Bost, PCP, as needed, M.H. had a psychological evaluation completed, there is a surplus of food in the home and the family owns their home with no intentions of moving. When M.H. needed an attorney for the Juvenile Summons Plaintiff hired one.
(All contrary to Williams' statements in her January 29, 2018 email to DFS.)

**Stability**
- The family is not nomadic; they own their home – utilities are on, and bills are paid, M.H. and S.H. have regular attendance at school, they attend monthly counseling session, extended friends and family are available for support (when the family is not home there are people who watch the home for safety), M.H. was on medication for depression and sleep and no longer requires them because she uses coping mechanisms learned through counseling. The relationship between Plaintiff and children is consistent and there were no concerns reported during visits or THP.
(All contrary to Williams' statements in her January 29, 2018 email to DFS.)

**Mastery**
*- Cindy has shown self-efficacy in her ability to success in accomplishing specific tasks even when she does not see the relevance to the case (i.e., parenting classes).* M.H. has been using coping skills of talking to supports, walking and reading to prevent further time in psychiatric hospitals or having the urge to cut/smoke marijuana. S.H. and M.H. are academically ahead of peers their age.
(All contrary to Williams' statements in her January 29, 2018 email to DFS.)

**Children's Division Assessment / Recommendation:**
Children's Division believes it is in the best interest of M.H. and S.H. to remain in the physical custody of Cindy Haynes and return to the legal custody of Cindy Haynes on June 27, 2018.   [Emphasis added.]
(All contrary to Williams' statements in her January 29, 2018 email to DFS.)
(See **Exhibit 39**.)

167.    On September 4, 2018, Charles pleaded guilty to a Class C Felony, Statutory

Sodomy of a Minor in the Second Degree under R.S. Mo. §566.064 for sexually abusing M.S.H.

At that hearing Charles stated:

| | |
|---|---|
| THE COURT: | Sir, how do you plead to the Class C felony of statutory sodomy in the Second Degree, guilty or not guilty? |
| DEFENDANT: | Guilty. |
| THE COURT: | Do you further understand that by pleading guilty you are making an incriminating statement with regard to the charge and the presumption that you are innocent and the requirement that a jury be convinced of your guilt beyond a reasonable doubt are lost to you? |
| DEFENDANT: | Yes. |
| THE COURT: | You understand that by pleading guilty you waive your right to trial and admit the essential elements of the charge against you in count four? |
| DEFENDANT: | Yes. |
| THE COURT: | Have any threats or promises been made to you to induce you to enter your plea of guilty? |
| DEFENDANT: | No. |
| THE COURT: | Sir, what is the range of punishment on this class c felony? |
| DEFENDANT: | Seven years. I think. |
| THE COURT: | It's up to seven years in prison, did you understand that before you entered your guilty plea? |
| DEFENDANT: | Yes. |
| THE COURT: | Are you pleading guilty because you are in fact guilty and admit that you committed the offense charged? |
| DEFENDANT: | Yes. |
| THE COURT: | Tell me in your own words what you did? |
| DEFENDANT: | I had M.S.H. perform oral sex on me in Ripley County. |
| THE COURT: | The prosecuting attorney alleges that on or about between late November or early December of 2013, in Ripley County, Missouri, you had deviate sexual intercourse with M.H., whose date of birth is January 15, 1999, and at that time M.H. was |

44

less than 17 years old and you were 21 years of age or older. Is that what you did?

DEFENDANT:   Yes.

(A copy of the transcript of Charles' guilty plea testimony of September 4, 2018 is attached as **Exhibit 40.**)

168.   On November 23, 2018, M.H. told Plaintiff and M.S.H. that Williams threatened her again that if M.S.H., Plaintiff or M.H. testified against Charles at this upcoming sentencing hearing, Williams would return M.H. and S.H. to foster care.  Williams told M.H. that Williams would be asking the Court to put her father on probation at his sentencing hearing on November 26, 2018.

169.   On November 23, 2018, M.H. told Plaintiff and M.S.H., "I am scared of going back to foster care."  "I'm going to kill myself first before I go back to foster care."  "I can't deal with dad anymore, if he is free on probation."  Plaintiff told M.H. that she would fight for M.H.'s custody.  She would protect M.H. from Charles and that Plaintiff would seek again Williams' disqualification from the divorce case.

170.   On November 24, 2018, M.H. hung herself.

171.   Because of M.H.'s death, Charles's sentencing set for November 26, 2018, was rescheduled to December 12, 2018.

172.   On December 12, 2018, Williams testified at Charles's sentencing seeking that he should be placed on probation instead of being incarcerated.  According to Williams "both of these children (M.H. and S.H.) were highly sexualized for their age."  (A copy of the transcript of Williams' December 12, 2018 testimony at Charles' sentencing is attached as **Exhibit 41**; pg. 35, ln. 22 to pg. 36, ln. 8.)  Williams was GAL in the Divorce and Juvenile cases as well as M.H.'s personal attorney when she testified on behalf of Charles.

45

173.     At the same hearing, Williams testified that Plaintiff asked her to speak with M.S.H., but Williams declined to speak with M.S.H. because Williams did not want to "jeopardize" her ability to testify for Charles at his criminal trial.  (See **Exhibit 41**; pg. 26, ln. 8-19.)

174.     Williams testified that M.H. and S.H. told her that they did not want to be around Charles and Grandmother Haynes because they "abused M.H. and S.H. verbally and emotionally."  Williams testified that "it was not a concern for me because of the level of influence exerted by mother and M.S.H. on the children."  (See **Exhibit 41**; pg. 29, ln. 23 to pg. 30, ln. 23.)  Williams painted Plaintiff and M.S.H. as villains who helped convict Charles (even though Charles pled guilty to sexually abusing M.S.H.) and convinced M.H. and S.H. not to want to be with Charles.  In reality, no other person's testimony convicted Charles.  Only Charles' testimony did.

175.     Williams was not concerned that Charles threatened to kill M.S.H. and bury her and her mother.  Williams was not concerned that Charles admitted that he sodomized and had sex with his minor stepdaughter, M.S.H.

176.     The recording of Charles admitting sexual abuse of M.S.H. and his threats to kill M.S.H. and Plaintiff were in the custody of the Doniphan Police Department and Criminal Court in Cases *State v. Charles Haynes*, Cause No. 13RI-CR00907 and 13RI-CR00907-01.  (See **Exhibit 7**.)  Williams threatened Plaintiff to return S.H. and M.H. into foster care if Plaintiff disclosed Charles' admissions and threats to the Divorce Court.  Williams still maintained that M.S.H. was a villain who fabricated the abuse even after Charles admitted his guilt.

177.     Grandmother Haynes testified that Charles was a wonderful son, who took care of all her needs and helped her with everything and that he was a role model parent.

46

178.    On December 18, 2018 Plaintiff and M.S.H. did not testify at Charles's

sentencing.  Both were afraid that Williams would take steps to have S.H. returned to foster care

as Williams threatened many times.

179.    Despite Williams' testimony seeking Charles's probation, on December 12, 2018,

Charles was sentenced to serve a seven (7) year term of imprisonment for sodomizing his minor

stepdaughter, M.S.H.  (A copy of Charles' sentence in his criminal case dated December 12,

2018 is attached as **Exhibit 42**.)

180.    On March 17, 2020 Dr. Marks reported to Plaintiff's attorney that:

> S.H. had an older biological sister M.H. who perished by suicide. It
> remains my belief that M.H. was sexually abused by her father over a
> period of time but specifically while she was in the custody of the
> Division living at her paternal grandmother's home. M.H. was also a
> patient under my care, and I have included the reports that I provided to
> the Division as well as a letter that I wrote for the Special Counsel who
> was appointed by the Attorney general of MO.
>
> It is my understanding that the GAL who was appointed to the cases of
> both S.H. and M.H. testified at trial on behalf of Mr. Haynes. This
> testimony, if it occurred, is in my opinion more than just a conflict of
> interest and may rise to the level of professional misconduct. Since the
> entire process of the criminal case was suspicious and may have been the
> cause of M.H.'s death by suicide; I want to recommend that S.H. have no
> contact with her biological father, Mr. Haynes until she is at least 18 years
> of age. I would further recommend that contact with Mr. Haynes would
> only be initiated by S.H. when she believes that she is strong enough to
> handle whatever manipulation he may try to use to get her to believe that
> he is innocent of the charges.

(A copy of Dr. Marks' March 17, 2020 letter is attached as **Exhibit 43.**  Plaintiff provided this

letter to Williams.)

181.    From the time of his appointment until M.H.'s death, therapist Marks was of the

opinion that M.H. should have no contact with her father.  From the time of his appointment until

S.H. turns 18, Dr. Marks expressed his opinion that S.H. should have no contact with her father.

Williams did not report Dr. Marks' opinions to the Divorce Court and did not protect M.H. Plaintiff tried to set up a hearing with the Divorce Court for which Williams and Charles' attorney persistently requested continuances which were granted.  At that time, Plaintiff, was not represented by an attorney and she was not successful in delivering Dr. Marks' message to the Divorce Court.

182.    From the date of her first involvement in the case on May 6, 2016 until M.H.'s death on November 24, 2018, Williams repeatedly threatened M.H. with her and her sister's placement in foster care if M.H., Plaintiff or M.S.H. testified against her father at his criminal trial or at his sentencing.  M.H. reported these threats to her doctors, Plaintiff and her stepsisters, M.S.H., and Mindy.  (A copy of several of these messages M.H. texted of Williams' threats is attached as **Exhibit 44**.)

**183.    Such threats were not within the scope of Williams' duties as a GAL.  They also violated her duties as an attorney for S.H. and M.H.**

184.    Williams instructed S.H. and M.H. not to discuss Williams' conversations with the girls with anyone, especially with Plaintiff, their mother.  Williams threatened S.H. and M.H. that Williams would place S.H. and M.H. in foster care if they shared with anyone, especially with their mother, their conversations with Williams.  Williams' constant threats were not within the scope of her duties as a GAL.  They also violated her duties as an attorney for S.H. and M.H.

185.    On April 29, 2021, Williams withdrew from the divorce case.  In her Motion to Withdraw, Williams stated that "**she believed that all of the underlying custody matters were resolved due to Petitioner's [Charles'] incarceration**."        [Emphasis added.]

186.    Throughout her involvement in the Haynes divorce, Williams consistently and persistently attempted to keep Charles out of jail and/or on probation and to reunite M.H. with

her abuser, her father, through custody, visitation, and joint therapy instead of protecting M.H. as the law required.

187.    On July 27, 2021 Dr. Jerry Marks wrote a letter addressed to the Divorce Court in Doniphan, Missouri. The letter stated:

> Cynthia's care and protection of the girls never raised any concerns in my mind.  The girls were overachieving at school leading me to wonder how the DIVISION ever took custody of the girls in the first place.  There have been so many politically motivated decisions made in this case, that made me wonder many times that the best interests of the children [in this case] were not protected, but plainly thwarted. These children were exposed to danger which led to tragedy. I am disturbed that the officers of the Court, including attorneys and several agencies of the Court were used to further their agenda in protecting a child molester; and disregarded the felonious nature of childhood sexual abuse which took place in this family and in this case.
>
> **I would not support the appointment of another GAL as the Court and the GAL [in this case] had demonstrated that any of their actions are not in the best interests of the children [and not in the best interests of S.H.].**          [Emphasis in the original.]

(A copy of Dr. Marks' July 27, 2021 letter is attached as **Exhibit 45.**)

## IV.    CAUSES OF ACTION

## COUNT I – WRONGFUL DEATH – ACTING OUTSIDE THE SCOPE OF GAL DUTIES
### (DEFENDANTS WILLIAMS AND SPAIN, MILLER)

188.    Plaintiff realleges and incorporates herein the allegations in the paragraphs stated above as if fully set forth herein.

189.    Plaintiff is the mother of M.H., and is in the class of individuals authorized to pursue wrongful death claims against all of the named Defendants pursuant to R.S. Mo. §537.080.

190.    As a court appointed GAL, Williams' duty was to advocate for the best interests

of M.H. by providing the Divorce Court relevant information bearing on M.H.'s interests

untainted by the parochial interests of M.H.'s father. *Guier v. Guier,* 918 S.W.2d 940, 950 (Mo.

App. W.D. 1996); *In re Marriage of Patroske*, 888 S.W.2d 374, 384-85 (Mo. App. S.D. 1994).

191.     Williams had a duty to comply with R.S. Mo. §452.423.3 (1)-(2)[9] and Missouri

case law requiring her to investigate and to report to the Divorce Court M.H.'s safety concerns,

wishes, attachments and attitudes, all of which were paramount. *Keling*, 155 S.W.3d at 834

<u>supra</u>.

192.     Williams had a duty to comply with R.S. Mo. §210.115 requiring her to hotline

allegations of sexual abuse of M.H. by her father to the police and the Department of Family

Services (DFS) and to hotline Grandmother Haynes' failure to protect M.H. while M.H. was in

Grandmother Haynes' custody.  A reasonable GAL acting under the same or similar

circumstances would have hotlined M.H. being abused.

193.     Williams had a duty to comply with the MRPR which have the force and effect of

judicial decisions. *McVeigh*, 401 S.W.3d at 287, <u>*supra*</u>.  Williams had a duty to act within the

scope of the GAL duties (Rule 4-1.2) to protect M.H. from harm by taking all necessary

protective actions (Rule 4-1.14[10]) because M.H. was a minor.

---

[9]   The guardian ad litem shall:
   (**1**)    Be the legal representative of the child [child's best interests] at the hearing, and
may examine, cross-examine, subpoena witnesses, and offer testimony;
   (**2**)    Prior to the hearing, conduct all necessary interviews with persons having contact
with or knowledge of the child in order to ascertain the child's wishes, feelings, attachments, and
attitudes. If appropriate, the child should be interviewed;
   (**3**)    Request the juvenile officer to cause a petition to be filed in the juvenile division of
the circuit court if the guardian ad litem believes the child alleged to be abused or neglected is in
danger.

[10]   The MRPR 4-1.14 states:
   (a)   When a client's capacity to make adequately considered decisions in connection with
a representation is diminished, whether because of minority, mental impairment, or for
some other reason, the lawyer shall, as far as reasonably possible, maintain a normal

194.    Williams had a duty to comply with the Missouri Supreme Court GAL Standards which required Williams to be guided by the **best interests of M.H.** and demanded Williams to exercise independent judgment on behalf of M.H. (Standard 3); to diligently and faithfully advocate a position in the best interests of M.H. (Standard 4); to communicate with M.H. regularly (Standard 5); to investigate and review all necessary information pertaining to M.H.'s best interests and not rely on information provided by third parties (Standard 6); to maintain confidentiality of information (Standard 7); to advocate for timely hearings and compliance with the law and court orders (Standard 8); to explain to M.H. the purpose of each court proceeding (Standard 9); to present evidence, file pleadings, and call witnesses when appropriate to ensure all information relevant to M.H.'s best interests is presented to the court for consideration (Standard 11); and to present the evidence and recommendations to the Divorce Court consistent with M.H.'s best interests (Standard 13).

195.    At all times pertinent hereto, Williams violated her duties and acted outside the scope of her duties as a GAL in the Haynes divorce in one or more of the following respects:

a.    Threatening M.H. that if her mother, her stepsister, and/or M.H. testified against Charles in his pending sexual abuse criminal case, M.H. and S.H. would be returned to foster care;

b.    Threatening to cut M.H. and S.H.'s visitation time with Plaintiff, if M.H., Mellissa, or Plaintiff testified against Charles in his criminal case;

c.    Threatening M.H. that if her mother, stepsister, and/or M.H. testified against Charles at his sentencing, M.H. and S.H. would be returned to foster care;

---

client-lawyer relationship with the client.
(b)   When the lawyer reasonably believes that the client has diminished capacity; is at risk of substantial physical, financial or other harm unless action is taken; and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a next friend, guardian ad litem, conservator or guardian.

d.      Placing M.H. in a double bind by threatening that if she, her stepsister and/or her mother testified against Charles at his criminal trial, M.H. would be placed in foster care, but if she did not testify against her father, and her father was released or placed on probation as Williams advocated, that M.H. would be placed in her father's custody or required to spend time with her father, who had sexually abused M.H.;

e.      Testifying at Charles' sentencing favorably to Charles seeking to have Charles placed on probation;

f.      Testifying at Charles' sentencing hearing that Charles was not at fault because M.H. and S.H. were "highly sexualized;"

g.      Failing to realize that her perception that S.H. and M.H. were "highly sexualized" was the direct result of sexual abuse by their father;

h.      Failing to protect M.H. from sexual abuse at Grandmother Haynes' house;

i.      Failing to report to the Divorce and Juvenile Courts that M.H. was sexually, physically, and emotionally abused by Charles;

j.      Failing to hotline sexual, physical, and emotional abuse M.H. suffered in the custody of Grandmother Haynes as was required by R.S. Mo. §210.115;

k.      Willfully insisting on M.H.'s interaction with her father and Grandmother Haynes knowing that both of them abused or allowed the abuse of M.H. sexually, emotionally, and/or physically;

l.      Advocating for M.H.'s reunification with her sexual abuser;

m.      Threatening M.H. that if she did not reunify with Charles, M.H. would be placed back in foster care or, worse, in the custody of Charles, her sexual abuser;

n.      Not reporting to the Divorce and Juvenile Courts M.H.'s physical and mental condition;

o.      Failing to seek appropriate healthcare personnel to help M.H. combat depression, PTSD, and sexual abuse trauma;

p.      Promoting false allegations of "educational neglect even while M.H. and S.H. were excelling at school;" and

q.   Failing to protect M.H. from false allegations of educational neglect, *Taylor v. Taylor,* 60 S.W.3d 652 (Mo. App. E.D. 2001).

196.   The acts and/or omissions of Defendants Williams and Spain, Miller outside the scope of Williams' duties as a GAL, caused or contributed to cause M.H. to suffer sexual abuse, severe and excruciating emotional pain, loss of dignity, and deterioration of her mental health which resulted in her suicide, her wrongful death.

197.   The acts and/or omissions of Defendants Williams and Spain, Miller caused or contributed to cause M.H. taking her life on November 24, 2018.

198.   The acts and/or omissions of Defendants Williams and Spain, Miller caused or contributed to cause Plaintiff suffering the following damages:

a.   Past, present and future loss of love, affection, care, and companionship of her daughter M.H.;

b.   M.H. suffering excruciating pain and anguish which also traumatized and hurt Plaintiff for the past six years and into the future;

c.   Reasonable and necessary expenses for funeral and related charges; and

d.   Future earnings, wealth, and/or support from M.H.

199.   Plaintiff's suffering and damages are continuing and ongoing and will continue into the future.

200.   Plaintiff is entitled to recover against Defendants Williams and Spain, Miller for causing aggravating circumstances leading to M.H.'s death as authorized by R.S.Mo. §537.090.

Wherefore, Plaintiff seeks actual damages and aggravating circumstances damages against Defendants Williams and Spain, Miller as set forth above in fair and reasonable amounts allowed by the Missouri Wrongful Death Statute each in excess of One Hundred Thousand ($100,000.00) to be determined by a jury, plus attorney fees and such costs and other and further

relief to which Plaintiff is entitled as determined by this Court.

## COUNT II – WRONGFUL DEATH – LEGAL MALPRACTICE
### (DEFENDANTS WILLIAMS AND SPAIN, MILLER)

201.    Plaintiff realleges and incorporates the allegations in the paragraphs stated above as if fully set forth herein.

202.    Williams became M.H.'s personal attorney on January 30, 2017 in the Haynes' divorce.  In this role, Williams owed M.H. the duty to exercise the skill and learning ordinarily exercised by attorneys under the same or similar circumstances. *Johnson v. Sandler, Balkin, Hellman & Weinstein*, 958 S.W.2d 42, 52 (Mo. App. W.D. 1997); *Steward v. Goetz*, 945 S.W.2d 520, 531 (Mo. App. E.D. 1997).

203.    Williams also owed M.H. the duty of care as was established by the Divorce Court Order making Williams M.H.'s private attorney.

204.    Williams departed from the established standards of her profession when representing M.H. in the Haynes divorce and juvenile proceedings by failing to exercise the required degree of skill and learning ordinarily exercised by attorneys representing minors in family court and juvenile court proceedings under the same or similar circumstances by the members of legal profession in one or more of the following ways:

> a.   Threatening M.H. that she would place M.H. and her sister in foster care, if M.H., M.S.H., or Plaintiff testified against Charles in his criminal case;
>
> b.   Threatening M.H. that she would cut M.H. and S.H.'s visitation time with Plaintiff, if M.H., M.S.H., or Plaintiff testified against Charles in his criminal case;
>
> c.   Threatening M.H. that she would place M.H. and S.H. back into foster care if M.H., M.S.H., or Plaintiff testified against Charles at his sentencing hearing;
>
> d.   Threatening M.H. that she would return M.H. and S.H. to foster care if M.H.

54

told Plaintiff about Williams' threats and M.H.'s conversations with Williams;

e.  Promoting false allegations of educational neglect by Plaintiff;

f.  Ignoring M.H.'s wishes not to have any contact with Charles and Grandmother Haynes;

g.  Ignoring the recommendations of M.H.'s health care providers and DFS personnel that M.H. should be returned into the custody of Plaintiff and not have any contact with Charles;

h.  Misrepresenting to the Divorce Court that Plaintiff consented to M.H. and S.H.'s foster care placement in February 2017;

i.  Refusing and failing to communicate with M.H.;

j.  Refusing to protect M.H. from bullying at the Doniphan Public School;

k.  Disclosing M.H.'s confidential communications that she was afraid of Charles to Charles and Grandmother Haynes;

l.  Instructing DePaul Hospital to deny Plaintiff access to M.H. when she was hospitalized to treat M.H.'s self-mutilating behavior without having authority to do so; and

m.  Committing such other breaches of professional duties of care as will be shown by discovery in this case.

205.    The acts and/or omissions of Defendants Williams and Spain, Miller as personal attorneys for M.H., caused or contributed to cause M.H. to suffer sexual abuse, severe and excruciating emotional pain, loss of dignity, and deterioration of her mental health which resulted in her suicide.

206.    The acts and/or omissions of Defendants Williams and Spain, Miller caused or contributed to cause M.H. taking her life on November 24, 2018.

207.    The acts and/or omissions of Defendants, Williams and Spain, Miller caused or contributed to cause Plaintiff to suffer the following damages:

a.  Loss of love, affection, care, and companionship of her daughter M.H.;

55

    b.  M.H. suffering excruciating pain and anguish which Plaintiff witnessed and so which also traumatized and hurt Plaintiff for the past six years and into the present and future;

    c.  Reasonable and necessary expenses for funeral and related charges; and

    d.  Future earnings, wealth, and/or support from M.H.

208.    Plaintiff's suffering and damages are continuing and ongoing and will continue into the future.

209.    Plaintiff is entitled to recover against Defendants Williams and Spain, Miller for causing aggravating circumstances leading to M.H.'s death as authorized by R.S Mo.§537.090.

Wherefore, Plaintiff seeks actual damages and aggravating circumstances damages against Defendants Williams and Spain, Miller as set forth above in fair and reasonable amounts allowed by the Missouri Wrongful Death Statute each in excess of One Hundred Thousand ($100,000.00) to be determined by a jury, plus attorney fees and costs and such other and further relief to which Plaintiff is entitled as determined by this Court.

## COUNT III - WRONGFUL DEATH - BREACH OF FIDUCIARY DUTIES
### (DEFENDANTS WILLIAMS AND SPAIN, MILLER)

210.    Plaintiff realleges and incorporates the allegations in the paragraphs stated above as if fully set forth herein.

211.    By becoming M.H.'s personal attorney in the Haynes divorce, Williams and Spain, Miller acknowledged their obligation to comply with their fiduciary duties to M.H.

212.    As M.H.'s attorney, Williams and Spain, Miller owed M.H. an unconditional duty of fidelity, loyalty, and integrity when representing M.H.

213.    By virtue of Williams' entry of appearance as M.H.'s personal attorney, a trust and a fiduciary relationship existed between M.H. and Williams.  Williams accepted the trust and

fiduciary duties with respect to M.H.'s representation as M.H.'s personal attorney.

214.     The MRPR provide standards for determining the duties that attorneys owe their clients. *McRentals, Inc. v. Barber*, 62 S.W.3d 684, 697 (Mo. App. W.D. 2001); *Beare v. Yarbrough*, 941 S.W.2d 552, 556 (Mo. App. E.D. 1997).  In *McRentals, Inc*., the court referred to the ethical rules for guidance in determining the fiduciary duty owed to a client by an attorney. *McRentals, Inc.,* 62 S.W.3d at 697.  In *Beare*, the court considered the ethical rules in determining whether an attorney was engaged in a conflict of interest.  *Beare,* 941 S.W.2d at 556.

215.     Williams and Spain, Miller breached their fiduciary duties owed M.H. in one or more of the following respects:

a.     By failing to withdraw from their representation of M.H. in the Haynes' divorce when faced with conflicts of interest in serving as a GAL in Juvenile and Divorce cases, as well as serving as M.H.'s personal attorney, all while advocating for Charles and his interests;

b.     By placing Charles' interests above M.H.'s interests and her safety by advocating for Charles to have custody and visitation with M.H. and/or to be reunited with M.H.;

c.     By advocating for M.H. to be placed with Grandmother Haynes and for Grandmother Haynes to supervise Charles' time with M.H. knowing that Grandmother Haynes was unable to do competently so;

d.     Testifying at Charles' sentencing proceedings seeking Charles' probation instead of incarceration after Charles pleaded guilty to sexual deviant sodomy of M.H.'s stepsister, M.S.H.;

e.     Threatening M.H. that she [Williams] would return M.H. and S.H. to foster care if Plaintiff, M.S.H. or M.H. testified at Charles' criminal proceeding and later at his sentencing hearing.

f.     Failing to advise M.H. and Plaintiff to seek an ethics opinion and to seek an informed written consent from M.H. and Plaintiff with respect to Williams' conflicting representation of M.H. in Williams' role as her GAL and in her role as M.H.'s personal attorney;

g.      Disclosing to Grandmother Haynes and Charles M.H.'s confidential conversations with Williams pertaining to M.H.'s concerns about her safety;

h.      Not reporting to the Divorce Court that Charles sexually abused M.H. and that Grandmother Haynes failed to supervise Charles as the Divorce Court ordered;

i.      Collecting compensation from Charles and Grandmother Haynes in violation of MRPR 4-1.8(f)[11] which interfered with Williams' independent professional judgment and with Williams' and M.H.'s client-lawyer relationship;

j.      Protecting Charles and Grandmother Haynes and shielding them from any responsibility for the harm they caused M.H.;

k.      Implying to the court in Charles' criminal proceedings that it was M.H.'s and S.H.'s fault that Charles was convicted because of Williams' own personal opinion that M.H. and S.H. were "too sexualized for their age;" and

l.      For failing to realize that the reason she believed M.H. and S.H. were "too sexualized for their age" was because M.H. had been sexually abused by their father according to M.H.'s own pediatrician and therapist.

216.    The acts and/or omissions of Defendants Williams and Spain, Miller in conflict with their duties as M.H.s' personal attorneys caused or contributed to cause M.H. to suffer sexual abuse, severe and excruciating emotional pain, loss of dignity, and deterioration of her mental health which resulted in her suicide.

217.    The acts and/or omissions of Defendants Williams and Spain, Miller in conflict with their duties as M.H.s' personal attorneys caused or contributed to cause M.H. taking her life on November 24, 2018.

---

[11]   A lawyer shall not accept compensation for representing a client from one other than the client unless:
     (1)  the client gives informed consent;
     (2)  there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and (3) information relating to representation of a client is protected as required by Rule 4-1.6.

218.    The acts and/or omissions of Defendants, Williams and Spain, Miller in conflict with their duties as M.H.s' personal attorneys caused or contributed to cause Plaintiff suffering the following damages:

      a.     Past, present and future loss of love, affection, care, and companionship of her daughter M.H.;

      b.     M.H. suffering excruciating pain and anguish, which Plaintiff witnessed and so which also traumatized and hurt Plaintiff for the past six years and into the present and future;

      c.     Reasonable and necessary expenses for funeral and related charges; and

      d.     Future earnings, wealth, and/or support from M.H.

219.    Plaintiff's suffering and damages are continuing and ongoing and will continue into the future.

220.    Plaintiff is entitled to recover against Defendants Williams and Spain, Miller for causing aggravating circumstances leading to M.H.'s death as authorized by R.S. Mo. §537.090.

Wherefore, Plaintiff seeks actual damages and aggravating circumstances damages against Defendants Williams and Spain, Miller as set forth above in fair and reasonable amounts allowed by the Missouri Wrongful Death Statute each in excess of One Hundred Thousand ($100,000.00) to be determined by a jury, plus attorney fees and costs and such other and further relief to which Plaintiff is entitled as determined by this Court.

## COUNT IV – PERSONAL CLAIM OF PLAINTIFF - ACTING OUTSIDE THE SCOPE OF GAL DUTIES
### (DEFENDANTS WILLIAMS AND SPAIN, MILLER)

221.    Plaintiff realleges and incorporates the allegations in the paragraphs stated above as if fully set forth herein.

222.    Williams owed a duty of care to Plaintiff.  *In re Krigel*, 480 S.W.3d 294, 299

(Mo. 2016).[12]

223.    Williams was prohibited from making a false statement of material fact or law to the Divorce Court, the DFS and the Juvenile Courts.  *In re Krigel*, 480 S.W.3d at 299.

224.    Williams was prohibited from using litigation tactics during the Haynes' divorce that had no substantial purpose other than to embarrass, delay, or burden Plaintiff.  *In re Krigel*, 480 S.W.3d at 299.

225.    Williams was prohibited from engaging in professional misconduct that was prejudicial to the administration of justice and to Plaintiff.  *In re Krigel*, 480 S.W.3d at 299.

226.    Williams had a duty to comply with the MRPR and the Supreme Court GAL Standards in her dealings with Plaintiff and in performing her GAL duties in the Haynes divorce. *In re Krigel*, 480 S.W.3d at 299.

227.    At all times pertinent hereto, Williams acted outside the scope of her duties as a GAL in the Haynes divorce in one or more of the following respects:

      a.      Promoting false allegations of "educational neglect" against Plaintiff;

      b.      Seeking placement of S.H. and M.H. into foster care based on false allegations of "educational neglect" against Plaintiff;

      c.      Threatening Plaintiff and M.H. that she would reduce Plaintiff's visitation time with S.H. and M.H. while they were in foster care if Plaintiff or M.S.H. testified against Charles in his criminal case;

      d.      Threatening Plaintiff that she would return S.H. and M.H. to foster care if Plaintiff or M.S.H. testified against Charles in his criminal case and/or at his sentencing hearing;

---

[12]   An attorney owes a duty to persons not her clients in certain circumstances. *Donahue v. Shughart, Thomson & Kiroy, PC*, 900 S.W.2d 624, 629 (Mo. *banc* 1995) (attorneys owe fiduciary duties to a third party, where the third party was to benefit from the attorney's services); *Kennedy v. Kennedy*, 819 S.W.2d 406, 410 (Mo. App. E.D. 1991) (an attorney is liable to third parties if the attorney is guilty of fraud, collusion, malicious or tortious act); *Deutsch v. Wolf*, 994 S.W.2d 561, 571 (Mo. 1999) (the accountant for the trust owed a fiduciary duty to the trust beneficiaries).

e.       Threatening M.H. to reduce her visitation time with Plaintiff if M.H. testified that Charles had sexually abused her;

f.       Threatening M.H. to be returned to foster care if M.H. testified that Charles had sexually abused her;

g.       Instructing DePaul Hospital personnel not to allow Plaintiff to visit M.H. while M.H. was hospitalized for self-mutilating behavior because of Charles' sexual abuse;

h.       Repeatedly advocating for S.H. and M.H. to be reunified with Charles and Grandmother Haynes knowing that neither of them protected S.H. and M.H. as the Divorce Court required;

i.       Not reporting to the Divorce and Juvenile Courts that Charles sexually abused M.H.;

l.       Testifying at Charles' sentencing hearing favorably to Charles implying that Charles was convicted because of M.H. and S.H.'s fault of "being highly sexualized;"

m.       For failing to realize that the reason she perceived M.H. and S.H. of "being highly sexualized" was because M.H. had been sexually abused by their father, according to M.H.'s own pediatrician; and

n.       Ignoring the written findings of M.H.'s own pediatrician that M.H. had been sexually abused by her father.

228.    The acts and/or omissions of Defendants Williams and Spain, Miller enumerated above caused or contributed to cause Plaintiff to suffer severe and excruciating emotional pain, loss of enjoyment of life, and deterioration of Plaintiff's mental health.

229.    The acts and omissions of Defendants Williams and Spain, Miller caused or contributed to cause Plaintiff to suffer the following damages:

a.       Loss of love, affection, care and companionship of her daughters S.H. and M.H. while they were placed in foster care;

b.       Past, present and future loss of love, affection, care, and companionship of her daughter M.H.;

c.       Painful and stressful litigation for the past six years;

      d.     Significant medical expenses; and

      e.     Significant legal fees and court expenses.

230.    Plaintiff's suffering and damages are continuing and ongoing and will continue into the future.

231.    Plaintiff reserves her right to seek leave of the Court to pursue punitive damages at a later date as prescribed by R.S. Mo. §510.261 and to seek other and further relief as this Court deems just and proper under the circumstances.

Wherefore, Plaintiff seeks actual damages against Defendants Williams and Spain, Miller in fair and reasonable amounts allowed by law each in excess of One Hundred Thousand ($100,000.00) to be determined by a jury, plus attorney fees and costs and other and further relief to which Plaintiff is entitled as determined by this Court.

## COUNT V – WRONGFUL DEATH – NEGLIGENT SUPERVISION
### (DEFENDANT SPAIN, MILLER)

232.    Plaintiff realleges and incorporates the allegations in the paragraphs stated above as if fully set forth herein.

233.    Spain, Miller had a duty to hire individuals who were qualified to perform the duties set forth above and who did not present a danger to M.H.

234.    Spain, Miller had a duty to properly supervise Williams who was responsible for representing M.H. in the Haynes' divorce and who was not a partner, member and/or principal in Spain, Miller, but was a relatively recent law school graduate when she represented M.H.

235.    Spain, Miller failed in their duties to supervise Williams who failed and/or refused to properly represent M.H. as her personal client and who acted outside the scope of her authority as a GAL.

236.    Spain, Miller failed in their duties to supervise Williams' legal work in all regards herein, in that they did not recognize a conflict of interest in Williams' representation of M.H.'s best interests as GAL, M.H.'s personal interests as M.H.'s attorney and Charles' interests, which adversely impacted M.H.'s safety and led M.H. to her suicide.

237.    The acts and/or omissions of Defendant Spain, Miller caused or contributed to cause M.H. taking her life on November 24, 2018.

238.    The acts and/or omissions of Defendant Spain, Miller caused or contributed to cause Plaintiff suffering the following damages:

      a.    Past, present and future loss of love, affection, care, and companionship of her daughter M.H.;

      b.    M.H. suffering excruciating pain and anguish which Plaintiff witnessed and which also traumatized Plaintiff and hurt Plaintiff for the past six years and into the present and future; and

      c.    Reasonable and necessary expenses for funeral and related charges; and

      d.    Future earnings, wealth, and/or support from M.H.

239.    Plaintiff's suffering and damages are continuing and ongoing and will continue into the future.

240.    Plaintiff is entitled to recover against Defendant Spain, Miller for causing aggravating circumstances leading to M.H.'s death as authorized by R.S.Mo. §537.090.

Wherefore, Plaintiff seeks actual damages and aggravating circumstances damages against Defendants Williams and Spain, Miller as set forth above in fair and reasonable amounts allowed by the Missouri Wrongful Death Statute each in excess of One Hundred Thousand ($100,000.00) to be determined by a jury, plus attorney fees and costs and such other and further relief to which Plaintiff is entitled as determined by this Court.

## COUNT VI   WRONGFUL DEATH – NEGLIGENCE
### (DEFENDANT GRANDMOTHER HAYNES)

241.     Plaintiff realleges and incorporates the allegations in the paragraphs stated above as if fully set forth herein.

242.     By intervening in the Haynes' divorce and petitioning for S.H. and M.H.'s custody, Grandmother Haynes implied and/or acknowledged that she was physically and mentally capable to take care of M.H. and guaranteeing her safety.

243.     By accepting physical and legal custody of M.H., Grandmother Haynes testified at the Divorce Court hearing on December 7, 2016 that "her neck was on the line" in protecting the safety and wellbeing of M.H.

244.     Grandmother Haynes promised the Divorce Court she would comply with the December 22, 2016 Divorce Court Order and accepted the responsibility for M.H.'s safety. Grandmother Haynes promised to the Divorce Court and to Plaintiff that Charles would not have unsupervised access to M.H. while in her custody.

245.     Based on Grandmother Haynes' promises of her responsibilities, the Divorce Court placed M.H. in Grandmother Haynes' physical and legal custody.

246.     Grandmother Haynes owed M.H. a duty to protect her from sexual and/or other abuse by Charles.

247.     Grandmother Haynes failed to protect M.H. and was thereby negligent in one or more of the following ways:

      a.    Concealing from the Divorce Court her physical conditions including congestive heart failure and arthritis pain which demanded prescription painkillers and her need for insomnia medication;

      b.    Concealing from the Divorce Court her eyesight and hearing decline;

      c.    Failing to supervise Charles' visits with his daughters;

a. Granting Charles unsupervised and unfettered access to M.H. during the day and/or at night allowing Charles to sexually abuse M.H. while M.H. was in her custody;

e. Failing to report Charles' sexual abuse of M.H. to the police and the Divorce Court;

f. Failing to seek immediate medical help and support for M.H.; and

g. Demanding reunification of Charles and M.H. knowing that this reunification would traumatize and/or cause M.H. pain.

248. Grandmother Haynes knew and/or should have known that the above-described actions would expose M.H. to injury, mental health decline and suicide. *I.e.*, M.H.'s injuries, mental health decline and suicide were all foreseeable results of Grandma Haynes' actions and inactions.

249. The acts and/or omissions of Grandmother Haynes caused and/or contributed to cause M.H. to suffer sexual abuse, severe and excruciating emotional pain, loss of dignity, and deterioration of her mental health which resulted in her suicide.

250. The acts and omissions of Defendant Grandmother Haynes caused and/or contributed to cause Plaintiff to suffer the following damages:

a. Past, present and future loss of love, affection, care, and companionship of her daughter M.H.;

b. M.H. suffering excruciating pain and anguish which Plaintiff witnessed and so which also traumatized Plaintiff and hurt Plaintiff for the past six years and into the present and future;

c. Reasonable and necessary expenses for funeral and related charges; and

d. Future earnings, wealth, and/or support from M.H.

251. Plaintiff's suffering and damages are continuing and ongoing and will continue into the future.

252.     Plaintiff is entitled to recover against Defendant Grandmother Haynes for causing aggravating circumstances leading to M.H.'s death as authorized by R.S. Mo. §537.090.

Wherefore, Plaintiff seeks actual damages and aggravating circumstances damages against Defendant Grandmother Haynes as set forth above in fair and reasonable amounts allowed by the Missouri Wrongful Death Statute each in excess of One Hundred Thousand ($100,000.00) to be determined by a jury, plus attorney fees and costs and such other and further relief to which Plaintiff is entitled as determined by this Court.

## COUNT VII - WRONGFUL DEATH - SEXUAL ASSAULT & BATTERY
### (DEFENDANT CHARLES HAYNES)

253.     Plaintiff realleges and incorporates the allegations in the paragraphs stated above as if fully set forth herein.

254.     Charles, an adult in his fifties, who after physically and mentally manipulating M.H., began sexually assaulting her.  Plaintiff reasonably believes that in addition to the acts of sodomy, Charles also raped M.H.

255.     At all times of Charles' sexual assaults, M.H. was under the age of consent.

256.     Charles knowingly and willfully acted in a manner that created a substantial risk to the body, physical health, and mental health of M.H., a child, by repeatedly sexually abusing, sexually assaulting and/or sexually battering M.H.

257.     Charles knew that the above-described actions would expose M.H. to injury, to mental anguish, to the decline in her mental health and suicide.

258.     Charles acted with conscious disregard to M.H.'s safety, life, and her rights.

259.     Charles' conduct was willful, wanton, malicious, done with evil motive and criminal intent.

260.     Charles' intentional sexual assault and/or battery of M.H. caused or contributed to cause the loss, injuries, and damages suffered by M.H.

261.     These sexual assaults and/or batteries caused and/or contributed to cause M.H. to suffer sexual abuse, severe and excruciating emotional pain, loss of dignity, and deterioration of her mental health which resulted in her suicide.

262.     The sexual assaults and/or batteries by Defendant Charles caused and/or contributed to cause M.H. taking her life on November 24, 2018.

263.     The acts and/or omissions of Defendant Charles Haynes caused and/or contributed to cause Plaintiff suffering the following damages:

     a.     Past, present and future loss of love, affection, care, and companionship of her daughter M.H.;

     b.     M.H. suffering excruciating pain and anguish which Plaintiff witnessed and so which also traumatized Plaintiff and hurt Plaintiff for the past six years and into the present and future;

     c.     Reasonable and necessary expenses for funeral and related charges; and

     d.     Future earnings, wealth, and/or support from M.H.

264.     Plaintiff's suffering and damages are continuing and ongoing and will continue into the future.

265.     Plaintiff is entitled to recover against Defendant Charles Haynes for causing aggravating circumstances leading to M.H.'s death as authorized by R.S. Mo. §537.090.

266.     Because of his actions, Defendant Charles Haynes is not entitled to any share of damages awarded for the wrongful death of M.H.

Wherefore, Plaintiff seeks actual damages and aggravating circumstances damages against Defendant Charles Haynes in fair and reasonable amounts allowed by the Missouri Wrongful Death Statute each in excess of One Hundred Thousand ($100,000.00) to be

67

determined by a jury, plus attorney fees and costs and such other and further relief to which

Plaintiff is entitled as determined by this Court.

### JURY DEMAND

267.    Plaintiff requests trial by jury of all claims set forth above.


/s/ Laurence D. Mass
Laurence D. Mass, Esq. Bar # 30977 Mo.
230 S. Bemiston Avenue, Suite 1200
Saint Louis, Missouri 63105
Phone: (314) 862-3333 ext. 20
Fax: (314) 862-0605
e-mail: laurencedmass@att.net


/s/ Evita Tolu
Evita Tolu, Esq. Bar # 49878 Mo.
1 Crabapple Court
Saint Louis, Missouri 63132
Cell: (314) 323-6033
Fax:  (314) 207-0086
e-mail: evitatolu@outlook.com

Attorneys for Cynthia K. Haynes

68