UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHERN DISTRICT

| | | |
|---|---|---|
| **CYNTHIA K. HAYNES** | ) | |
| **(a/k/a Cynthia K. Randolph),** | ) | |
| **individually and under the Missouri Wrongful** | ) | |
| **Death Statute,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Cause No. 1:21-CV-00160-ACL** |
| | ) | |
| **JENNIFER WILLIAMS, individually** | ) | |
| | ) | |
| **JENNIFER WILLIAMS,** | ) | |
| **d/b/a WILLIAMS LAW** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **SPAIN, MILLER, GALLOWAY & LEE, LLC** | ) | |
| **A Missouri limited liability company,** | ) | |
| | ) | |
| **BERNICE HAYNES, individually and** | ) | |
| | ) | |
| **CHARLES HAYNES, individually** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANT BERNICE HAYNES' MEMORANDUM
IN SUPPORT OF HER MOTION TO DISMISS**

**I. Introduction.**

This case arises from what can only be described as a tragic family situation in Ripley County, Missouri. Plaintiff Cynthia Hanes ("Cynthia") and Defendant Charles Haynes ("Charles") are husband and wife, whose extremely contentious divorce began in 2013 and is still ongoing today. *See Haynes v. Haynes*, 13RI-CV00554 (the "Divorce Case").

While the Divorce Case was pending, Cynthia and Charles's daughter, M.H., committed suicide. That leads to this wrongful death case, wherein a horrible tragedy is now the basis for a crusade against the guardian ad litem, law firm, and others involved in the Divorce Case. Bernice Haynes ("Bernice"), M.H.'s 95-year-old grandmother is one of those others. At least

part of the contentious nature of the Divorce Case was Charles's criminal proceeding, in which he was accused of sexually abusing Cynthia's daughter from a previous marriage.  In December 2016, the Divorce Case became so contentious that Bernice intervened to seek temporary custody of M.H.  Bernice was in fact awarded temporary custody, but for little more than 30 days, at which time that custody arrangement also became contentious, and M.H. was sent back to foster care.  She stayed in foster care until July 2018, when she was placed back in Cynthia's custody.  On November 24, 2018, M.H. committed suicide by hanging herself.

The allegation is that Bernice allowed Charles to have unsupervised visitation with M.H., rather than the supervised visitation allowed by the Court's order.  This allegedly allowed Charles to sexually abuse M.H., which allegedly caused M.H. to commit suicide nearly 21 months later.  Disregarding the legal issue for a moment, Bernice loved M.H., and any contrary allegations in the Amended Complaint are frankly absurd.  Bernice, having endured the death of her granddaughter, must now recount in a legal proceeding, all the other reasons why her granddaughter committed suicide.  Staying with her grandmother for little more than 30 days did not cause M.H. to commit suicide some 21 months later.  The case against Bernice should be dismissed.

## II.  Standard of review.

Rule 12(b)(6) allows a court to dismiss the allegations in a complaint for failure to state a claim upon which relief can be granted.  "To survive a motion to dismiss, a complaint must allege facts sufficient to state a claim to relief that is plausible on its face."  *Ulrich v. Pope County*, 715 F.3d 1054, 1061 (8th Cir. 2013).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than just labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Benton v. Merrill Lynch &*

*Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008).   "Where the allegations show on the face of the complaint there is some insuperable bar to relief, dismissal under 12(b)(6) is appropriate."  *Id.*

In addition, the Court may consider matters of public record that are outside the Complaint in a 12(b)(6) motion, specifically including Missouri state court filings.  *See e.g. Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007); *Dixon v. Davis*, 2020 WL 6544250, *2 (E.D. Mo. 2020) ("Initially, it should be observed that the Court can take judicial notice of state court filings.  In Missouri, as in other states, court records are public records.").

**III. Facts for Bernice's Motion to Dismiss.**

All of the following facts are taken either directly from Cynthia's Amended Complaint [Doc. 6], from the filings in the Divorce Case or in some instances, both.  Bernice does not admit that any of Cynthia's allegations are true, but for purposes of this Motion those allegations should be considered as true.

-   M.H. was the daughter of Cynthia and Charles. [Am. Compl., Doc. 6, ¶¶ 4, 18].

-   M.H. was born on August 30, 2004.  [Am. Compl., Doc. 6, ¶ 3].

-   Cynthia and Charles were married on May 23, 2008.   [Am. Compl., Doc. 6, ¶ 20].

-   During the marriage, Charles physically and emotionally abused Cynthia and M.H.  [Am. Compl., Doc. 6, ¶¶ 23-24].

-   Cynthia filed for divorce against Charles in Randolph County, Missouri on May 11, 2011, which case was dismissed by the Court for Cynthia "failing to attend Focus on Kids within 30 days of filing petition."  [Am. Compl., Doc. 6, ¶ 34]; *see also Haynes v. Haynes*, Case No. 11RA-CV00606.

-   Cynthia was previously married to another man and had a daughter, M.S.H., making M.S.H. Charles's step-daughter.  [Am. Compl., Doc. 6, ¶ 22].

-   Charles was charged with sexually abusing his step-daughter, M.S.H., on December 2, 2013.  [Am. Compl., Doc. 6, ¶¶ 35-37]; *State v. Haynes*, 13RI-CR00907.

-   Shortly thereafter, Cynthia and Charles filed for divorce against one another in December 2013, which cases were consolidated into one divorce proceeding, *Haynes v. Haynes*, 13RI-CV00554; [Am. Compl., Doc. 6, ¶ 36].

- M.H. was placed in foster care in 2014 and spent the next 18 months in foster care, during which time she was placed with three different foster families and moved three times to different school districts, which "traumatized" M.H.  [Am. Compl., Doc. 6, ¶ 104, n. 5].

- Jennifer Williams was appointed as GAL for M.H. on May 6, 2016, which would be approximately two and a half years after the divorce was filed.  [Am. Compl., Doc. 6, ¶ 46].

- Bernice is Charles's mother and M.H.'s grandmother.  [Am. Compl., Doc. 6, ¶ 16].

- On November 9, 2016, Bernice filed a motion to intervene in the Divorce Case and asked to be "a possible placement provider for said minor children."  [Am. Compl., Doc. 6, ¶ 53]; .*Haynes v. Haynes*, 13RI-CV00554, Motion to Intervene dated November 9, 2016.

- Bernice was almost 90 years old at the time.  [Am. Compl., Doc. 6, ¶ 55].

- On December 22, 2016, the Divorce Court ordered that, "on a temporary basis", Cynthia, Charles and Bernice would all share legal custody of M.H., but Bernice would have physical custody.  *Haynes v. Haynes*, 13RI-CV00554, Order Regarding Emergency Motion for Child Custody Pendente Lite dated December 22, 2016.[1]

- The Divorce Court's order stated that Cynthia should receive "liberal visitation", that Charles should receive "liberal supervised visitation", and that M.H. should be placed in the Doniphan Public School District.  *Haynes v. Haynes*, 13RI-CV00554, Order Regarding Emergency Motion for Child Custody Pendente Lite dated December 22, 2016.

- Cynthia alleges that M.H., who had previously been home schooled by Cynthia, was severely bullied while enrolled in the Doniphan School District and that this "traumatized" M.H.  [Am. Compl., Doc. 6, ¶¶ 76-78].

- Only eight days after the Divorce Court granted temporary physical custody to Bernice, on December 30, 2016, Cynthia filed a motion alleging that Charles was "exercising unsupervised visitation" of M.H. and that Bernice was not capable of supervising visitation.  *Haynes v. Haynes*, 13RI-CV00554, Motion to Present Additional Evidence dated December 30, 2016.

- On January 25, 2017, GAL Jennifer Williams filed a Motion to Amend Temporary Custody Order in which she recounts various breaches of the order by Charles and Cynthia and states "It is the belief of the undersigned that the minor children have had

---

[1] Despite Cynthia's allegation that Bernice has at all relevant times resided in New Jersey, Bernice in fact lived in Ripley County, Missouri at all relevant times prior to this civil suit being filed.  Bernice moved to New Jersey permanently, to live with her daughter Karen, after Bernice endured the suicide of her granddaughter and the incarceration of her son.

such liberal contact with [Charles] and [Cynthia] that they have been unable to adjust to residing in the home of [Bernice] and attending public schools." *Haynes v. Haynes*, 13RI-CV00554, Motion to Amend Temporary Custody Order dated January 25, 2017.

- On January 29, 2017, M.H. was admitted to SSM Health DePaul St. Louis for cutting herself, at which time the psychiatrist noted:

> Saddest:  3 yrs ago when to Foster care because Bio father molested 18 yo half sister.  He went to jail x 2.  She is angry at him.
>
> Maddest:  father
>
> Wishes:  1 – be home, 2 – all the court to stop, 3 – dad in jail.

[Am. Compl., Doc. 6, ¶¶ 94-98, 104, Exhibit 14].

- On February 3, 2017, the Divorce Court entered an Order Amending Temporary Custody Order stating "That since the order of this Court on December 22, 2016, there has been a deterioration of conditions with the minor children to the extent that [Charles], [Cynthia], [Bernice] and Guardian ad litem now agree that it is in the best interest of the minor children that they be taken into custody by the Ripley County Juvenile Office and placed into the legal custody of Children's Division." *Haynes v. Haynes*, 13RI-CV00554, Order Amending Temporary Custody Order dated February 3, 2017.

- On March 20, 2017, M.H. was again admitted to a medical facility for cutting, this time while in foster care.  [Am. Compl., Doc. 6, ¶ 116].

- In July 2018, M.H. was placed into the custody of Cynthia, after having been in foster care since February 2017.  [Am. Compl., Doc. 6, ¶ 166].

- On September 4, 2018, Charles pleaded guilty to sexually abusing his step-daughter, M.S.H.  [Am. Compl., Doc. 6, ¶ 167].

- Cynthia alleges that from May 6, 2016, until the date of M.H.'s death, GAL Williams "repeatedly threatened M.H. with her and her sister's placement in foster care if M.H., Plaintiff or M.S.H testified against her father at his criminal trial or at his sentencing." [Am. Compl., Doc. 6, ¶ 182].

- Cynthia alleges that on November 23, 2018, M.H. told Plaintiff that GAL Williams threatened to return M.H. to foster care and M.H. stated "I am scared of going back to foster care.  I'm going to kill myself first before I go back to foster care."  [Am. Compl., Doc. 6, ¶¶ 168 - 169].

- On November 24, 2018, M.H. hung herself.  [Am. Compl., Doc. 6, ¶ 170].

**IV. Missouri law requires the Court to determine whether a complaint contains sufficient allegations of proximate cause in a case of wrongful death involving suicide.**

From the outset, a wrongful death case involving suicide defies traditional analysis.  In a traditional case, a defendant's tortious action (either negligent or intentional) injures a plaintiff.  The plaintiff then sues the defendant for the injuries directly caused by the tortious action.  If the tortious action causes death, then the same rules apply except that the case is filed by the decedent's surviving family members, rather than the injured party herself.

In a suicide case, the tortious action is a step-removed from the injury.  In that situation, the defendant does not directly cause death (the decedent causes her own death in a suicide), but rather the allegation is that the tortious action caused such pain, emotional distress, irresistible impulse, etc. that suicide was a foreseeable and natural result of the defendant's tortious action.

Missouri law is generally scant in the suicide context, at least compared to more traditional tort situations, but the case that most modern Missouri appellate courts identify as the beginning is *Wallace v. Bounds*, 369 S.W.2d 138 (Mo. 1963).  In that case, a man injured in an automobile accident later committed suicide, and the question was whether the negligent driver could be held responsible for the suicide.  The Court stated:

> Suicide, due to a mind disordered by an accident or injury or even by an assault accompanied by mental torture, has been held not so related to the wrongful acts as to furnish a ground for the action, where the act of suicide of the insane person is voluntary and done with knowledge of its purpose and physical effect; but where, as the proximate result of the injury the person injured becomes insane and bereft of reason, and while in this condition and as a result thereof he takes his own life, his act being involuntary, the act causing the injury has been held to be the proximate cause of death.

*Id*. at 143 – 44.

Courts then attempted, and struggled, to apply this vague standard to various situations. *See e.g. Stafford v. Neurological Medicine, Inc.*, 811 F.2d 470 (8th Cir. 1987); *Eidson v. Reproductive Health Services*, 863 S.W.2d 621 (Mo. App. E.D. 1993).

In 2011, the Missouri Supreme Court set the current state of the law in *Kivland v. Columbia Orthopaedic Group, LLP*, 331 S.W.3d 299 (Mo. banc. 2011). That case involved alleged medical malpractice, wherein a patient eventually committed suicide after enduring complications from a spinal surgery. The Court noted the difficult application of the analysis identified in *Wallace* and determined that the analysis should really focus on the traditional issue of proximate cause. "Missouri's causation standard in a wrongful death case is that the decedent's death was 'a direct result' of a defendant's negligence." *Id*. at 309 (citing MAI 20.01 and 20.02). The Court went on to say:

> Before a jury can decide causation, however, a plaintiff must offer evidence that the court determines would establish that the defendant's negligence was the proximate cause of the decedent's death. If this evidence is not offered or is insufficient, the plaintiff has not made a submissible case. Proximate cause—which is a question for the court—is established by evidence that the injury or death suffered was "the natural and probable consequence of defendant's conduct." A plaintiff can show that the defendant's negligence was the proximate cause of the decedent's suicide by presenting evidence that the decedent's suicide was the "natural and probable consequence" of the injury he suffered at the hands of the defendant. Unless this evidence—which may require expert witness testimony if no direct evidence is available—is presented, the suicide would be an intervening cause and the claim could not be submitted to the jury. If, however, the plaintiff presents evidence that the suicide resulted from the injury, the claim then can be submitted to the jury to decide as a question of fact whether the suicide is a direct result of the defendant's negligence.

*Id*. at 309 – 10.

And of course, the traditional proximate cause rules apply in suicide situations as in any other case. As the Court in *Callahan v. Cardinal Glennon Hosp.* (which *Kivland* cited) stated:

> To the extent the damages are surprising, unexpected, or freakish, they may not be the natural and probable consequences of a defendant's actions. **If the facts involved an extended scenario involving multiple persons and events with**

> **potential intervening causes, then the requirement that the damages that result be the natural and probable consequence of defendant's conduct comes into play and may cut off liability.**

863 S.W.2d 852, 865 (Mo. banc 1993) (emphasis added).

## V.  No causation against Bernice.

In most cases, although the suicide is itself a step removed from the tortious action, the alleged injury (suicide) is still a direct result of the tortious action.  That is exactly what Cynthia alleges against Charles.  The tortious conduct is Charles allegedly abusing M.H. and the alleged foreseeable injury is M.H.'s suicide.

In the case of Bernice, the connection is much more remote.  The action that allegedly caused the suicide is still the sexual abuse.  But Bernice did not sexually abuse anyone.  Rather, she allegedly allowed Charles unsupervised visitation with M.H.[2] during a **<u>very short period</u>**, when the Divorce Court's temporary order stated visitation should be supervised.  The allegation is that Bernice should have known that if she allowed Charles unsupervised visitation, that he would sexually abuse M.H., and then that M.H. would commit suicide.  This would not meet the Court's test for proximate cause in a straightforward case.   This case is anything but straightforward.  The little time that M.H. spent in Bernice's custody did not happen in a vacuum.  The following is a list of causes that have nothing to do with Bernice, all of which are described and cited to above:

- M.H. knew that her father was charged with sexually abusing her step-sister in 2013.

- M.H. knew that her parents were in contentious divorce proceedings for almost five years prior to her death (Dec. 2013 – Nov. 2018).

- M.H. was placed into at least three different foster homes and sent to at least three separate schools, beginning in 2014, well before she was placed in Bernice's custody in December 2016.  Cynthia states this "traumatized" M.H.

---

[2] Bernice strenuously denies this.

- M.H. was bullied at school and called names.

- M.H. was constantly pushed and pulled by Cynthia and Charles, each of which was trying to get custody of her and each of which was allegedly badmouthing the other to M.H.

- M.H. was sent for medical and/or psychiatric help twice after cutting herself.

- M.H. told her psychiatrist she was "saddest" three years ago while in foster care and wanted "all the court to stop".

- M.H. was sent back to foster care for approximately 17 months, after living with Bernice for a little more than 30 days.

- M.H.'s father eventually pleaded guilty to sexual abuse of her step-sister.

- M.H.'s Guardian ad Litem "repeatedly threatened M.H. with her and her sister's placement in foster care if M.H., Plaintiff or M.S.H testified against her father at his criminal trial or at his sentencing."

- On November 23, 2018, M.H. told Cynthia "I am scared of going back to foster care.  I'm going to kill myself first before I go back to foster care."

- The next day, November 24, 2018, M.H. committed suicide, more than 21 months after M.H. had last been in Bernice's custody.

On the basis of these facts, Cynthia asserts that M.H.'s suicide was the direct result of being in Bernice's custody.  This is simply not true.  It is not possible for any jury to look at these facts and determine that Bernice caused her granddaughter to commit suicide.  It is the Court's role to determine proximate cause and such cause is lacking here.  The case against Bernice should be dismissed.

**VI. Conclusion.**

For all the foregoing reasons, the Court should grant Bernice's Motion to Dismiss.

Respectfully submitted,

THE LIMBAUGH FIRM
407 N. Kingshighway, P.O. Box 1150
Cape Girardeau, MO  63702-1150
Telephone:  (573) 335-3316
Facsimile: (573) 335-1369
Email:  jsteffens@limbaughlaw.com

By____/s/ John C. Steffens_____
        John C. Steffens - #63267

ATTORNEYS FOR DEFENDANT BERNICE
HAYNES


## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2022, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all attorneys of record.

/s/ John C. Steffens_____