**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| CYNTHIA K. HAYNES (a/k/a Cynthia K. Randolph), individually and under the Missouri Wrongful Death Statute | ) ) ) ) | |
| Plaintiffs | ) | |
| v. | ) ) | Cause No. 1:21-CV-00160-SNL |
| JENNIFER WILLIAMS, individually, | ) | JURY TRIAL DEMANDED |
| JENNIFER WILLIAMS, d/b/a WILLIAMS LAW, | ) | |
| SPAIN, MILLER, GALLOWAY & LEE, LLC, | ) | |
| a Missouri limited liability company, | ) | |
| BERNICE HAYNES, individually and | ) | |
| CHARLES HAYNES, individually | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN RESPONSE TO DEFENDANTS**
**WILLIAMS' AND SPAIN-MILLER'S MOTIONS TO DISMISS**

## TABLE OF CONTENTS

**PAGE**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Authorities Cited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Argument    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
    **Standard of Review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    **Williams Acted Outside the Scope of Her Duties as a GAL by Her Threats to
        M.H. and Plaintiff to Punish Them If They Testified Against Charles
        Haynes at His Criminal Trial (Tampering with a Witness)** . . . . . . . . . . . .  8

    **Plaintiff Has Properly Alleged Causation for Damages in Her Wrongful
        Death Claims Pursuant to a Missouri Supreme Court Ruling** . . . . . . . . . .  14

    **Williams Was Also M.H.'s Personal Attorney.** . . . . . . . . . . . . . . . . . . . . . . . . .  19

    **Williams Owed a Duty of Care to Plaintiff.** . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

    **Spain-Miller's Arguments Should Be Rejected
        for the Same Reasons Williams's Should Be** . . . . . . . . . . . . . . . . . . . . . . .  22

Conclusion    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

i

# TABLE OF AUTHORITIES

**CASES**                                                                                             **PAGE**

Baumgart v. Baumgart, 944 S.W.2d 572 (Mo. App. W.D. 1997) . . . . . . . . . . . . . . . . . . . . . . . 23

Bosely v. Lemmon, 287 Fed. Appx. 273 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Callahan v. Cardinal Glennon Hosp., 863 S.W.2d 852 (Mo. 1993) . . . . . . . . . . . . . . . 16, 17, 18

Chambers v. Stern, 994 S.W.2d 463 (Ark. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Dahl v. Charles F. Dahl, M.D., PC Defined Ben. Pension Tr.,
      744 F.3d 623 (10th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Demorrow v. Demorrow, 169 S.W.3d 591 (Mo. App. S.D. 2005). . . . . . . . . . . . . . . . . . . . . . . 23

Derda v. Ameriquest Mortg. Co.,
      2007 U.S. Dist. LEXIS 19773 (E.D. Mo. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Deutsch vs. Wolf, 994 S.W.2d 561 (Mo. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Edwards v. Gerstein, 237 S.W.3d 580 (Mo. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 14, 23

Falk v. Sadler, 341 S.C. 281 (S.C. App. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fox v. Wills, 890 A.2d 726 (Md. App. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Krigel, 480 S.W.3d 294 (Mo. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Jarrett v. Jones, 258 S.W.3d 443 (Mo. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Jungerman v. City of Rayton, 925 S.W.2d 202 (Mo. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Kehm v. Procter & Gamble Mfg. Co., 724 F.2d 630 (8th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . 12

Kennedy v. Kennedy, 819 S.W.2d 406 (Mo. App. S.D. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Kivland vs. Columbia Orthopaedic Group, LLP,
      331 S.W.3d 299 (Mo. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 18

Kohl v. Murphy, 767 F.Supp. 895 (N.D. Ill. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Lewis v. Blue Springs Sch. Dist., 2017 U.S. Dist. LEXIS 181671 (W.D. Mo. 2017) . . . . . . . . 18

Martin v. Hendren, 127 F.3d 720 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

ii

Parton v. Jeans, 2019 Ariz. App. Unpub. LEXIS 1322 (AZ Appeals 2019) . . . . . . . . . . . . . . . . 17

Riley v. Willo Prods. Co., 2013 U.S. Dist. LEXIS 13887 (E.D. Mo. 2013). . . . . . . . . . . . . . . . 17

Snyder v. Baumecker, 708 F.Supp. 1451 (D.N.J. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Southers v. City of Farmington, 263 S.W.3d 603 (Mo. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

State *ex rel.* Bird v. Weinstock,
        864 S.W.2d 376 (Mo. App. E.D. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11, 19, 22

State *ex rel*. Prater v. Brown, 572 S.W.3d 94 (Mo. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

State *ex rel*. Twiehaus v. Adolf, 706 S.W.2d 443 (Mo. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

State v. Blakeburn, 859 S.W.2d 170, 178 (Mo. App. W.D. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 9

State v. McLaughlin, 988 S.W.2d 542 (Mo. App. E.D. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Tolu vs. Reid, 2021 WL6122562 (Mo. App. E.D. 2021) . . . . . . . . . . . . . . . . . . . . . . . 11, 19, 22, 23

Worsham v. Nix, 83 P.3d 879 (OK Civ. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**STATUTES AND RULES**
R.S. Mo. §452.523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

R.S. Mo. §566.064 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

R.S. Mo. §575.270.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

R.S. Mo. §575.270.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATEMENT OF FACTS
### Background

1.      Plaintiff and Charles Haynes were married on May 23, 2008.  They had two daughters M.H. and S.H..  Plaintiff had two daughters from a previous marriage, M.S.H. and Melinda Hogg.  Plaintiff and Charles have been litigating their divorce since December 2013. (¶¶20-22, 35.)  (All paragraph references are to paragraphs in the Amended Complaint, Doc. 6.)

2.      M.H. was born on August 30, 2004 and was fourteen (14) when she took her life. (¶3.)  S.H. was born in 2009.  (¶21.)  M.S.H. was born in 1999.  (¶22.)  M.S.H. was fourteen (14) when she revealed that Defendant Charles Haynes had been sexually molesting her.  (¶35.)

3.      Jennifer Williams (hereinafter, "Williams") had other child clients who had been the victims of sexual abuse.  (Exh. 41, pg. 32, Williams' testimony at Charles Haynes' sentencing.)  She received training in the area of child sexual abuse.  (Exh. 41, pg. 32.)  GAL standards require a GAL to have initial training of eight (8) hours and three (3) hours GAL training annually.  The training should include "dynamics of child abuse and neglect."  (Exh. 3, GAL Standards #14.)

4.      In her role as a GAL, Williams should have contact with therapists, medical doctors, teachers, neighbors, and foster parents of children for whom she serves.  (Exh. 41, pg. 33.)  She was aware that some sex offenders have a preferred type of victim or age of victim (Exh. 41, pg. 34) and that M.H. was in the age of Charles Haynes' victims (Exh. 41, pg. 34).

5.      Williams had available to her a transcript of the preliminary hearing from April 2014 in which M.S.H. (M.H.'s step-sister) testified that Charles Haynes sexually molested her. (See ¶40 and Exhibit 5.)  There was evidence from DNA tests of Charles Haynes' sperm taken from sights at which M.S.H. testified that Charles Haynes had sexually molested her.  (See ¶41.)

1

6.     Available to Williams, which she declined to review, was a transcript of a conversation Charles Haynes had with Plaintiff on May 29, 2014 in which Charles Haynes acknowledged having had oral sex with M.S.H..  When M.S.H. was fourteen (14) years old.  In the recording, Charles Haynes threatened to kill Plaintiff and M.S.H. (see ¶¶49-52 and Exh. 7). Williams refused to listen to that recording (¶106).

7.     Williams was informed that there was child pornography on grandmother Haynes' computer which was only used by Charles Haynes.  Williams chose not to review that material (¶73).

8.     M.H. informed Williams that Charles Haynes visited her bedroom without being supervised by Bernice Haynes, as the divorce court ordered, during nights when she was at Bernice Haynes' home from late December 2016 until the end of January 2017.  M.H. informed Williams that she ran to Plaintiff's house because she was terrified of Charles Haynes.  Upon learning this, Williams told Charles Haynes that M.H. was leaving his mother's home in the middle of the night.  (¶¶86 & 87.)

9.     M.H. started cutting herself (doing self-harm) at the end of January 2017 when she was principally living at Bernice Haynes' house.  Plaintiff took M.H. to Southeast Hospital. From there, medical personnel had her transported to DePaul Hospital in St. Louis County for in-patient psychiatric treatment for self-mutilation.  Williams was aware of this.  (¶94.)  The DePaul Hospital records show that M.H. was angry at her father, that he had abused her older half-sister and that she wanted her father in jail.  (¶104.)  DePaul Hospital refused to return M.H. to Bernice Haynes' custody even though the divorce court granted Bernice Haynes physical custody of M.H..  (¶107.)

10.     After DFS gained custody of M.H. and S.H. in February 2017, it held monthly

Family Support Team (FST) meetings.  Before the April 27, 2017 meeting, DFS Officer Whaley sent Williams and other involved adults an email about a "very disturbing note" M.H.'s foster parents found which M.H. wrote.  In it, M.H. stated, "daddy fuck my pussy."  (¶121 and note attached to Exh. 22.)

11.    All the persons at that April 2017 meeting which Williams did not attend (but for which notes of the meeting were available to her) came to the conclusion that Charles Haynes had sexually molested M.H..  M.H. stated she could not sleep when she was at her grandmother Haynes' house because she never knew when her father would come into her bedroom.  Williams informed of M.H.'s note, chose not to investigate why M.H. wrote it or why M.H. was afraid to sleep at her grandmother's house.  M.H. also had a diary in which she had written in large capital letters "HELP."  (See ¶¶121-126 and Exh. 22 and its attachments.)  No one at the meeting knew that Williams threatened M.H. that if M.H. testified against Charles at his criminal trial that she would put M.H. in foster care.  (¶133.)

12.    Toward the end of March 2017, M.H.'s foster parents discovered that M.H. had again cut herself.  She was admitted to a different inpatient psychiatric ward.  M.H. expressed concern about living in the house where Charles Haynes had sexually molested M.S.H..  (¶116 & Exh. 18.)  M.H. was particularly upset that Charles' criminal trial had been continued.  (¶117.)  The hospital personnel expressed their concerns that Charles have no contact with M.H..  (¶118 & Exhs. 19 & 20.)

13.    Williams never requested a psychological evaluation of Charles Haynes, even though she requested one for Plaintiff.  (¶130.)

14.    Williams frequently contended that Plaintiff brainwashed S.H. and M.H. against Charles Haynes.  However, DFS personnel and healthcare professionals recommended that both

3

girls not have contact with Charles Haynes.  Williams was told about and could have accessed a recording of Charles Haynes acknowledging he sexually molested M.S.H..  (¶138.)

15.     The July 27, 2017 records of Dr. Bost, M.H.'s pediatrician, state that Charles Haynes had sexually molested M.H..  Dr. Bost tested M.H. for STDs.  Dr. Bost stated that it was not wise to permit Charles Haynes access to either M.H. or S.H..  (¶¶143-145 and Exh. 27.)

16.     In a report dated September 8, 2017, Jerry Marks, a Ph.D. in social work who was providing therapeutic treatment for M.H., stated that he believed that M.H. was sexually abused by her father and that M.H. did not want to go through what her sister (M.S.H.) had been through by testifying against Charles Haynes.  (¶151 and Exh. 31.)

17.     Charles Haynes and Bernice Haynes paid Williams for her services for providing legal counsel after January 30, 2017.  (¶156.)  Williams was both a GAL and attorney for M.H. and S.H. and did not provide legal services to Charles or Bernice Haynes.

18.     Williams told M.H. on several occasions that Charles Haynes would not go to jail for having sexually molested M.S.H..  (¶159.)

**Williams' Threats**

19.     In January 2017, when M.H. was living at Bernice Haynes' house, Williams threatened Plaintiff and her attorney that if they challenged her authority or provided the educational test results for M.H. to the divorce court, that Plaintiff would lose her then visitation rights with M.H. and S.H..  (¶81.)

20.     In January 2017, Williams blocked Plaintiff's effort to have S.H. tested by the Doniphan School District.  Williams told Plaintiff's then attorney that if Plaintiff sought to disqualify Williams, that Plaintiff would lose her ongoing visitation rights to see M.H. and S.H..  Williams accused Plaintiff of manipulating her daughters not to want to see their father who had

4

admitted to sexually abusing their older stepsister.  (¶¶82–84.)

21.    After January 30, 2017, Williams threatened M.H. that if M.H., M.S.H., or Plaintiff testified against Charles Haynes at his criminal trial that Williams would return M.H. and S.H. to foster care.  Williams repeatedly claimed that Plaintiff "brainwashed" S.H. and M.H. against their father.  (¶102.)

22.    Williams threatened Plaintiff that if she kept "pushing" to have custody of her daughters or greater visitation time, that Williams would cut Plaintiff's visitation time with Plaintiff's daughters.  (¶120.)

23.    In spring 2018, M.H. told Plaintiff that Williams had consistently threatened M.H. since early 2017 that Williams would place M.H. in foster care if M.H. testified against Charles. (¶133, f/n 7.)  Williams continually threatened Plaintiff with loss of custody and/or visitation if she insisted on Williams' recusal.  (¶139.)  Williams also consistently threatened Plaintiff and M.H. to return M.H. and S.H. to foster care if they testified that Charles sexually abused M.H.. (¶154.)

24.    In October 2017, Williams threatened M.H. that if M.S.H., M.H. or Plaintiff testified against Charles Haynes at his criminal trial that she would return M.H. and S.H. to foster care.  She instructed M.H. not to tell anyone of Williams' conversation with M.H..  Williams insisted to M.H. that Charles would not go to jail.  (¶153.)

25.    Dr. Marks, M.H.'s therapist, stated that it was his belief that Williams brought gifts to M.H. at school from her father as a way of telling M.H. that she would return to foster care if M.S.H. testified against her father.  It was his belief that Williams was tampering with M.S.H.'s testimony at Charles Haynes' criminal trial through M.H..  (See ¶¶163-165 and Exhibits 36, 37, and 38.)

26.     On September 4, 2018 Charles Haynes pled guilty to sexually abusing M.S.H. when she was under seventeen (17) years old, a Class C felony, statutory sodomy of a minor in the Second Degree.  (R.S. Mo. §566.064.)

27.     After that plea, Williams continued her threats to M.H. (the last time being November 23, 2018) that if M.S.H. or Plaintiff or M.H. testified against Charles Haynes at his sentencing hearing she would return M.H. and S.H. to foster care.  Williams stated that she would ask the court to place Charles on probation.  (¶168.)

28.     From her first involvement in Plaintiff's divorce case until M.H.'s death, Williams repeatedly threatened M.H. that if she, Plaintiff or M.S.H. testified against Charles that M.H. and S.H. would be placed in foster care.  (¶182.)  Williams instructed M.H. not to tell anyone about her threats.  (¶184.)

29.     On December 18, 2018 Plaintiff and M.S.H. did not testify at Charles's sentencing. Both were afraid that Williams would take steps to have S.H. returned to foster care as Williams threatened many times.  (¶178.)

30.     From the date of her first involvement in the case on May 6, 2016 until M.H.'s death on November 24, 2018, Williams repeatedly threatened M.H. with her and her sister's placement in foster care if M.H., Plaintiff or M.S.H. testified against Charles at his criminal trial or at his sentencing. M.H. reported these threats to her doctors, Plaintiff and her stepsisters, M.S.H. and Mindy. (A copy of several of the messages M.H. texted of Williams' threats is attached as **Exhibit 44**.) (¶182.)

31.     The acts and/or omissions of Defendants Williams and Spain, Miller, Galloway & Lee, LLC (hereinafter, Spain-Miller) outside the scope of Williams' duties as a GAL, caused or contributed to cause M.H. to suffer severe and excruciating emotional pain, loss of dignity, and

deterioration of her mental health which resulted in her suicide.  (¶196.)

32.     The acts and/or omissions of Defendants Williams and Spain-Miller as personal attorneys for M.H., caused or contributed to cause M.H. to suffer severe and excruciating emotional pain, loss of dignity, and deterioration of her mental health which resulted in her suicide.  (¶205.)

**ARGUMENT**
**Standard of Review**

Plaintiff agrees with Spain-Miller's statement of the legal standard to be applied by this Court in deciding the various Motions to Dismiss.  Plaintiff agrees that this Court has to accept all of the factual allegations as true and give Plaintiff the benefit of all reasonable inferences that derive from those allegations.  (Spain-Miller Memorandum at 2-3.)  Based on these "true facts," the Court evaluates whether they support a cause of action against the Defendants as alleged. The burden is on the Defendants to show that "beyond a reasonable doubt" Plaintiff can prove no facts that would support a claim that would entitle her to relief.  Derda v. Ameriquest Mortg. Co., 2007 U.S. Dist. LEXIS 19773 (E.D. Mo. 2007).

Granting a Motion to Dismiss is only for the unusual case in which the pleadings as alleged cannot support any cause of action.  Plaintiff believes that she has properly alleged her causes of action under the diversity jurisdiction of this Court and that the Motions to Dismiss should be denied.  However, if this Court believes that any alleged cause of action is missing any necessary elements which can be remedied pursuant to the arguments presented herein, Plaintiff requests that this Court grant Plaintiff an opportunity to amend her pleadings pursuant to Rule 15 to comport with the decision of this Court.

**Williams Acted Outside the Scope of Her Duties as a GAL
by Her Threats to M.H. and Plaintiff to Punish Them If They Testified Against Charles
Haynes at His Criminal Trial (Tampering with a Witness)**

Williams and Spain-Miller rely heavily upon State *ex rel.* Bird v. Weinstock, 864 S.W.2d

376 (Mo. App. E.D. 1993).  They state that under the ruling in Bird, Williams is immunized from

suit even if she acted to assist Charles defending against criminal charges based on his abuse of

M.S.H.  In Bird, the father alleged that Bird, the GAL in that case, had acted negligently by,

among other actions, assisting with the stepfather's defense against criminal charges relating to

abuse.  (*I.e.,* Williams' Memorandum at 5)  Plaintiff did not allege that Williams assisted in

Charles' defense, but that Williams was advocating for Charles by tampering with Plaintiff,

M.H., and M.S.H. being a witness against Charles.  Tampering with a witness is not "assisting"

in a criminal defense within the confines of the law, but is acting outside of those confines.  It is

acting outside the scope of Williams' duties as a GAL.

As alleged, Williams threatened both Plaintiff and M.H. that if they and/or M.S.H.

testified against Charles at his criminal proceedings, and later at sentencing, that she would

punish them by returning M.H. and S.H. to foster care.  With regard to M.H., Williams also

threatened that if she brought charges against her father, that she would be similarly punished.

Both actions violate Missouri criminal statute R.S. Mo. §575.270.1 which forbids a person from

doing anything to induce a witness or perspective witness, including threatening that person, not

to offer testimony in court.  Section 575.270.2 contains the same prohibitions, but for inducing a

"victim" not to bring charges against another person.

The circumstances in the instant case are similar to those in State v. McLaughlin, 988

S.W.2d 542 (Mo. App. E.D. 1999) in which the defendant spoke to a witness and encouraged her

to ask the victim of the crime how much the victim loved her son and stated that he hated to see a

child get hurt, but that anything was possible.  Those actions by defendant McLaughlin were tampering with a witness in violation of §575.270.1.  <u>McLaughlin,</u> 988 S.W.2d at 544.  See also, <u>State v. Blakeburn</u>, 859 S.W.2d 170, 178 (Mo. App. W.D. 1993).  Williams threats to punish M.H. and her younger sister if she, Plaintiff or M.S.H. testified against Charles was tampering with them as witnesses against Charles Haynes.

In decisions rendered after <u>Bird</u>, *supra*, (a 1993 Court of Appeals decision) the Missouri Supreme Court set limits to the scope of a GAL's duties.  In <u>Edwards v. Gerstein</u>, 237 S.W.3d 580, 582 (Mo. <u>2007</u>) the Missouri Supreme Court held that there is no difference between official and quasi-judicial immunity.  In <u>Edwards</u> the plaintiff chiropractor sued members of the Board of Chiropractic Examiners and an employee of the Board.  The Court addressed quasi-judicial immunity and official immunity which were applicable to different defendants and concluded that "the distinction [between them] is without a difference . . ."  (237 S.W.3d at 582.)  In her solo dissent analyzing quasi-judicial immunity, official immunity and the public duty doctrine, Judge Stith explicitly recognized that the Court concluded that there was no difference between quasi-judicial and official immunity.  Thus, Missouri case law on official immunity applies equally to persons courts protect through quasi-judicial immunity.

There is no immunity for an official's breach of duties in which an injured party has "a specific, direct, and distinctive interest."  <u>State *ex rel*. Twiehaus v. Adolf</u>, 706 S.W.2d 443, 445 (Mo. 1986).  When an injury to a particular identifiable individual is reasonably foreseeable as a result of an official's breach of duty, the officer is not protected by immunity.  <u>Jungerman v. City of Rayton</u>, 925 S.W.2d 202, 205 (Mo. 1996).  These decisions apply to Williams.

**Compliance with the law is mandatory and is not a discretionary act**.  <u>State *ex rel*. Prater v. Brown</u>, 572 S.W.3d 94 (Mo. 2019).  [Emphasis added.]  Nondiscretionary or mandatory

acts imposed by law require a person to act in a prescribed manner, in obedience to the mandate of legal authority.  Southers v. City of Farmington, 263 S.W.3d 603, 610 (Mo. 2008).  Bird, *supra*, explicitly stated that quasi-judicial immunity only extended to discretionary acts.  864 S.W.2d at 376.

Tampering with a witness, a criminal offense, is beyond the scope of Williams' duties as a GAL.  Throughout her time as a GAL from after July 2017, when the juvenile court returned M.H. and S.H. to Plaintiff's physical custody, until M.H.'s death at the end of November 2018, Williams continuously tampered with M.H., her mother and M.S.H. from being truthful witnesses against Charles.  (See pgs. 4-6 above.)  Williams constantly ignored evidence of Charles' own confession from May 2014 admitting to sexually molesting M.S.H. when she was underage.  (¶¶49-52, 106.)

By threatening to punish M.H. and S.H. should Plaintiff, M.S.H., or M.H. testify against Charles, Williams was not acting in the best interest of S.H. or M.H., but to benefit Charles in his criminal case through her illegal acts.  By threatening Plaintiff that if Plaintiff asserted her rights as a party to the custody proceedings that she would punish Plaintiff, Williams again was not acting to determine what was in the best interest of M.H. and S.H., but to preserve her own status, which was outside the scope of her duties.  To grant Williams immunity is to hold that she is above the law.  It subordinates the authority of the custody court to Williams's actions and decisions that violate criminal statutes and seek to violate Plaintiff's rights to take all appropriate actions to represent Plaintiff's interests in the custody proceedings.[1]

---

[1]  The Missouri Supreme Court issued Standards by which a GAL must conduct herself when fulfilling her duties in 2011 (Exh. 3).  The Standards also set limits and define the scope of a GAL's duties.  If Williams or any other GAL can violate them with impunity, it is as if the standards do not exist.  The Missouri Supreme Court did not issue those standards so that a GAL can ignore them.  Standard 14 requires a GAL to have training in child abuse and neglect.

Williams contends that "even if Williams violated certain ethical rules or regulations while serving as a GAL . . . her conduct fell squarely within the scope of her GAL duties because the actions concerned matters that were at the heart of her GAL role, *e.g.*, determining and making recommendations as to a custodial arrangement that would best serve M.H. and S.H." (Williams' Memorandum at 7-8.)  She relies heavily on <u>Tolu vs. Reid</u>, 2021 WL6122562 (Mo. App. E.D. 2021) to support her argument.  (That decision is under appeal.  Until the appeal is exhausted, it is not final.  Case.net ED109721 and SC994490.)

Williams fails to address that her criminal conduct does not come within the scope of her duties.  <u>Tolu</u> does not address a GAL's violation of criminal statutes.  Williams does not explain how tampering with a witness aids in determining custodial arrangements or serves the best interests of M.H. and S.H.  Nor does she explain how threatening to punish Plaintiff for exercising her rights in her custody case is an excusable action within the context of a GAL's duties.  Williams does not explain how the ruling by the Supreme Court in <u>Edwards</u>, *supra*, equating quasi-judicial immunity with official immunity does not have precedence over the <u>Tolu</u> decision by a Court of Appeals.

In Missouri, "official immunity is not limitless" and immunity does "not apply to conduct that is willfully wrong or done with malice or corruption," or "in bad faith."  <u>Southers</u>, 263 S.W.3d at 612.  Williams' acts enumerated above were, at the very least, done in bad faith and are acts outside the scope of her duties disqualifying Williams from being granted immunity. <u>Bird</u>, *supra*.  If this Court finds Williams' conduct to be neutral and within Missouri law, this Court protects Williams, as well as other GALs who violate Missouri criminal statutes, from

---

Williams did not apply that training to protect M.H. as she was obligated to do.  Instead, she ignored the abuse M.H. and her family endured from Charles and illegally threatened M.H. and Plaintiff.

11

being accountable for their egregious acts.  This Court would embrace lawlessness for GALs who hurt children and damage their parents.

GALs like Williams would also be at liberty to harm family court litigants and their children consistent with "Legal Abuse Syndrome," (LAS) a form of Post-Traumatic Stress Disorder (PTSD), a psychiatric injury caused by court-involved professionals' ethical violations, betrayal, abuse of power, lack of accountability, and/or fraud within the legal system.[2]  LAS is progressing into a hidden endemic operating for the convenience of the courts and at the expense of families.

Williams argues that she can be held accountable only by the courts and/or their licensing boards.  (Williams' Memorandum at 10.)  This "remedy" is illusory at best.  Plaintiff's only real remedy is to file this suit to deter Williams and other court professionals from conduct similar to hers.  Courts can never compensate those significantly injured by egregious acts done by a GAL acting outside the scope of her duties, especially if courts broaden those duties so greatly that, in reality, she is free to violate criminal laws.  See Kehm v. Procter & Gamble Mfg. Co., 724 F.2d 630, 631 (8th Cir. 1984).  (Courts cannot cure damage done by violations of protective orders.)  GALs will only be held accountable through actions brought by those they greatly harm.

Courts in other jurisdictions have arrived at the same conclusion in analyzing whether GALs' actions fall outside the scope of their duties.  In Fox v. Wills, 890 A.2d 726 (Md. App.

---

[2]  Karin Huffer, Ph.D., **Legal Abuse Syndrome (LAS): A Preventable Public Health Problem**, 3d ed. 2017 and Karin Huffer, Ph.D., **Legal Abuse Syndrome: 8 Steps for Avoiding the Traumatic Stress Caused by the Justice System,** 2013. LAS is a subtype of PTSD codified in Diagnostic and Statistical Manual of Mental Disorders 5 (DSM 5) as V62.89, V62.5 and International Classification of Diseases (ICD-10) Z62.5, Z62.5, Z65.0 and Z65.3 codes.  DSM 5 V codes and ICD-10 codes are known as "Other Conditions That May Be a Focus of Clinical Attention," and affect the diagnosis, course, prognosis, or treatment of a patient's mental disorder. These codes are not mental disorder codes.

2006), a mother sued a GAL.  The court found that the GAL was not immune from negligence claims for allowing the father unsupervised visits with the child when the court restricted the father to supervised visits.  Maryland had no statutes that grant immunity to GALs.  In Missouri no statute immunizes Williams from violating criminal laws.

In <u>Falk v. Sadler</u>, 341 S.C. 281 (S.C. App. 2000), a mother sued a former GAL for negligence and breach of her fiduciary duty.  The court refused to immunize the GAL.  The GAL abused her position by negotiating spousal support in father's favor <u>using the children as a bargaining tool</u>.  That is similar to Williams using the threat of foster care for M.H. and S.H. to keep M.S.H., Plaintiff and M.H. from testifying against Charles.  See also, <u>Kohl v. Murphy</u>, 767 F.Supp. 895 (N.D. Ill. 1991).

The Supreme Court of Arkansas in <u>Chambers v. Stern</u>, 994 S.W.2d 463 (Ark. 1999) extended quasi-judicial immunity to a psychologist so long as he was "acting within the scope of a court's order" appointing him.  994 S.W.2d at 466.  Although the court order appointing Williams in this case (Exhibits 1 and 2) is not explicit in the parameters of the court appointment, violating criminal statutes and making threats should persons seek to enforce their rights are outside of the scope of any reasonable appointment.

Williams cites two Federal Circuit Court cases that applied quasi-judicial immunity even when the officer granted the immunity acts "improperly" (<u>Martin v. Hendren</u>, 127 F.3d 720, 722 (8th Cir. 1997)) or acts wrongfully and "even unlawful[ly]" (<u>Dahl v. Charles F. Dahl, M.D., PC Defined Ben. Pension Tr.</u>, 744 F.3d 623, 630 (10th Cir. 2014)).  (Williams' Memorandum at 6.) <u>Martin v. Hendren</u> applies immunity for a bailiff against a claim of excessive use of force.  The bailiff was following a court's orders to restrain a person in the courtroom.  In this case, Williams does not suggest that a court authorized her to tamper with witnesses, to threaten to punish M.H.

13

or Plaintiff should they or M.S.H. testify in Charles' criminal case.  But see <u>Bosely v. Lemmon</u>, 287 Fed. Appx. 273, 280 (4th Cir. 2008) which distinguishes <u>Martin</u>.  <u>Dahl</u>., <u>supra</u>, concerned monitoring telephone conversations which does not apply to the instant case.  It contradicts Missouri case law cited above emanating from <u>Edwards</u>, <u>supra</u>.  Williams does not cite any Missouri case that defines the scope of a GAL's duties.

Rather than seek discussions about GAL immunity in other jurisdictions, this Court should focus on what the Missouri Courts have held.  The Missouri Supreme Court has stated that there is no distinction between quasi-judicial immunity and official immunity.  <u>Edwards v. Gersten</u>, <u>supra</u>.  Therefore, Plaintiff has properly pled that under the circumstances of this case, Williams is not immunized from suit.  Plaintiff has pled Counts I-IV properly.  Williams and Spain-Miller are not entitled to be immunized from this suit.[3]

**Plaintiff Has Properly Alleged Causation for Damages
in Her Wrongful Death Claims Pursuant to a Missouri Supreme Court Ruling**

In her Memorandum, Williams claims that Plaintiff has not sufficiently alleged that Williams had a duty of care to foresee or to prevent M.H.'s suicide.  (Williams at pp. 10-13.) Williams cites five cases from other jurisdictions specifically addressing whether an attorney is responsible to foresee that a client might commit suicide caused by the attorney's negligence. These cited cases hold that a suicide is an intervening cause between an attorney's negligent act and a client's suicide.  The cases Williams cites hold that only a person with particular training in the psychological fields, such as a psychiatrist, or an institution which houses a person, such as a hospital, psychiatric ward, or a prison, can be charged with being responsible to foresee that a

---

[3] Even if not all of Plaintiff's allegations of Williams acting outside the scope of her duties support that determination, the ones alleging Williams' threats to punish M.H. and Plaintiff should they and/or M.S.H. testify against Charles Haynes at his criminal trial do.

client or person the institution houses may commit suicide.  (Williams Memorandum at 10-13.)
That is not the standard in Missouri.

Williams should have been able to foresee injury to M.H. from threatening her with
taking her from the safety of her mother's home to place her in foster care should she, her mother
or stepsister testify at Charles Haynes' criminal trial and later at his sentencing.  At the very least,
it was easy to foresee that such illegal threats would cause M.H. and Plaintiff, to suffer significant
emotional harm as alleged.  (¶¶196,205.)  M.H. wanted Charles to go to jail.  (¶104.)  She wanted
to be protected and ran to her mother's home (Plaintiff's home) to escape Charles coming into
her bedroom when she lived at Bernice Haynes' home.  M.H. was terrified of Charles.  (¶¶86,
87.)

Most interestingly, Williams states that Missouri courts have not had occasion to consider
whether an attorney (a non-psychologically trained professional) can be liable for a client's
(patient's) suicide.  Williams ignores the Missouri Supreme Court decision in Kivland vs.
Columbia Orthopaedic Group, LLP, 331 S.W.3d 299 (Mo. 2011) in which the Court held that a
professional or other person not trained in psychology or psychiatry can be responsible for a
client's (patient's) suicide that is the natural and probable consequence flowing from injuries
caused by a defendant's negligence.  (See also Bernice Haynes' Memorandum at 7-8.)  In
Kivland, the defendant orthopedist had no training in psychology or psychiatry just as an attorney
or any other person committing a negligent act would not.

The court in Kivland took a very different approach than did the courts in the cases cited
by Williams.  Those cases predated Kivland by nine to thirty (9-30) years.  The Missouri
Supreme Court rejected previous holdings that suicide is an intervening cause between a
defendant's negligent or other wrongful act and the ultimate injury suffered by the decedent, her

15

suicide.  The court applied Missouri case law construing causation in a wrongful death case to the

defendant orthopedist.  In Kivland, *supra*, the decedent patient suffered extreme disabling and

crippling injuries from alleged negligent surgery and suffered continually, severe, non-treatable

physical pain.  A psychologist offered his opinion that Kivland's emotional suffering following

his tragic injuries and continual horrendous pain led him to commit suicide.  The Missouri

Supreme Court concluded that causation principles applicable under the wrongful death statute

and tort cases are just as applicable to circumstances in which a person commits suicide

following injuries suffered from tortious acts as to any other circumstances leading to a person's

death.

The Court in Kivland, *supra*, held that in a wrongful death case, the plaintiff has to show

that the claimed negligence either "directly caused" or "directly contributed to cause" the

decedent's death.  331 S.W.3d at 306 citing, Callahan v. Cardinal Glennon Hosp., 863 S.W.2d

852, 863 (Mo. 1993).  The Kivland court rejected previous analyses of causation in wrongful

death cases ending in suicide.  It rejected that the suicide of a decedent was necessarily an

intervening cause between a defendant's negligence and the injured party's suicide.

The Missouri Supreme Court concluded in Kivland that the better rule was simply to

apply the standard used in any wrongful death case; that is, whether the decedent's death was "a

direct result" of the defendant's negligence.  To that end, Plaintiff has the burden to prove that

Williams' negligence, or other tortious act, was the "proximate cause" of M.H.'s death; that is,

was it the "natural and probable consequence" of the injury that M.H. suffered as a result of

Williams' acts.  As alleged, Williams' threats led to M.H. suffering tremendously, emotionally

fearing having to return to foster care and fearing Charles not being imprisoned as Williams told

her would happen.

16

The Missouri Supreme Court acknowledged that a plaintiff may be required to present expert testimony proving the causal connection between the defendant's injuries from tortious acts and the decedent's suicide just as Kivland did in his lawsuit against the defendant orthopedist. (See Exh. 45, Dr. Marks' July 2021 report to the Haynes divorce court explaining that causal connection.) See Riley v. Willo Prods. Co., 2013 U.S. Dist. LEXIS 13887 (E.D. Mo. 2013) in which Judge Weber applied the ruling in Kivland to deny a motion to dismiss in a wrongful death action based upon injuries from a defective product causing a decedent's suicide.[4]

In the instant case there is a plethora of evidence showing that Williams knew or should have known that her constant threats to M.H. and to Plaintiff were causing M.H. significant emotional distress, that M.H. wanted her father imprisoned, that M.H. only felt safe at her mother's home, that M.H. feared being returned to foster care and desperately did not want that to occur, and that M.H. dreaded the idea of even seeing her father or his mother. (See Statement of Facts above.) Williams had at her disposal an abundance of evidence that Williams' threats caused M.H. significant and discernable emotional distress. M.H.'s efforts at self-harm, records of M.H.'s two psychiatric hospitalizations, records from therapists, notes of FST meetings, and conversations with M.H. and Plaintiff all put Williams on notice that her threats were harming M.H..

Under Kivland, *supra*, and Callahan, *supra*, it is not necessary to prove that Williams should have foreseen M.H.'s suicide, only to have foreseen that Williams' actions would have caused M.H. harm. What is necessary is to determine whether Plaintiff has properly pled that

---

[4] In a very recent case, Parton v. Jeans, 2019 Ariz. App. Unpub. LEXIS 1322 (AZ Appeals 2019), the court reviews several cases in which courts in other jurisdictions do not rotely apply the "suicide rule" that the suicide, itself, is an intervening cause between a wrongful tortious act and a person's suicide.

there is causal connection between Williams' actions and M.H.'s suicide to satisfy the criteria

established by Kivland.  331 S.W.3d at 308-310; see also Callahan, 863 S.W.2d at 864-865.

Whether Plaintiff can prove her case is not a matter for resolution on a motion to dismiss.

Kivland, 331 S.W.3d at 311-313.  Plaintiff has pled causation in Counts I, II and III.

Worsham v. Nix, 83 P.3d 879 (OK Civ. App. 2003) cited by Williams (Memorandum pg.

11) discusses that even though a wrongful death suit might be dismissed given the fact that

suicide was traditionally considered an intervening cause, that the defendants in that case could

still be held liable for having caused emotional distress for the decedent from the time of her

injury until her death.  The court in Worsham noted that traditionally a cause of action resulting

in emotional distress damages when accompanied by a physical injury, survives the plaintiff's

death.  It cited cases from Minnesota and New Jersey that when the attorney's actions are

"egregious or extraordinary" courts have allowed recovery for emotional distress damages by the

estate of the deceased.  *I.e.,* Snyder v. Baumecker, 708 F.Supp. 1451 (D.N.J. 1989).  (Also cited

by Williams.)  (See Worsham, 83 P.3d at 887-888.)  Plaintiff intends to pursue such a claim

under Missouri law.[5]

---

[5]  Plaintiff believes that after review of Worsham, that she should open an estate for M.H. for the purpose of litigation and pursue a claim for the mental distress that M.H. suffered as a result of Williams' actions.  Plaintiff will seek to amend the Complaint accordingly after the estate is established.  On behalf of M.H.'s estate, Plaintiff will pursue claims against Williams for negligent infliction of emotional distress based upon Williams actions that were outside the scope of her duties.  See Jarrett v. Jones, 258 S.W.3d 443, 444-445 (Mo. 2008) stating that when a defendant should realize that her conduct subjected the plaintiff to an unreasonable risk of mental distress that can be medically diagnosed, the plaintiff has a cause of action.  That is what occurred per Dr. Marks' analysis.  See also Lewis v. Blue Springs Sch. Dist., 2017 U.S. Dist. LEXIS 181671 (W.D. Mo. 2017).

### Williams Was Also M.H.'s Personal Attorney.

Williams also argues that she never served as M.H.'s personal attorney during the Haynes divorce.  Plaintiff does not contest that Williams was a GAL, but the January 30, 2017 Order (Exh. 2) established that Williams also served as the attorney for M.H. and S.H.  Plaintiff acknowledges that the Bird, *supra*, and Tolu, *supra*, cases state that the GAL acts as an agent of the court and is not "strictly" the attorney for the children whose best interests she serves.  However, the January 30, 2017 Court Order (Exh. 2) was not simply an order appointing Williams as a GAL.  It was more.  Paragraph 5 of that Order explicitly states that Williams shall have "an attorney-client relationship with the minor children, and all communications between the GAL and the minor children shall be privileged . . ."  It prohibits the parties and their counsel from making any attempt to "invade" that privilege.  That provision of the appointment order goes beyond what is called for under the GAL statute, R.S. Mo. §452.523, and transforms that appointment to Williams being personal attorney for M.H. and S.H. as well as GAL.  The current judge handling the Haynes divorce recognized this.  (See recent order of Judge Kamp in the Haynes divorce attached as Exh. 1.)

Although discovery will show whether Williams submitted a proposed order which became the January 30, 2017 Order when the court signed it.  What is not in dispute is that Williams never sought to "clarify" whether ¶5 of the January 30, 2017 Order also appointed Williams as attorney for M.H. and S.H.  As the facts show, Williams had experience as a GAL, having represented other children who had been abused.  She had gone through GAL training from which it could reasonably be inferred she would have been taught the nature of the GAL's relationship with the court and with the children whose interest she was to serve consistent with Bird, *supra*.  Had she thought that it was necessary to question her status as attorney for the

19

children and to clarify the Court Order before being sued, she would have done so.  Instead, she

accepted her appointment as attorney for the children and sought to use that to her advantage

while participating in the Haynes divorce.  Plaintiff has properly pled causes of action under

Counts II and III for Williams' violations of her duties to M.H. as her attorney.

### Williams Owed a Duty of Care to Plaintiff.

Williams argues that she did not owe a duty of care to Plaintiff (Count IV) because she

was a GAL and as such owed no duty to the parent of the minor whose best interests the GAL is

appointed to represent in a custody case.  (Memorandum at 13-14.)  She states that the cases

Plaintiff has cited in her Amended Complaint are unhelpful.  She is wrong.  For example, in

Kennedy v. Kennedy, 819 S.W.2d 406, 410 (Mo. App. S.D. 1991), which Plaintiff cited, a

landowner who obtained title to property (current owner) had a cause of action against the

attorney for the former owners who were foreclosed upon.  The attorney fraudulently represented

that the foreclosure was not legal and that the current owner did not have good title.  That caused

the current owner to lose a sale from which he would have had a significant gain.

In Deutsch vs. Wolf, 994 S.W.2d 561, 571 (Mo. 1999) an accountant for a trust was liable

to the beneficiaries of the trust for negligent accounting work that resulted in beneficiaries losing

considerable sums of money.  The attorney and accountant defendants in these cases were found

liable to persons who were not their clients, but who suffered harm from the actions they took

against the plaintiffs.  These cases support Plaintiff having a cause of action against Williams for

the emotional suffering Plaintiff has endured as a result of the threats Williams made to Plaintiff,

not for Williams' acts within her duties as a GAL.  As the defendants did in Kennedy and

Deutsch, Williams acted directly against Plaintiff in ways that were injurious to her and not in

fulfillment of Williams' duties to act in the best interest of M.H. and S.H..

In *In re* Krigel, 480 S.W.3d 294, 299 (Mo. 2016), the Missouri Supreme Court held that attorneys owe duties of care to adverse parties.  In Krigel, the mother's attorney withheld from the father's attorney, the mother's plans to give the parents' child up for adoption.  480 S.W.3d at 297-99.  The mother's attorney told the child's father that the adoption would not happen without father's consent.  The child was adopted without father's knowledge.  480 S.W.3d at 299.  The mother's lawyer argued that he owed no duties to the father.  The Supreme Court disagreed stating, the "[r]esponsibility to a client requires a lawyer to subordinate the interests of others to those of the client, but that responsibility does not imply that a lawyer may disregard the rights of third persons."  480 S.W.3d at 300.

In the instant case, Plaintiff has enumerated many instances in which Williams threatened Plaintiff that if she asserted her rights as a litigant in her custody dispute to oppose Williams or to seek Williams' recusal that Williams would punish her.  (*Ie.,* ¶¶81-84, 120, 227.)  Plaintiff alleged that Williams threatened Plaintiff directly that if she, M.H., or M.S.H. testified against Charles in criminal proceedings that she would punish Plaintiff and her daughters by placing them in foster care.  (¶227.)  These were threats made directly to Plaintiff which caused her considerable anxiety and emotional suffering.  (¶¶228-230.)  When making threats to Plaintiff, Williams was acting illegally and/or egregiously.  Plaintiff also witnessed the emotional suffering M.H. incurred because of Williams' threats to both of them which Williams made in order to cause Plaintiff to change her behavior.  Under the precedents of the cited cases, Plaintiff has a valid claim against Williams stated in Count IV.[6]

---

[6]  Just like Plaintiff, M.H. had a similar claim for having been personally threatened by Williams that M.H. would be punished if she truthfully testified at a trial concerning criminal charges against her father.  Those threats are outside the scope of Williams' duties and are the result of Williams' conduct which are actionable.  As a result, Plaintiff has validly set forth allegations which can serve as a basis for a claim that can be asserted by M.H.'s estate which is

## Spain-Miller's Arguments Should Be Rejected
## for the Same Reasons Williams's Should Be.

In its Memorandum, Spain-Miller argues that the protection of the GAL through immunity arises out of both Federal and State law.  While the Bird case, which first granted quasi-judicial immunity to a GAL, discussed the origin of judicial immunity in both Federal and State law, a GAL's immunity is exclusively governed by State law.  (Spain-Miller Memorandum at 3-4.)  The Federal cases that discuss immunity for a GAL are based upon diversity of citizenship as is the current case.  Since Missouri common law governs whatever immunity Williams, and thus Spain-Miller, may be entitled to is controlled by the Missouri courts, then the decisions of the Missouri courts are the law which must be addressed.  As Spain-Miller acknowledges, Williams acted within the course and scope of her employment and/or agency with the firm.  (Spain-Miller Memorandum at 2, 9 and ¶8.)

In its Memorandum, Spain-Miller reiterates some of the principal holdings in Bird as well as the recent decision of Tolu v. Reid, *supra*.  (However, it does not address that the Tolu case is still under appeal.)  As does Williams, Spain-Miller argues that all claims and allegations against Williams fall "firmly within the scope of her duties as Guardian Ad Litem."  (Spain-Miller Memorandum, pg. 6.)  Spain-Miller cites facts from Plaintiff's Complaint, ¶195, which are alleged to be actions outside the scope of Williams' duties. (See particularly the allegations of Williams' threats stated in ¶195(a-d).)  Spain-Miller asserts that allegations " relate directly to Williams' recommendations regarding custody and visitation."  It never addresses that the allegations in ¶195(a-d) are allegations of tampering with a witness.  It does not explain how tampering with a witness comes within recommendations regarding "custody and visitation."

---

being established.

Even if some of the allegations in the sub-points under ¶195 will fall generally within the scope of the duty of a GAL, tampering with a witness and threatening to punish a parent for asserting her rights in her divorce proceedings do not fall within the scope of a GAL's duties; certainly not within the scope that has been articulated by any Missouri court.  Spain-Miller does not explain how tampering with a witness in a sexual molestation case of an older stepsister is a fulfillment of a GAL's duties to protect M.H. and S.H.,  (see Demorrow v. Demorrow, 169 S.W.3d 591, 593 (Mo. App. S.D. 2005)) or to provide the court with sufficient information so that it can make sure that the child's interests are protected.  (Baumgart v. Baumgart, 944 S.W.2d 572, 578 (Mo. App. W.D. 1997).

Glaringly absent from Spain-Miller's presentation, just as it was from Williams', is Spain-Miller's failure to address Edwards v. Gerstein, supra, in which the Missouri Supreme Court stated there was no difference between official immunity and quasi-judicial immunity.  The firm does not address the implications of that ruling as it applies to GALs.  Williams violating criminal prohibitions against tampering with a witness is a much greater and more severe allegation of acting outside the scope of the GAL's duties than the allegations in the Tolu case brought against a GAL for violating her fiduciary duty, civil statutory restraints, and court orders prohibiting the release of an evaluating psychologist's report to a treating therapist.  The consequences of Williams' actions are even of greater seriousness than the terrible injury of alienating children from a parent alleged in the Tolu case.

Contrary to Spain-Miller's argument that Counts II, III and V do not state allegations of Williams acting outside the scope of her duties as a GAL, Spain-Miller never explains how Williams' tampering with a witness or threatening punishment for Plaintiff exercising her rights

23

as a litigant are within her duties.  Spain-Miller simply concludes that.  Spain-Miller also does

not address the specific language in the January 30, 2017 Order stating that Williams had an

attorney-client relationship with S.H. and M.H., language what was wholly unnecessary for

Williams to be appointed only as a GAL.  (See discussion on pages 18-19 above.)  For the

reasons cited herein, Spain-Miller's Motion to Dismiss should be denied.


### CONCLUSION

For all of the reasons stated above, this Court should deny Williams' and Spain-Miller's

Motions to Dismiss and set a date for a Rule 26 conference.


Respectfully submitted,

/s/  Laurence D. Mass                             /s/  Evita Tolu
Laurence D. Mass   #30977              Evita Tolu              #49878
230 South Bemiston, Suite 1200       Immigration Law Group, LLC
St. Louis, Missouri  63105                 9378 Olive Blvd., Suite 307
Phn:   (314) 862-3333, Ext. 20         St. Louis, MO 63132
Fax:   (314) 862-0605                       Phn:  314-323-6022
laurencedmass@att.net                     Fax:  314-207-0086
                                                        Email:  evitatolu@yahoo.com

Attorneys for Plaintiff


### CERTIFICATE OF SERVICE

It is hereby certified that on this   15th   day of February 2022, a copy of the foregoing
was filed electronically with the Clerk of the Court to be served to all counsel by operation of the
Court's electronic filing system.


/s/  Laurence D. Mass

24