UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| CYNTHIA K. HAYNES, | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| v. | ) No. 1:21-CV-160-ACL |
| | ) |
| JENNIFER WILLIAMS, et al., | ) |
| | ) |
| Defendant(s). | ) |
| | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on four separate motions to dismiss. (Docs. 29, 31, 33, 58.)
The motions are fully briefed and ready for disposition.

I.      **Background[1]**

This action stems from the tragic death of M.H., Plaintiff Cynthia K. Haynes' minor child,

due to suicide.  Divorce proceedings between Plaintiff and her husband Charles Haynes ("Charles")

have been ongoing since 2013 in the Ripley County Circuit Court ("Divorce Case").  Charles is

currently serving a seven-year term of imprisonment at the Farmington Correctional Facility in St.

Francois County, Missouri, for sodomy of M.H.'s older stepsister M.S.H.

Defendant Jennifer Williams, an attorney licensed in the State of Missouri, was appointed

guardian ad litem ("GAL") in the divorce case.  She served as GAL for M.H. from May 6, 2016,

through November 24, 2018.  Williams was employed by the law firm Spain, Miller LLC ("Spain,

Miller") from May 2016 until December 2019.  From December 2019 until April 29, 2021,

Williams was a sole proprietor and used the fictitious name of "Williams Law."

---

[1]The Court's statement of the facts is taken from the Complaint, assumed as true for the purpose of
the instant motions only.  The Court has summarized and condensed the allegations of the 68-page
Complaint.

Defendant Bernice Haynes ("Bernice") is Charles' mother, and intervened in the divorce proceedings to seek custody of M.H. and her sister S.H.  Bernice was awarded physical custody and sole decision-maker responsibility for M.H. on December 22, 2016.  At that time, Plaintiff was awarded unsupervised visitation, and Charles was granted supervised visitation at Bernice's home.

The Amended Complaint ("Complaint") alleges that Charles was present and unsupervised most of the time at Bernice's home, and came into M.H.'s room in the middle of the night to sexually abuse her.  M.H. would frequently run to Plaintiff's home in the middle of the night, because she was terrified of Charles.

M.H. reported the abuse to Williams.  Williams did not report the abuse to the divorce court, and instead accused Plaintiff of manipulating M.H.  Williams told Plaintiff and M.H. that she would cut their visitation time if Plaintiff interfered with Bernice's custodial rights.  Plaintiff requested that Williams recuse herself from the Haynes divorce, but Williams said she would not recuse herself.

In January 2017, when M.H. was twelve years of age, Plaintiff discovered M.H. was mutilating herself while in Bernice's custody.  Plaintiff took M.H. to a local hospital, which referred her to a hospital in St. Louis.  M.H. was hospitalized on January 29, 2017, in a locked psychiatric ward for treatment of self-mutilation behavior.

Williams acted as Charles' lawyer, and threatened M.H. that if she, M.S.H., or Plaintiff testified against Charles in his criminal case, Williams would recommend that the children be returned to foster care.  Williams advocated for Charles to spend time with S.H. and M.H. through visits and reunification therapy.  Williams also falsely alleged that Plaintiff was guilty of educational neglect.  Relying on Williams' allegation of educational neglect, the divorce court placed M.H. and S.H. into the custody of the Department of Family Services ("DFS").

M.H. was admitted into a psychiatric unit between March 20 and March 23, 2017, because her foster parents noticed that she was cutting herself. Medical records noted that M.H. was not happy being in foster care and experienced thoughts of self-harm due to her father's trial being pushed back.

At an April 27, 2017 DFS meeting, M.H.'s foster parents produced a disturbing letter M.H. had written that included references to engaging in sexual activity with Charles. DFS officials and Plaintiff told Williams about M.H.'s note. Williams did not address M.H.'s letter, but continued to raise her concerns about Plaintiff's educational neglect of M.H. at a May 2017 DFS meeting. On June 7, 2017, a DFS-appointed therapist wrote a letter to DFS recommending that M.H. and S.H. be returned home to reside with their mother, and stating that it was not in the best interest of the children to have contact with their father or paternal grandmother. The therapist subsequently recused himself from therapy because he disagreed with Williams about therapeutic goals.

In July 2017, a Court-Appointed Special Advocate ("CASA") worker wrote a letter to the divorce court reporting that M.H. had undergone intelligence testing due to the allegations of educational neglect, which reveled she was within or above the appropriate grade levels as her peers. The CASA worker also indicated that M.H. had expressed concern about her relationship with Williams, and felt that Williams was really Charles' lawyer.

On a July 27, 2017 visit with her pediatrician Dr. Roger Bost, M.H. reported that Charles was sexually molesting her when she stayed at her grandmother's house. M.H. stated that she became depressed and started cutting herself as a result. After M.H.'s disclosure of the abuse to Dr. Bost, Dr. Bost tested M.H. for sexually transmitted diseases and noted in his records that M.H. was sexually abused. Dr. Bost authored a letter that was delivered to the divorce court, DFS, and Williams, in which he stated that it did not sound wise to permit Charles or Bernice access to M.H. or S.H., in light of the evidence Charles had sexually abused M.H. Williams continued to advocate

for Charles' meetings with M.H. and S.H., while threatening Plaintiff with the loss of Plaintiff's custodial rights.

On July 27, 2017, the juvenile court returned M.H. and S.H. to Plaintiff's custody after finding there was no educational neglect on Plaintiff's part.  The juvenile cases remained open due to Williams' continued objections to Plaintiff having custody.

On September 2, 2017, DFS appointed Jerry Marks, Ph.D. as counselor to M.H. and S.H. Dr. Marks' September 8, 2017 letter noted that M.H. had been sexually abused by Charles, who was awaiting court action for the alleged abuse of another daughter living at the house.  DFS reports from September and October 2017 noted that the girls did not want contact with Charles or Bernice, although Williams still insisted on therapeutic visits with Charles.  M.H. reported to M.S.H. that she was scared because Williams told her that if she testified against Charles, Williams would place her and S.H. back in foster care.  In a December 2017 letter to DFS, Dr. Marks indicated that M.H. experienced real trauma in the moves to foster homes and the various schools she attended.  M.H. reported that she was happy to be home with her mother and had been on the honor roll the most recent term.

Williams came to M.H.'s school weekly after July 2017, and threatened M.H. that if she, M.S.H., or Plaintiff testified in Charles' criminal case, Williams would return M.H. and S.H. to foster care.  On several occasions, Williams also threatened to place M.H. into "juvie" if M.H. testified against Charles.  Williams ordered M.H. to keep Williams' conversations from her mother and sister in order to avoid foster care.

In a March 30, 2018 letter to the DFS and the juvenile court, Dr. Marks indicated that M.H. reported to him that Williams had been coming to see her at school.  Williams brought two rounds of gifts from Charles and her paternal grandmother and asked M.H. about Plaintiff's psychological testing.  Dr. Marks stated that it seemed to him that Williams was using her access to M.H. to put

pressure on her about the upcoming trial of Charles relating to the sexual abuse of M.S.H., and to suggest M.H. could go back into foster care if she testified against Charles. Dr. Marks wrote a letter to the Assistant Attorney General for the State of Missouri assigned to investigate Charles' sexual abuse of M.S.H. on May 22, 2018. Dr. Marks raised concerns about M.H.'s safety when with Charles and Bernice. He also expressed his belief that the divorce court mishandled Plaintiff's divorce case and that Williams was pressuring M.H. not to testify at Charles' criminal trial.

On June 27, 2018, the juvenile court terminated its jurisdiction and awarded physical and legal custody of M.H. and S.H. to Plaintiff.

On September 4, 2018, Charles pleaded guilty to second degree statutory sodomy of a minor, a Class C felony, for sexually abusing M.S.H. On November 23, 2018, M.H. told Plaintiff and M.S.H. that Williams threatened her again that if M.S.H., Plaintiff, or M.H. testified against Charles at his upcoming sentencing hearing, Williams would return M.H. and S.H. to foster care. Williams told M.H. that she would be asking the court to put Charles on probation at his sentencing hearing on November 26, 2018. On November 23, 2018, M.H. told Plaintiff and M.S.H., "I am scared of going back to foster care," "I'm going to kill myself first before I go back to foster care," and "I can't deal with dad anymore, if he is free on probation."

On November 24, 2018, M.H. hung herself.

On December 12, 2018, Williams testified at Charles' sentencing hearing, requesting that he be placed on probation instead of being incarcerated. Neither Plaintiff nor M.S.H. testified at Charles' sentencing due to their fears that Williams would take steps to have S.H. returned to foster care.

In a letter to Plaintiff's attorney dated March 17, 2022, Dr. Marks stated, in relevant part:

> It is my understanding that the GAL who was appointed to the cases of both S.H. and M.H. testified at trial on behalf of Mr. Haynes. This testimony, if it occurred, is in my opinion more than just a conflict of interest and may rise to the level of professional misconduct. Since the

> entire process of the criminal case was suspicious and may have been the
> cause of M.H.'s death by suicide; I want to recommend that S.H. have no
> contact with her biological father, Mr. Haynes until she is at least 18 years
> of age.

(Doc. 6 at 49, quoting Plaintiff's Exhibit 43.)

Plaintiff sets forth seven counts in her Complaint.  In Count I, Plaintiff asserts a wrongful death claim against Defendants Williams and Spain, Miller, based on Williams acting outside the scope of her GAL duties.  In Count II, Plaintiff asserts a wrongful death claim against Williams and Spain, Miller based on their alleged legal malpractice.  Count III alleges wrongful death based upon the breach of fiduciary duties of Williams and Spain, Miller.  In Count IV, Plaintiff asserts a personal claim against Williams and Spain, Miller, based on Williams' alleged acting outside the scope of her GAL duties.  Count V asserts a wrongful death claim against Spain, Miller, based on their negligent supervision of Williams.  In Count VI, Plaintiff asserts a wrongful death claim against Bernice Haynes on a theory of negligence.  Finally, Count VII asserts a wrongful death claim against Charles Haynes, based on his sexual assault and battery of M.H.

Each Defendant—Bernice Haynes; Jennifer Williams; Spain, Miller; and Charles Haynes—has filed a separate motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted.

## II.    Standard

"To survive a motion to dismiss for failure to state a claim, the complaint must show the plaintiff 'is entitled to relief,' Fed. R. Civ. P. 8(a)(2), by alleging 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1063 (8th Cir. 2017) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In reviewing a Rule 12(b)(6) motion, the Court accepts all factual allegations as true and construes all reasonable inferences in the light most favorable to the nonmoving

party. *Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019), *cert. denied*, 140 S. Ct. 607

(2019). The Court does not, however, accept as true a plaintiff's conclusory allegations or legal

conclusions drawn from the facts. *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). The

complaint must "allege sufficient facts that, taken as true, 'state a claim to relief that is plausible on

its face.'" *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (alteration in

original) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted). A facially plausible

claim is one "that allows the court to draw [a] reasonable inference that the defendant is liable for

the misconduct alleged." *Wilson v. Ark. Dep't of Human Servs.*, 850 F.3d 368, 371 (8th Cir. 2017)

(internal quotation omitted). In addressing a motion to dismiss, a court "may consider the pleadings

themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of

public record." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (cited case omitted)

## III.    Discussion

The undersigned will discuss the motions to dismiss in turn, beginning with that of

Defendant Bernice Haynes.

### A.   Defendant Bernice Haynes

In Count VI, Plaintiff alleges that Bernice owed M.H. a duty to protect her from sexual and

other abuse by Charles. She claims that Bernice failed to protect M.H. and was thereby negligent in

that she failed to supervise Charles' visits with his daughters, granted Charles unsupervised and

unfettered access to M.H. allowing Charles to sexually abuse M.H. while M.H. was in her custody,

failed to report Charles' sexual abuse of M.H. to the police and the divorce court, failed to seek

immediate medical help and support for M.H., and demanded reunification of Charles and M.H.

knowing that this would cause M.H. pain. Plaintiff alleges that Bernice knew or should have

known that her actions would expose M.H. to injury, mental health decline, and suicide. Plaintiff

claims that the acts and omissions of Bernice caused or contributed to cause M.H. to suffer sexual abuse, severe and excruciating emotional pain, loss of dignity, and deterioration of her mental health which resulted in her suicide.

Defendant argues that Plaintiff's Complaint must be dismissed because Plaintiff is unable to demonstrate proximate cause. Defendant contends that the tortious conduct here was Charles—not Bernice—allegedly sexually abusing MH. As such, Defendant argues that the connection between Bernice's alleged actions and inactions with regard to her supervision of Charles are too remote from the alleged injury (M.H.'s suicide) to establish causation.

Plaintiff responds that the Complaint establishes that Bernice's negligence was a cause in fact and was not too remote a cause of M.H.'s suicide. She argues that, given Charles' history of abuse, the court's order for supervised visitation, and Bernice's acknowledgement of the importance of Charles having supervised visits, she has properly pled causation.

"To show causation in any wrongful death case, a plaintiff must show that the negligence of the defendant 'directly cause[d]' or 'directly contribute[d] to cause' the patient's death." *Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 306 (Mo. banc 2011) (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 863 (Mo. banc 1993)); *see also Tanner v. City of Sullivan*, 2013 WL 3287068, at *8 (E.D. Mo. June 28, 2013). "Before a jury can decide causation, however, a plaintiff must offer evidence that the court determines would establish that the defendant's negligence was the proximate cause of the decedent's death." *Kivland*, 331 S.W.3d at 309. "The requirement of proving proximate cause absolves those actors whom it would be unfair to punish because of the attenuated relation which their conduct bears to the plaintiff's injuries." *Id.* Proximate cause is a question for the court. *Id.* A plaintiff can show that the defendant's negligence was the proximate cause of the decedent's suicide by presenting evidence that the

decedent's suicide was the "'natural and probable consequence' of the injury he suffered at the hands of the defendant." *Id.*

In *Kivland*, the decedent was paralyzed from the waist down after undergoing spinal surgery. *Id.* at 302. He suffered intense pain in the paralyzed region and efforts to alleviate the pain failed. *Id.* Eight months after he filed a medical malpractice action against the surgeon, the decedent committed suicide. *Id.* His family amended his suit to include a wrongful death claim for the suicide. *Id.* The *Kivland* plaintiffs relied on the testimony of a medical expert that the decedent's suicide resulted from the pain caused by the surgery. *Id.* The decedent's surgeon moved for partial summary judgment on the action's claims for wrongful death and lost chance of survival, asserting that the decedent's suicide was an independent intervening act, and that, as a matter of law, the surgeon could not be responsible for the decedent's death. *Id.* at 303-04. As to the wrongful death claim, the Court rejected the surgeon's request to make a general exception to the causation standard when the death is by suicide, and instead held that plaintiffs can show that a defendant's negligence was the proximate cause of the decedent's suicide by presenting evidence that the suicide was the "natural and probable consequence" of the injury the decedent suffered at the hands of the defendant. *Id.* at 309. The Court held that the *Kivland* plaintiffs had met this burden. *Id.* at 310.

The parties do not cite, and the Court was unable to find a case directly on point. Plaintiff analogizes Bernice's negligence to that of the surgeon in *Kivland*. This Court, however, finds that *Charles'* actions are more appropriately compared to the actions of the surgeon. The surgeon (in negligently performing surgery) directly injured the decedent (by causing his paralysis and pain). The decedent's suicide was the natural and probable consequence of the injury inflicted by the surgeon. Here, Plaintiff alleges that Bernice negligently failed to supervise Charles. As a result, *Charles* (in sexually abusing M.H.) directly injured M.H. (by inflicting psychological and

emotional pain).  Plaintiff alleges that M.H.'s suicide was the natural and probable consequence of the injury inflicted by Charles (her psychological and emotional pain suffered due to the sexual abuse).  Bernice's alleged negligence is, therefore, more removed from M.H.'s suicide than the actions of the surgeon in *Kivland*.

Even assuming Bernice's alleged conduct could be considered the cause-in-fact of M.H.'s death, her conduct cannot be considered the proximate cause.  The Missouri Supreme Court stresses the difference between proximate causation and cause-in-fact in this extreme way: "carried to the ridiculous, 'but for' the mother and father of the defendant conceiving the defendant and bringing him into this world, the accident would not have happened.  Obviously, this is not a basis for holding the mother and father liable." *Callahan*, 863 S.W.2d at 865.  The Court agrees with Bernice that her alleged negligent conduct was too far removed from M.H.'s death.  Bernice may have created a condition for M.H.'s injury to occur in failing to adequately supervise Charles.  However, "[i]f a prior and remote cause does nothing more than give rise to an occasion by which an injury is made possible, and there intervenes between that cause and the injury a distinct and unrelated cause of injury, a negligence action does not lie, even though the 'but-for' test is satisfied."

The Court finds that the allegations in the Complaint are insufficient to establish Bernice's alleged negligent supervision of Charles proximately caused M.H.'s death.   Bernice's alleged actions and inactions are too attenuated to M.H.'s death by suicide.  Thus, Bernice's Motion to Dismiss will be granted and Count VI will be dismissed.

**B.  Defendant Charles Haynes**

Plaintiff alleges in Count VII that Charles—an adult in his fifties—after physically and mentally manipulating M.H., began sexually assaulting her.  Plaintiff states that she reasonably believes that in addition to acts of sodomy, Charles raped M.H.  She alleges that Charles knowingly

and willfully acted in a manner that created a substantial risk to the body, physical health, and mental health of M.H., a child, by repeatedly sexually abusing, sexually assaulting, and sexually battering M.H. The Complaint alleges that Charles' "intentional sexual assaults and/or batteries caused and/or contributed to cause M.H. to suffer sexual abuse, severe and excruciating emotional pain, loss of dignity, and deterioration of her mental health which resulted in her suicide." (Doc. 6 at p. 67.)

In his Motion to Dismiss, Charles argues that Plaintiff has failed to allege facts in her Complaint that would establish that Charles' alleged actions were the proximate cause of M.H.'s suicide. Charles contends that, because the facts of the Complaint involve a number of individuals and entities allegedly causing M.H.'s suicide over an extended period, Charles' conduct cannot be the proximate cause of M.H.'s death. He quotes the following language from *Callahan* in support of his argument:

> If the facts involved an extended scenario involving multiple persons and events with potential intervening causes, then the requirement that the damages that result be the natural and probable consequences of the defendant's conduct comes into play and may cut off liability.

863 S.W.2d at 865.

Plaintiff responds that both *Kivland* and *Callahan* support her position that Charles' actions proximately caused M.H.'s suicide. Plaintiff argues that the allegations in the instant case present a stronger causal connection than either of those cases. As such, Plaintiff argues that a jury should determine whether Charles' actions contributed to cause M.H.'s suicide. This Court agrees.

As discussed with regard to Bernice's Motion to Dismiss, Charles' alleged actions were more directly related to M.H.'s death than those of Bernice, and were akin to the actions of the surgeon in *Kivland.* Plaintiff's allegations against Charles include the following:

- Charles abused his daughters, M.H. and S.H., and his stepdaughters physically and emotionally.  (Doc. 6 at p. 6.)

- Charles sexually abused M.H. when M.H. was in the custody of Bernice.  He came into M.H.'s room in the middle of the night when Bernice was not present and sexually abused M.H. Some nights M.H. was so scared that she ran to Plaintiff's home.  *Id.* at pp. 5, 20.

- M.H. testified in December 2016 that she did not want to see Charles; that she never considered that he did not do to M.S.H. what she was claiming; and that she had seen Charles hurting her mom.  *Id.* at p. 16.

- On March 20, 2017, M.H. was admitted into a psychiatric unit because her foster parents noticed that she was cutting herself.  The hospital records note that she reported that Charles had molested her step-sister and that she had thoughts of self-harm due to Charles' trial set back.  She also identified Charles' trial as the cause of her depression.  *Id.* at p. 27-28.

- In June 2017, M.H.'s foster parents reported that M.H. was "scared of Charles."  *Id.* at p. 34.

- A therapist who worked with M.H. concluded that it was not in her best interest to have any contact with Charles.  *Id.*

- Dr. Marks concluded that Charles had sexually abused M.H. and that M.H. should have no contact with Charles.  *Id.* at 49.

- Charles threatened Plaintiff that if she or M.H. testified against him, Williams would return M.H. and S.H. to foster care and he could get custody of the children once he was on probation.  *Id.* at 40.

- On November 23, 2018, M.H. told Plaintiff that she could not deal with her
  father anymore if he was free on probation. *Id.* at 47.

- M.H. committed suicide on November 24, 2018, two days before Charles'
  scheduled sentencing hearing. *Id.*

Assuming all well-pled facts as true and construing all reasonable inferences in Plaintiff's favor, the Complaint does include allegations from which a jury may infer that Charles' actions proximately caused M.H.'s death. The allegations show that Charles sexually abused M.H., that M.H. feared Charles, that Charles' actions caused M.H. tremendous emotional distress, that Charles' conduct caused M.H. to cut herself on multiple occasions resulting in psychiatric hospitalizations, and that Charles threatened Plaintiff to have M.H. returned to foster care if Plaintiff or M.H. testified against Charles. Significantly, M.H. took her life only two days prior to Charles' sentencing hearing. This temporal proximity lends support to Plaintiff's claims that M.H. feared Charles would be released on probation or that she would be returned to foster care after the sentencing proceeding. A reasonable jury could infer from such allegations that M.H.'s suicide was a probable consequence of Charles' actions.

Accordingly, Charles' Motion to Dismiss will be denied.

## C. Defendants Williams and Spain, Miller

Plaintiff has named Jennifer Williams individually and Jennifer Williams, d/b/a Williams Law as Defendants. The Court will refer to these Defendants collectively as "Williams." As previously noted, Plaintiff has also named Williams' employer at the relevant time—the law firm Spain, Miller—as a Defendant. Although Williams and Spain, Miller are represented by separate counsel and have filed separate motions to dismiss, the motions raise the same issues.

The first four counts of the Complaint are directed at both Williams and Spain, Miller. In Count I, Plaintiff alleges that Williams acted outside the scope of her duties as a GAL, which

caused or contributed to cause M.H. to suffer sexual abuse, severe and excruciating emotional pain, loss of dignity, and deterioration of her mental health, resulting in M.H.'s suicide.  Count II alleges legal malpractice.  Plaintiff claims that Williams departed from the established standards of her profession when representing M.H. in the Haynes divorce and juvenile proceedings, which caused or contributed to cause M.H.'s injuries and suicide.  In Count III, Plaintiff alleges that Defendants breached their fiduciary duties to M.H., which caused or contributed to cause M.H.'s injuries and death.  Count IV alleges a personal claim of Plaintiff, based on Williams acting outside the scope of her GAL duties.  Finally, Count V alleges a negligent supervision claim against Defendant Spain, Miller, based on Spain, Miller's failure to supervise Williams.

In her Motion to Dismiss, Williams argues that she is entitled to "quasi-judicial immunity" as to Counts I through IV, because the allegations in the Complaint relate to conduct that fell within the scope of her GAL duties.  She argues that Counts II and III also fail to state a claim for which relief can be granted, because Plaintiff has not sufficiently alleged that Williams had a duty to foresee or prevent M.H.'s suicide.  Finally, Williams argues that Count IV also fails to state a claim because Plaintiff has not sufficiently alleged that Williams owed a duty of care to Plaintiff.

Spain, Miller argues in its Motion to Dismiss that Plaintiff's claims against Williams and Spain, Miller must fail as Williams and her employer have absolute immunity against suit for any and all causes of action arising out of her performance of her duties as GAL.

### 1.  Quasi-Judicial Immunity

Defendants Williams and Spain, Miller both argue they are entitled to absolute immunity against Plaintiff's claims by virtue of the doctrine of quasi-judicial immunity.  Plaintiff responds that Defendants are not entitled to quasi-judicial immunity, because Williams acted outside the scope of her duties by threatening M.H. and Plaintiff.

"'Absolute quasi-judicial immunity derives from absolute judicial immunity.'" *Doe v.*

*Chapman*, 528 F. Supp. 3d 1051, 1056 (E.D. Mo. 2021) (quoting *Martin v. Hendren*, 127 F.3d 720,

721 (8th Cir. 1997)).  "A judge's absolute immunity extends to public officials for acts they are

specifically required to do under court order or at a judge's direction." *Id.*  Missouri Courts have

held that a GAL has absolute immunity for actions taken in her capacity as GAL.  *See State ex rel*

*Bird v. Weinstock,* 864 S.W. 2d 376, 386 (Mo. Ct. App. 1993); *Tolu v. Reid,* 639 S.W.3d 504, 514

(Mo. Ct. App. 2021), *reh'g and/or transfer denied*, (Jan. 31, 2022) and *transfer denied*, (Mar. 1,

2022).

The Missouri Court of Appeals in *Bird* held that quasi-judicial immunity applies to

statutorily mandated GALs in child custody proceedings.  864 S.W. 2d at 385-86.  The Court

articulated the following rationale for this rule:

> Indeed, the need for an independent guardian ad litem is particularly compelling in
> custody disputes. Often, parents are pitted against one another in an intensely
> personal and militant clash. Innocent children may be pawns in the conflict. To
> safeguard the best interests of the children, however, the guardian's judgment must
> remain impartial, unaltered by the intimidating wrath and litigious penchant of
> disgruntled parents. Fear of liability to one of the parents can warp judgment that is
> crucial to vigilant loyalty for what is best for the child; the guardian's focus must not
> be diverted to appeasement of antagonistic parents.

*Id.* at 386 (citations omitted).

In *Tolu*, the plaintiff mother did not dispute that the court-appointed GAL was protected

by quasi-judicial immunity.  639 S.W.3d at 519.  Instead, she argued that quasi-judicial immunity

only attaches to conduct within the scope of a GAL's duties, and that a breach of fiduciary duty

resulting from the release of protected healthcare information was not within that scope.  *Id.*

Specifically, the plaintiff alleged that the GAL released the psychological evaluation report of the

court-appointed psychological expert to the court-appointed reunification therapist in violation of

the family court's orders, the Missouri Rules of Professional Conduct, the Health Insurance

Portability and Accountability Act ("HIPPA"), and guardian ad litem standards. *Id.* The Court noted that the GAL's violations of rules, statutes, or regulations applicable to conduct within the scope of duties subject to the immunity "does not negate the immunity." *Id.* at 520. The Court held that the plaintiff's allegation that the GAL committed constructive fraud and/or breach of fiduciary duty by releasing the report "'fall[s] squarely withing the scope of [the GAL's] duties as court appointed guardian ad litem.'" *Id.* (quoting *Bird*, 864 S.W.2d at 386). As such, the GAL was absolutely immune from civil liability based on the doctrine of quasi-judicial immunity. *Id.* at 521.

Here, some of Williams' alleged conduct falls within her duties as GAL. For example, Plaintiff alleges that Williams engaged in the following actions: falsely testified at a hearing in the divorce case that Plaintiff refused to provide Williams with the children's educational records (Doc. 6 at 16-17); failed to investigate Bernice's health condition as it related to her ability to care for S.H. and M.H. (*id.* at 19); failed to disclose to the divorce court or prosecutor that Charles' computer contained pornographic images of minor children (*id.* at 20); failed to protect M.H. from school bullying when Plaintiff reported that bullying to her (*id*. at 21); failed to file educational test results of M.H. with the court to prove Plaintiff did not neglect M.H.'s educational needs (*id.*); failed to investigate or report to the court when M.H. told her about Charles' nightly visits to her bedroom without Bernice present (*id*. at 22); failed to recuse herself from the divorce case when requested to do so by Plaintiff (*id*. at 23); yelled and screamed at M.H. for making her come to the hospital on a Sunday when M.H. was hospitalized in January 2017 due to self-mutilation (*id*. at 24); instructed the hospital personnel to prohibit M.H.'s communication with Plaintiff (*id*.); made false statements to the divorce court in a February 3, 2017 pleading regarding Plaintiff's suitability as a parent that led to M.H. and S.H. being placed into DFS custody (*id.* at 27); failed to investigate why M.H. was mutilating herself and failed to hot line the child abuse M.H. suffered at Bernice's home (*id.* at 29); insisted that M.H. and Charles participate in reunification therapy together despite

being informed about Charles' unsupervised visits (*id.*); made persistent false allegations of educational neglect against Plaintiff (*id.* at 33); and continued to advocate for Charles to see M.H. and S.H. despite the healthcare professionals' recommendations against it (*id*. at 35).

The above actions and inactions, even if negligent or in violation of rules, were directly related to Williams' duties as a GAL to determine what was best for M.H. in the context of the Haynes divorce. *See*, *e.g. Tolu,* 639 S.W.3d at 520; *McCuen v. Polk County,* 893 F.2d 172, 174 (8th Cir. 1990) (concluding that "[absolute] immunity [to which guardians ad litem, inter alia, are entitled] extends beyond oral testimony to providing their reports and recommendations to the family court.") [alterations in original]; *Kent v. Todd County,* 2001 WL 228433 at \*8 (D. Minn., February 21, 2001) (Guardians ad litem and custody evaluators "are afforded absolute immunity, even when claims of malice and bad faith in investigating and preparing their reports are asserted against them."). The Rules of Professional Conduct, and other statutory or regulatory provisions appliable to GALs serve as "mechanisms in place to prevent abuse and misconduct" as to these alleged actions. *Bird*, 864 S.W.2d at 386. As a result, Williams is immune from civil liability for those alleged actions set out above.

The Complaint, however, contains allegations that Williams engaged in conduct outside the scope of her appointed duties. Specifically, Plaintiff alleges that Williams threatened M.H. and Plaintiff that she would place M.H. and S.H. in foster care if M.H., Plaintiff, or S.H. testified against Charles at his criminal trial or sentencing. Plaintiff alleges as follows, in relevant part:

- Each time M.H. was forced to see Williams (after July, 2017 Williams came to M.H.'s school weekly), Williams threatened M.H. that if Plaintiff, M.S.H., or M.H. testified in Charles' criminal case, Williams would return M.H. and S.H. to foster care. On several occasions, Williams also threatened to place M.H. into 'juvie' if M.H. testified against her father. Williams told M.H. that her dad 'wouldn't go to jail.' Williams consistently ordered M.H. to keep Williams' conversations confidential from her mother and sister M.S.H. in order to avoid foster care. (Doc. 6 at 40-41.)
- From the date of her first involvement in the case on May 6, 2016 until M.H.'s death on November 24, 2018, Williams repeatedly threatened M.H. with her and

her sister's placement in foster care if M.H., Plaintiff or M.S.H. testified against her father at his criminal trial or at his sentencing. M.H. reported these threats to her doctors, Plaintiff and her stepsisters, M.S.H. and Mindy. *Id.* at 50.

- At all times pertinent hereto, Williams violated her duties and acted outside the scope of her duties as a GAL in the Haynes divorce in one or more of the following respects: (a) Threatening M.H. that if her mother, her stepsister, and/or M.H. testified against Charles in his pending sexual abuse criminal case, M.H. and S.H. would be returned to foster care; (b) Threatening to cut M.H. and S.H.'s visitation time with Plaintiff, if M.H., Mellissa, or Plaintiff testified against Charles in his criminal case; (c) Threatening M.H. that if her mother, stepsister, and/or M.H. testified against Charles at his sentencing, M.H. and S.H. would be returned to foster care; and (d) Placing M.H. in a double bind by threatening that if she, her stepsister and/or her mother testified against Charles at his criminal trial, M.H. would be placed in foster care, but if she did not testify against her father, and her father was released or placed on probation as Williams advocated, that M.H. would be placed in her father's custody or required to spend time with her father, who had sexually abused M.H. *Id.* at 53-54.

Plaintiff argues that tampering with a witness in the non-custody, criminal trial of Charles was beyond the scope of Williams' duties as a GAL.

Defendants argue that they are entitled to absolute quasi-judicial immunity, even for the alleged witness tampering. In support, they cite *Tolu* and *Bird*. Defendants compare Plaintiff's allegations against Williams to those of the plaintiff in *Tolu,* that the GAL disclosed an expert's medical report in violation of HIPPA. The Court found that the GAL was entitled to absolute quasi-judicial immunity regardless of whether she violated HIPPA. Plaintiff's allegations against Williams—that Williams tampered with the minor in an attempt to coerce her not to testify in her father's criminal trial—are markedly different than a HIPAA violation. The GAL's alleged HIPAA violation in *Tolu* took place when the GAL released one court-appointed medical professional's report regarding the minor to another court-appointed medical professional. These actions were directly related to the GAL's duties of gathering information to determine the best interests of the child.

Defendants next argue that the allegations made against the GAL in *Bird* were strikingly similar to Plaintiff's allegations. The plaintiff father in *Bird* alleged that the GAL did not respond

to claims that the children's stepfather sexually abused the children, and that the GAL permitted the children's mother to obtain visitation of the children. The plaintiff also alleged that the GAL was negligent "by aiding and assisting defendant [Stepfather] in defending sodomy charges brought against him arising out of the aforesaid sexual abuse of plaintiffs." 864 S.W.2d at 379. The Court concluded that the plaintiff's "allegations of negligence advanced in this case fall squarely within the scope of Guardian's duties as court appointed guardian ad litem." *Id.* at 386.

The facts of *Bird* are more similar to the instant case, in that *Bird* also involved allegations of child sexual abuse in connection with a child custody proceeding. Additionally, the plaintiff alleged that the GAL "aid[ed] and assist[ed]" the child's abuser with regard to charges brought against him arising out of the sexual abuse. Although the Court did not specify how the GAL allegedly assisted in the child's abuser's criminal case, there were no allegations that the GAL tampered with witnesses by threatening the child victim not to testify in the criminal proceeding. Of note, the Court indicated in a footnote that "many, if not all, of the allegations conflict with or are refuted by the records filed herein and in other proceedings before this court." 864 S.W.2d at 386 n. 9. In this case, Plaintiff refers to evidence corroborating her allegations of witness tampering against Williams. The Complaint contains an excerpt from the letter of court-appointed counselor Dr. Marks to DFS and the Juvenile Court in which he states as follows, in relevant part:

> Perhaps this is just me being cynical, but it seems to me that [Williams] is using her access to M.H. to put pressure on [M.H.] about the upcoming trial of her Father related to the sexual abuse of her sister M.S.H. It seems that I am the one who keeps reporting to you the irregularities of the process. I do not think it would be a jump in logic to say that the gifts are a way to send M.S.H. a message about her testimony in the case. I also think it is a way to put pressure on M.H. that she could be going back into foster care if she testifies against her Father.

(Doc. 6 at 43.)

Plaintiff argues that the instant case is more akin to those of *Falk v. Sadler*, 341 S.C. 281 (S.C. Ct. App. 2000). In *Falk*, a mother sued her children's former GAL for negligence, breach of

fiduciary duty, and malicious use or abuse of legal process. She alleged that the GAL exceeded the scope of her duties by advocating the father's interests during separation proceedings, and by attempting to negotiate spousal support for the father in exchange for physical separation of her minor clients from one another. She further alleged that the GAL interfered with the service of federal process in an action to stay the departure of the minor child from United States jurisdiction, withheld information as to the whereabouts of the father to hinder service and aid in his departure from the United States with her minor client, and gave legal advice to the father on avoiding service of process of the federal court action. *Id.* at 289. The trial court granted the GAL absolute quasi-judicial immunity merely on her status as GAL. The court of appeals overturned the lower court, holding that the immunity available to GALs is not a blanket immunity for any and all actions taken by the guardian. The appellate court held that if true, the allegations in the complaint show that the GAL "acted outside the scope of her duties as guardian ad litem and is thus not entitled to immunity…" *Id.* at 290.

        The facts of *Falk* bear some similarities to those of the instant case. Williams' alleged actions go beyond the mere "assisting" in Charles' defense or negligently failing to protect M.H. from sexual abuse. Plaintiff alleges that Williams repeatedly threatened M.H.—the minor with which she was entrusted to protect—with negative custody arrangements if she testified against Charles in a separate criminal proceeding. Plaintiff, like the plaintiff in *Falk*, alleges that the GAL engaged in egregious and likely criminal conduct in a separate proceeding.

        Although *Falk* is not controlling, Missouri law is clear that quasi-judicial immunity only applies to GALs if they are acting within the scope of their GAL duties. *See Bird*, 864 S.W.2d at 386 ("The civil immunity we acknowledge in this case attaches only to conduct within the scope of the guardian's duties.") The Court is not prepared to find as a matter of law that threatening a child victim of sexual abuse not to testify against her abuser in a separate criminal proceeding is within

the realm of GAL duties.  Thus, Williams and Spain, Miller are not entitled to quasi-judicial
immunity as to these allegations against Williams.

## 2.    Counts II and III

In Count II, Plaintiff asserts a wrongful death claim arising from Williams' legal
malpractice.  She alleges that Williams became M.H.'s personal attorney on January 30,
2017, at which time she owed M.H. a duty of care to exercise the skill and learning ordinarily
exercised by attorneys under the same or similar circumstances.  She argues that Williams breached
this duty, which resulted in M.H. taking her life.  Similarly, in Count III, Plaintiff alleges that
Williams breached her fiduciary duties as M.H.'s attorney, which resulted in M.H.'s death.

Williams argues that Counts II and III fail because they are premised on the factually
incorrect assumption that Williams was acting as M.H.'s personal attorney.  Williams contends that
the Missouri Court of Appeals rejected a similar argument that a GAL was the children's personal
attorney in *Bird*.  She further argues that Counts II and III fail to plausibly allege that she owed a
duty of care to foresee M.H.'s suicide.

Plaintiff responds that the divorce court's January 30, 2017 Order established that Williams
served as both GAL and personal attorney for M.H. and S.H.  Plaintiff refers to the following
language in the "Order for Appointment of Guardian Ad Litem":

> 5.  The Guardian Ad Litem shall have an attorney-client relationship with the minor
> children, and all communications between the Guardian Ad Litem and the minor
> children shall be privileged, and shall not be disclosed by the minor children or the
> Guardian Ad Litem except as she shall deem appropriate in the effective
> representation of the minor children, and then only generally and not specifically.
> Neither of the parties nor their counsel shall seek to invade this privilege either
> directly or indirectly, or to make any attempt to seek the disclosure or confidential
> communications from either the minor children or the Guardian Ad Litem.

(Doc. 1-2 at 2.)  Plaintiff argues that this provision was "not simply an order appointing Williams as
a GAL.  It was more."  (Doc. 44 at 23.)

In *Bird,* the plaintiff father claimed that the GAL was a court-appointed attorney for the child, rather than a judicial officer as claimed by the GAL.  864 S.W.2d at 384.  He argued that Missouri's GAL statute, § 452.423.2, is incompatible with the GAL's claimed status as a judicial officer.  The Court disagreed.  The Court examined § 452.423.2, which provides in relevant part that the GAL shall "be the legal representative of the child at the hearing, and may examine, cross-examine, subpoena witnesses and offer testimony," and "conduct all necessary interviews with persons having contact with or knowledge of the child in order to ascertain the child's wishes, feelings, attachments and attitudes." *Id.* (quoting Mo. Rev. Stat. § 452.423.2(1), (2)).  The Court stated that the "role envisioned for the guardian ad item in Missouri is a hybrid of the traditional and attorney-client roles, although closer to the traditional role than the strict attorney-client or advocate role." *Id.* at 385.   The Court remarked as follows regarding the language used in the GAL statute:

> Viewed in isolation, the use of the term 'legal representative,' the authorization to subpoena and examine witnesses and offer testimony, and the requirement that the guardian ascertain the child's wishes, feelings, attachments and attitudes could be viewed as indicative of a legislative intent that the guardian ad litem is to function as attorney for the child.  On the other hand, none of these features of the statute are inherently inconsistent or incompatible with the traditional view of the guardian ad litem's role.  The term 'legal representative' is ambiguous.  A 'representative' may be one acting 'in place of' as well as 'on behalf of.'…..Although the guardian ad litem is required to ascertain the child's wishes, feelings, attachments and attitudes, there is no direction that the guardian advocate such wishes and feelings even if the guardian concludes that the child's desires are not in its best interest.

*Id.*  The Court concluded that, although the best interests of the child are always paramount, the GAL's relationship to the child is "not strictly that of attorney and client." *Id.*  Instead, the GAL's "principal allegiance is to the court." *Id.*

This Court finds that Williams was appointed as M.H.'s GAL, and was not appointed as her personal attorney.  Plaintiff argues that the language used in the divorce court's order, such as "attorney-client relationship," "privilege," and "confidentiality" transformed William's role to that

of personal attorney to M.H.  The Court in *Bird*, however, instructed that similar terms describing

the GAL should not be read in isolation.  The order upon which Plaintiff relies is captioned "Order

for Appointment of *Guardian Ad Litem*."  (Doc. 1-2 at 1) (emphasis added).  In the first section of

the order, the court appoints Williams "to represent the interests of the minor children" "pursuant to

section[] 452.423… RSMo."  *Id.*  The order directed Williams to "conduct interviews with persons

having contact with or knowledge of the children in order to ascertain the children's wishes,

feelings, attachments, and attitudes,"  *Id.* at 2.  Throughout the order, Williams is referred to as "the

Guardian Ad Litem."  *Id.*  Further, Standard No. 7 of the Missouri Supreme Court GAL Standards

(attached to the Complaint as Exhibit 3), states that a GAL "shall comply with all statutes, rules,

and regulations relating to the receipt of confidential or privileged information received as guardian

ad litem," and shall not "redisclose any confidential or privileged information without valid court

order…"  (Doc. 1-3.)

       The order, read in its entirety, intended to appoint Williams as M.H.'s GAL pursuant to §

452.423.  Under Missouri law, a GAL is not a child's personal attorney; instead, their "principal

allegiance" is to the court.  *Bird*, 864 S.W.2d at 385.  Because Counts II and III both state claims

against Williams as M.H.'s personal attorney and the pleadings refute Plaintiff's allegations that

Williams was M.H.'s personal attorney, Counts II and III fail to state a claim upon which relief can

be granted.

       **3.  Count IV**

     In Count IV, captioned "Personal Claim of Plaintiff—Acting Outside the Scope of GAL

Duties"—Plaintiff  alleges a personal claim against Williams and Spain, Miller.  Plaintiff alleges

that Williams owed a duty of care to Plaintiff, citing *In re Krigel*, 480 S.W.3d 294, 299 (Mo. 2016).

Plaintiff alleges that Williams had a duty to comply with the Missouri Rules of Professional

Conduct and the Supreme Court GAL Standards in her dealings with Plaintiff and in performing her

GAL duties in the Haynes divorce. She claims that Williams acted outside the scope of her duties as a GAL in the Haynes divorce by making false allegations, threatening Plaintiff and M.H., not reporting to the courts that Charles sexually abused M.H., testifying at Charles' sentencing hearing favorably to Charles, and ignoring the findings of M.H.'s pediatrician that M.H. had been sexually abused by Charles. Plaintiff alleges that Williams' acts and omissions caused or contributed to cause Plaintiff's suffering and damages.

Williams argues that Count IV fails to state a claim because Plaintiff has not sufficiently alleged that Williams owed a duty of care to Plaintiff. She contends that there is no authority for the proposition that a GAL owes a duty of care to the parent of a minor that would subject her to liability in a civil action for damages.

The Complaint cites *In re Krigel* as authority for the proposition that Williams owes a duty of care to Plaintiff. In *Krigel,* the Missouri Office of Chief Disciplinary Counsel sought to discipline Krigel's law license for multiple alleged violations of the Rules of Professional Conduct in connection with his representation of a birth mother in an adoption dispute. 480 S.W.3d at 296. The Missouri Supreme Court found that Krigel committed multiple violations of the Rules of Professional Conduct, including make false statements to the birth father regarding the child's birth and adoption. *Id.* at 300. Plaintiff argues that *Krigel* supports the proposition that Williams owed a duty of care to Plaintiff and was prohibited from making false statements and engaging in professional misconduct. (Doc. 6 at 61-62.)

As Williams points out, however, *Krigel* was a disciplinary action, not a civil action for damages. Additionally, Krigel did not involve a GAL. Missouri courts have held that the Rules of Professional Conduct "do not form the basis for a civil cause of action." *Roth v. La Societe Anonyme Turbomeca France*, 120 S.W.3d 764, 777 (Mo. Ct. App. 2003). While the Rules of Professional Conduct provide standards and violation of them result in disciplinary action, they do

not augment an attorney's substantive legal duty or the extra-disciplinary consequences of violating such a duty.  *See Greening v. Klamen,* 652 S.W.2d 730, 734 (Mo. Ct. App. 1983); Rules of Professional Conduct, Scope.  Thus, Williams' alleged violations of the Rules of Professional Conduct do not create a duty to Plaintiff, nor do they form the basis for a civil cause of action.

Plaintiff argues that Williams nonetheless owed her a duty "based on Williams threatening her." (Doc. 56 at 9.)  Plaintiff argues that Williams owed Plaintiff "and everyone else" the duty not "to threat[en] them within the law."  *Id.*  Plaintiff fails to cite any authority for the proposition that a GAL's threatening a third party creates the right of the third party to bring a cause of action for damages against the GAL.

Because Plaintiff fails to establish a plausible basis for a personal claim against Williams, Count IV will be dismissed.

### IV.    Count V

In Count V, Plaintiff asserts a wrongful death claim against Defendant Spain, Miller, based on its alleged negligent supervision of Williams.  Specifically, Plaintiff alleges that Spain, Miller had a duty to properly supervise Williams, "who was responsible for representing M.H. in the Haynes' divorce…" (Doc. 6 at 64.)  Plaintiff states that Spain, Miller failed to supervise Williams, who "failed and/or refused to properly represent M.H. as her personal client and who acted outside the scope of her authority as a GAL."  *Id.*  She contends that Spain, Miller did not recognize a conflict of interest in Williams' representation of M.H.'s best interests as GAL, M.H.'s personal interests as M.H.'s attorney, and Charles' interests, which adversely impacted M.H.'s safety and led M.H. to her suicide.

Defendant Spain, Miller first argues that Williams was not acting in a separate role as M.H.'s personal attorney.  Defendant next argues that, as the employer of Williams, Spain, Miller is protected by the same quasi-judicial immunity that protects Williams.

The Court has already found that the pleadings reveal that Williams was not acting as M.H.'s personal attorney. The allegations in Count V depend upon the erroneous assumption that Williams was M.H.'s personal attorney. As such, Count V fails to state a claim upon which relief can be granted..

Defendant is correct that the principles of quasi-judicial immunity apply to Spain, Miller, as Williams' employer. *See Tolu*, 639 S.W.3d at 516 n. 8 ("Because Dr. Reid and Van Luven were properly dismissed, claims against their purported corporate employer were also properly dismissed"). As a result, Spain, Miller is immune from any claims related to actions Williams took within the scope of her duties as a GAL. The Court has found that some of Williams' alleged actions—namely her tampering with witnesses by threatening M.H. and Plaintiff not to testify in Charles' criminal case—were beyond the scope of her GAL duties. Because Williams is not entitled to quasi-judicial immunity with regard to these actions asserted in Count I, Spain, Miller is similarly not immune with regard to these alleged actions.

## Conclusion

Plaintiff has stated a plausible claim at this stage of the litigation as to Count I (against Williams and Spain, Miller); and Count VII (against Charles). Plaintiff's remaining claims (Counts II, III, IV, V, and VI) will be dismissed for failure to state a claim upon which relief can be granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Bernice Haynes' Motion to Dismiss (Doc. 29) is **granted**.

**IT IS FURTHER ORDERED** that the Williams Defendants' Motion to Dismiss Counts I-IV (Doc. 31) is **granted** as to Counts II, III, and IV; and **denied** as to Count I.

**IT IS FURTHER ORDERED** that Defendant Spain, Miller's Motion to Dismiss Counts I-

V (Doc. 33) is **granted** as to Counts II, III, IV, and V; and **denied** as to Count I.

**IT IS FINALLY ORDERED** that Defendant Charles Haynes' Motion to Dismiss Count

VII (Doc. 58) is **denied**.

Dated this 8th day of June, 2022.

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE