# JERRY MARKS, Ph.D., LCSW, P.C.
## 207 Creekside Drive
## Wentzville, MO 63385
## Telephone: 636-887-0914 Fax: 636-206-2522

Re: Cynthia K. Randolph v. Jennifer Williams, et all.
Case 1:21-CV-00160, U.S. District Court Eastern District

This report is provided to Attorneys for Cynthia K. Randolph. My opinions and conclusions are based on the facts as I learned them, on my in-person interactions with MH, SH, Cynthia, and the Division of Family Service's (Division) employees and the professionals who were involved in the care of Cynthia's daughters, MH, and SH. The names of Cynthia's daughters are abbreviated to protect their privacy. My opinions and conclusions are formulated based on my education, professional experience, and my observations.

I have done extensive work in the family and juvenile courts, having developed a reputation for being fair and honest in my recommendations to the courts. I have a Doctorate in Social Work from the Catholic University of America. I completed a fellowship in child and family studies at Walter Reed Army Medical Center in Washington, D.C. I am a Licensed Clinical Social Worker in the State of Missouri. I have also gained considerable expertise in providing compassionate, evidence-based care and treatment to children and youth affected by sexual and physical abuse.

Cynthia was referred to me by a St. Charles family law attorney in 2017. I began treating MH and SH after the Division allowed me to enter into the case just with one phone call. I replaced other mental health professionals who were previously involved in MH's and SH's treatment and who were recused by the involved legal professionals or who recused themselves because their care recommendations were ignored. The replacement of mental health professionals raised a red flag that something inappropriate was taking place in the process. I questioned why the mental health professionals were recused from this case because severing MH's and SH's therapeutic relationships with their therapists was imprudent as it undermined and jeopardized MH's and SH's therapy.

Both girls were allowed to see me in my office monthly to be transported to the appointments by their mother. Cynthia complied meticulously with the Division's recommendations and was devoted to helping her children heal during those difficult times. I was required to write quarterly reports to the Division about our therapeutic progress. I was confident that with the right care and support, MH and SH would heal from her traumatic experiences. From the very beginning, I advocated strongly that neither MH nor SH have any contact with their biological father, Charles Haynes (Haynes), and the rest of his family. Haynes had been charged with numerous felonies of statutory rape, child molestation, and deviant forcible child sodomy of MH's older half-sister MSH. Haynes had begun molesting MSH when she was only eleven years old. After MSH disclosed Haynes' sexual abuse to the authorities at the age of thirteen, Haynes was arrested and released on bond the next day. Cynthia filed for divorce immediately.

In February 2014, Haynes violated the terms of his bond when he came to Cynthia's house and threatened to kill MSH if MSH testified against him in the pending criminal investigation. Haynes' bond was revoked but Haynes was released from jail shortly. Although it was Haynes who violated the terms of his bond, Cynthia was charged with child endangerment because she allegedly allowed Haynes to come to her house. Haynes was not held accountable for violating his bond. It was another red flag that made me

question the adequacy of the legal process against Haynes in Ripley County. Cynthia was charged with child endangerment. MH, SH, and MSH were placed in the Division's custody with several foster families.

On April 3, 2014, MSH testified in Haynes' criminal case that Haynes had been sexually abusing her steadily for the past three years. I read a court transcript of MSH's testimony in State v. Haynes, 13RI-CR00907 and 13RI-CR00907-01 containing horrifying graphic descriptions of sexual abuse MSH sustained from Haynes. MH told me that MSH took police to various places where Haynes molested MSH. The State collected Haynes' and MSH's DNA samples from those places to support the criminal charges and ultimately Haynes' conviction.

I repeatedly insisted that MH and SH have no contact with their father and his family. It is common knowledge among mental health providers that perpetrators have a preferred victim type. Professionals involved in child protection are mandated to safeguard potential minor victims from sexual abuse. MH and SH met Haynes' preferred victim profile. Allowing Haynes through his mother to have access to MH and SH was a careless and reckless recommendation to the divorce court.

I saw MH on September 8, 2017. At that time, MH and her sister were in the legal custody of the Division. Cynthia was MH's and SH's physical custodian. During therapy with MH and SH, talking to Cynthia and Division's workers, I learned about the court process the girls were entangled in and saw how destructive and traumatizing the process was for them. The irregularities in the process that led MH and SH into the Division's custody in 2014, then in the custody of the girls' 90-year-old ailing paternal grandmother, and then again into the Division's custody in 2017 were alarming.

The Division separated MH, and SH, from their mother, MSH when it placed them in foster care in 2014. This placement was traumatic and emotionally painful, especially for MH. The girls were moved between multiple foster homes in less than one year and had to attend several different schools during that time. I reported my findings to the Division, confirming that the girls' experiences in the foster care system were negative and traumatic. MH and SH desperately wanted to be home with their mother. Cynthia was only allowed limited supervised visitation while the girls were in the Division's custody. The wrongful use of legal proceedings and foster care to punish Cynthia, a non-offender, and a safe parent, to protect a sexual abuser, had devastating consequences for MH. It caused MH to distrust the justice system and experience emotional trauma.

In May 2014 in an angry rant Haynes bragged to Cynthia that MSH "was cleaning up my cum after MSH "gave me a blow job." Haynes said "that (MSH) has been doing it for quite some time…She ain't no amateur" and "she knows what she's doing!" In the same conversation, Haynes demanded that MSH should be killed and that Cynthia kill MSH or that Haynes would kill MSH. Haynes threatened Cynthia that if "you don't want to hold people (meaning MSH) fucking accountable, I will! Do you really think I'm going to let MSH fuck these kids (MH and SH) up the rest of their lives? Shit! You will, I won't!" Haynes called MSH "too evil" and dictated that "she ought to be killed." Haynes ordered Cynthia to "bury that f*** (MSH)!!! That's what you're supposed to do." Cynthia recorded the conversation and provided it to the court as evidence in Haynes' criminal case.

In August 2015, the Division returned MH and SH into Cynthia's custody. As MH and I worked to process her trauma, she opened up about the difficult experiences she and her sister faced while in multiple foster homes. I saw MH's pain as she described her experiences. MH was troubled by the unfairness of the system unable to comprehend why they had been placed in foster care in the first place. At that time, MH had endured the hardships of several prolonged foster care placements which caused her to feel instability, trauma, and distrust in the system. MH was distraught that her father was not behind the bars and that the

criminal and divorce cases were dragged on without any resolution. MH felt helpless knowing that neither MH, MSH nor their mother could do anything to move the proceedings forward in which Haynes kept accusing MSH and Cynthia of fabricating sexual abuse against him. It was a very unhealthy environment for MH's well-being, causing her distress and feeling betrayed.

In 2016 Haynes asked the divorce court to appoint Jennifer Williams as a guardian ad litem for MH and SH after Haynes accused Cynthia of educational neglect and physical abuse. In December 2016, GAL Williams informed the divorce court that Cynthia neglected MH and SH educationally and recommended placing MH and SH with their paternal grandmother, Bernice Haynes, who was 90 years old at that time and had major health problems. Bernice Haynes was not a suitable and qualified custodian for the girls. Relying on the GAL, the court placed MH and SH with their paternal grandmother who was required to supervise her son's visitation with MH and SH at her house. At the time of this placement, Haynes was charged with statutory rape, child molestation, and deviant forcible child sodomy of MSH, MH's sister.

Once I reviewed MSH's deposition from Haynes' criminal case, I had no doubts that Haynes had sexually abused MSH. I was disturbed about the GAL's recommendation to place MH and SH with the 90-year-old ailing grandmother where Haynes had direct access to MH and SH. The GAL's recommendation was careless and belied all science behind sexual abuse, GAL's training related to the perpetrator's preferred victim type, grooming behaviors, and sexual abuse phases. The recommendation was contrary to the GAL's duty to protect the girls from harm.

In our December 1, 2017, therapy meeting MH told me that she had been through a lot in the last year and that it was very hard when she was placed with her paternal grandmother. Her father was there daily. MH knew that he was not supposed to be there but she did not know what to do or say. At the grandmother's house, Haynes had unlimited unsupervised access to MH during which Haynes sexually abused MH causing MH significant trauma, distress, and mistrust in the system that MH was taught would protect her from harm. The realization that MH had no place to turn for help stressed her and further compounded MH's trauma. Throughout our therapy, MH struggled with painful memories of multiple foster homes and different schools and the challenges that she had with fitting into the new environment. I reported to the Division, MH's experiences, and the significant trauma she sustained during the moves and in her paternal grandmother's custody. We worked through her painful memories and trauma processing while focusing on MH's safety.

From December 2016 to January 2017, while MH was in her grandmother's care, MH began cutting herself to cope with sexual trauma. At that time Cynthia had no legal or physical custody of the girls and Cynthia had no say in the situation. The girls did not receive any support or protection from the paternal grandmother and/or their appointed GAL. Self-mutilation in children is a powerful indicator of sexual abuse trauma. MH was not allowed to see her mother while she was at her grandmother's. In discussing her life at her grandmother's house, MH exhibited all the signs of acute distress, indicative of MH being a victim of Haynes' sexual abuse. The more we worked through MH's painful memories and trauma, the more signs of post-traumatic stress disorder, depression, and anxiety, I observed in MH.

When MH told the GAL that her father was at his mother's all the time and late at night, GAL Williams didn't help MH who ran to see her mother in the middle of the night. The GAL instead told Haynes about it. Haynes installed several cameras at his mother's house to watch MH who described to me she felt "like an animal in a cage." The GAL put MH in danger and the GAL invalidated MH's pain, concerns, and feelings. MH was hospitalized in January 2017 and treated for self-mutilating behavior. The hospital refused to release MH to her paternal grandmother. This confirmed to me that the hospital's mental health professionals determined that Haynes and his mother posed danger to MH. Upon MH's release from the

hospital, MH and her sister were placed in the Division's custody with a foster family. The girls were not released to Cynthia because of the GAL's accusation of Cynthia committing educational neglect of MH and SH. On January 7, 2017, MH took a state-approved academic performance test which showed that MH was performing academically as her peers and above her peers. Notably, both MH and SH had been Honor Roll students from the date of their placement in the Division's custody until the juvenile cases were closed in July 2018. The GAL's accusations that Cynthia committed educational neglect were never substantiated.

GAL Williams insisted that MH see her father and championed the idea that the two should spend time together despite Haynes' criminal charges and MH's self-mutilating behavior signaling sexual trauma. When children are invalidated and ignored, they suffer trauma, called traumatic invalidation which ultimately causes symptoms of PTSD each time traumatic invalidation is repeated. Here, MH, a sexually abused child, asked her GAL for protection but instead the child victim found herself repeatedly and traumatically invalidated, oppressed, and placed in fear. This repeated invalidation further damaged MH's already fragile mental health. It also undermined MH's therapy and trauma processing.

Cynthia was allowed to have visitation with her daughters while they lived with the foster family. Some sense of stability and trust was established at that time. In March 2017, while in foster care MH started cutting herself and was hospitalized again. The foster parents found a disturbing note in MH's backpack which stated, "Fuck my pussy daddy" and MH's diary notes screaming "Help, help, help, help, etc." The foster mother reported to the Division and the GAL that MH disclosed that Haynes had sexually abused MH while MH lived in her grandmother's house. The GAL didn't report MH's disclosure of sexual abuse. GAL Williams refused to communicate with MH while she lived with the foster family. The GAL, who placed MH with the paternal grandmother, didn't investigate the grandmother's failure to protect MH from harm and didn't investigate Haynes' abuse of MH. I questioned the relationship between the GAL and Haynes.

In July 2017, MH disclosed sexual abuse to her pediatrician, Dr. Bost, who tested MH for STDs and HIV. Knowing of MH's disclosures of sexual abuse, the GAL demanded reunification therapy between MH and her sexual abuser. All mental health professionals and the Division workers involved in the case were against it. MH repeatedly told Division workers, foster parents, her GAL, and her therapists that she didn't want to see her father or have anything to do with him. MH's wanted her father to be in jail and all the court to stop. The GAL's demands that MH be reunified with her abuser magnified MH's emotional distress and trauma further causing more PTSD symptoms and anxiety. Demanding MH to reunify with her sexual abuser destroyed any therapeutic progress MH had made and again invalidated MH's trauma.

Because MH and SH were excelling academically and Cynthia was a stable and safe parent, the Division wanted to return MH and SH into Cynthia's physical custody in July 2017. GAL Williams opposed the Division's decision insisting on educational neglect and accusing Cynthia and MSH of fabricating sexual abuse allegations against Haynes. The Division's policy required the Division to consider the GAL's input. GAL Williams and the Division agreed for the Division to retain the legal custody of MH and SH until July 2018. This compromise gave the GAL unfettered private access to MH.

During therapy sessions, MH reported that the GAL came to school to see MH regularly. MH thought it was odd because MH didn't see her GAL much when MH lived with the foster family. MH told me that the GAL brought MH gifts from her father and paternal grandmother. I advocated against the GAL bringing any gifts from Haynes and his family. The GAL used school visits and gifts to access MH to pressure her not to testify against her father at his criminal trial related to his sexual abuse of MSH. MH told me that GAL Williams wanted MH to testify favorably for her father and against her mother. MH was distraught that her GAL was advocating for her father and not for MH and SH. The school was a safe place for MH until the

GAL started coming to school and threatening MH there.

Because of the GAL's demands, MH was anxious, distressed, and in fear to return to foster care if MH or MSH were to testify against Haynes in his criminal case. GAL Williams' school visits caused MH more stress because school was no longer a safe place for MH. Anxious MH complained to Dr. Bost of having neck pain which Dr. Bost attributed to stress caused by the GAL's school visits. I construed the GAL's actions as witness tampering aimed to stop MH and MSH from testifying in the Haynes criminal trial and to prevent MH from revealing details of her sexual abuse. In March 2018, I reported to the Division that the GAL's visits to see MH at school in the past two months were tantamount to witness tampering. The GAL's misuse of power caused MH, a victim of Haynes' wrongdoings angst, and fear. By pressuring MH to remain silent, GAL Williams invalidated MH's sexual abuse trauma, caused fear, and ignored her basic human right to be safe. Although the GAL had an obligation to protect MH, from further harm, the GAL rallied for the sex offender ignoring the safety and well-being of Haynes' victims.

It was my opinion that the GAL kept the juvenile cases open to have access to MH to prevent MH from testifying against her father at his criminal trial. It was inappropriate when the GAL demanded from MH that Cynthia obtain a psychological evaluation. It caused MH more pressure making her feel responsible for her mother's evaluation. MH was in distress, traumatized, and vulnerable. MH was afraid to speak up because the GAL ordered MH to keep her conversations with the GAL confident. The GAL's misguided conduct impeded MH's therapy and deprived MH of much-needed support. In therapy, MH conveyed her fear of GAL placing MH and SH into foster care or in the custody of their father. I was against the GAL's visits to MH's school and her insistence on reunifying MH and her sister with their father. It was detrimental to their safety and well-being. I strongly urged the Division to close the juvenile cases to ensure that Haynes and his family have no contact whatsoever with MH and SH to protect them from any further harm. Despite my advice, the GAL insisted on reunifying Haynes and MH; pressured MH to not disclose the sexual abuse and not to testify against her father. In the meantime, Haynes continued to postpone his criminal and divorce cases for many years with no conclusion in sight for MH. Haynes' ability to remain on bond and not in prison was a source of additional stress and anxiety for MH and her family. The drawn-out process of adjudicating Haynes' criminal and divorce cases coupled with the GAL's intimidation and threats interfered with MH's therapy and deprived MH of any meaningful opportunities to heal.

In May 2018, I was so alarmed about the GAL's conduct that I wrote a letter to the Special Prosecutor assigned to State v. Haynes case. My objective was to provide the Special Prosecutor with an understanding of the five stages of sexual abuse, from grooming to the actual occurrence of sexual violence. The second goal was to explain how Haynes abused MH's older sister, MSH through each phase. I also reported to the Special Prosecutor about one attorney, referring to the GAL, who had insisted that the juvenile cases remain open even when all licensed professionals, including me, had asked to close the cases. I was concerned that the GAL, who was charged with the duty to protect MH from harm rallied around the perpetrator to keep him out of prison; continued to discredit Cynthia in court, and threatened MH to prevent her testimony about Haynes sexually abusing MH. Rather than strengthening MH's support system, GAL Williams carelessly damaged it through her irresponsible behavior. The GAL's conduct exacerbated MH's psychological trauma, making it more severe than it was before. MH's safety plan, developed during our therapy, was destroyed. The GAL's actions annihilated any therapeutic progress MH had made and defeated MH's support system and trust in the system.

MH told me that she never wanted to be in the situation her older sister MSH found herself in once MSH disclosed sexual abuse to law enforcement. MH was very distressed that Williams told the courts and the Division that MSH, along with her mother, had fabricated sexual abuse perpetrated by Haynes. MH's faith in the justice system, designed to protect MH, was shaken when her GAL placed MH with her paternal

grandmother, where MH was sexually abused. Rather than protecting MH from further harm, the GAL blamed MH and MSH, invalidated MH's trauma, and silenced MH's concerns while advocating for Haynes. MH was acutely stressed when the GAL demanded MH be reunited with her sexual abuser, requiring the child to disregard and deny the sexual abuse MH had endured. Therapists, who treat sexual abuse trauma, strongly advocate the importance of an evidence-based approach to mental health care for sexual abuse victims. This approach emphasizes the need for therapeutic healing and the development of the victim's coping skills and boundaries, rather than denying the trauma they have experienced. The GAL failed to utilize the trauma-informed approach as her training required. Invalidating MH, GAL Williams deprived MH of the dignity, care, and support MH needed causing MH more trauma and fear of her GAL.

Learning that Williams would testify on Haynes' behalf at his sentencing hearing asking for his probation instead of incarceration was the tipping point for MH's decision to take her life. On the morning of November 24, 2018, Cynthia, MSH, SH, and one of MH's acquaintances were with her, unaware of the tragedy that was to follow. MH kept her plans to herself and appeared calm. On that day, MH took her life because she knew that her GAL would seek Haynes' probation at his sentencing hearing on November 26, 2018. MH knew that if her father was on probation, her GAL would place MH and SH in the custody of MH's sexual abuser. If Haynes was given a jail sentence, then the GAL would put MH and SH in foster care as the GAL told MH repeatedly. MH had to protect herself and her sister from both outcomes. In her final act, MH took control of her life as her only way out. While alive, MH knew she couldn't control her life. MH exercised her final power to end her life to escape her sexual abuser, the GAL, and foster care.

The GAL's conduct, in this case, from its inception until MH's death, was careless, reckless, and not within the scope of her assignment. By advocating for Haynes before and after his conviction, and by intimidating and preventing MH from testifying against Haynes, GAL Williams ignored MH's safety and put MH's life in danger. The GAL misused the powers that the court entrusted to her and by doing so, she put MH in a situation from which MH had no way to escape. The GAL's conduct was the major factor that caused MH severe emotional distress that resulted in MH's suicide. Had the GAL acted as a reasonable and prudent GAL, MH would have been alive today.

Respectfully submitted,

*/s/ Jerry L. Marks*

Jerry L. Marks