# REECE FAMILY LAW

## DEFENDING YOUR FAMILY™

SPRINGFIELD · JOPLIN · LAWYERS

*Attorneys*
Shelly Renee' Reece, JD, MBA
Elizabeth A Warrick, JD
Todd C Hawkins, JD

*Business Manager*
Zane B Clark, MBA

*Paralegals*
Loni Conner
Lauren Young
Jennifer Hedges
Sheryl Jones, PP, PLS

*Reception*
Michelle Stallcup
Katelyn Slifer

REPORT - April 3, 2023

RE: CYNTHIA K. RANDOLPH V. JENNIFER WILLIAMS, et al.; Case No. 1:21-CV-160-ACL

I, Shelly Renee' Reece, JD MBA, have been requested to provide a report and provide an opinion regarding the above-referenced case on behalf of the Plaintiff, Cynthia K. Randolph. My report is in regards to the Standards with Comments for Guardians Ad Litem in Juvenile and Family Court Division Matters as well as the related Missouri Statutes for Guardian ad Litem duties. My findings, opinions and conclusions are based on my personal review of the court pleadings and their attached exhibits, case file exhibits, and facts therein relied upon. This report is made in consideration of the totality of the circumstances in the above referenced case filed by Cynthia K Randolph (also referred to as Plaintiff Mother) individually and under the Missouri Wrongful Death Statute for her legal claim against Defendants Jennifer Williams (also referred to as Defendant Williams, Guardian ad Litem or GAL) individually, and Charles Haynes (also referred to as Defendant Father) along with additional Defendants identified as necessary. My findings, opinions and conclusions are derived from my Juris Doctorate education, Masters of Business education, professional legal experience in family law and as a Guardian ad Litem as well as my own reading and analysis to a reasonable degree of certainty in my field.

I am the sole owner of two law firms, Reece Family Law, LLC in Springfield Missouri and Defending Your Family, LLC in Joplin Missouri. I train and supervise 3-5 attorneys employed in my firms. I have been practicing law in the field of family law for 26 years. I represent mothers, fathers, grandparents, and children. I have been a licensed Guardian ad Litem giving recommendations on my appointed cases for more than 20 years with the initial 8 hours of education and 3 yearly hours of continuing education. I am a Certified Licensed Mediator and have been appointed by the courts and private citizens to administer mediations since 1997. My full Curriculum Vieta is available upon request.

I was engaged for services on March 3, 2023 through the Plaintiff Mother's attorneys and received documentation for review through their firm. A full index of documents reviewed is available upon request.

PLAINTIFF'S EXHIBIT C - 001

The duty to serve as a Guardian ad Litem comes from an appointment from the Court. The Guardian ad Litem appointment is mandatory in child custody cases where there are allegations of abuse or neglect. **(Revised Statutes of Missouri 452.423 and 452.490).**

Black's Law Dictionary defines the Ad Litem as Latin translation "for the suit" and "for the purposes of the suit" and places a duty to prosecute or defend a suit on behalf of a party incapacitated by infancy or otherwise. Another definition from the Oxford Dictionary, which is used especially for a legal guardian, is "the ad Litem is appointed to act in a lawsuit on behalf of a child or other person who is not considered capable of representing themselves".

Plaintiff Mother and Defendant Father in this Wrongful Death action were previously involved in an elongated divorce litigation from 2013 to 2022 that included a side case diversion referral to Juvenile Court and Children's Division involvement. During their dissolution of marriage case Defendant Father requested the appointment of a GAL with an allegation against Plaintiff Mother concerning generalized educational neglect. Defendant Williams in this Wrongful Death action was appointed as the GAL in the divorce action between Defendant Father and Plaintiff Mother for their two minor girls, M.H. deceased and S.H. surviving sister (names redacted for privacy). Case No. 13RI-CV00554, Ripley County, Missouri. She was also appointed as the minor girl's GAL in each of the girl's juvenile case. An older sister named M.S.H. was in the home and was abused by Defendant Father who is now in jail.

The dissolution appointment covered the dates from May 6, 2016, through April 29, 2021, when the Guardian withdrew from service stating that due to the conviction of Defendant Father her appointment was no longer necessary, leaving the youngest girl S.H. surviving sister without a Guardian ad Litem to represent her for the duration of the divorce litigation.

M.H. deceased, who's death is disputed for liability in this litigation, hung herself due to extreme physical and emotional duress on November 24, 2018 two days prior to her expected testimony in Defendant Father, her biological Father's, sentencing hearing for the sexual abuse of her older sister M.S.H. who was 10-13 years of age during her abuse, the same age of M.H. deceased, during the divorce. The older sister M.S.H. testified to being abused by Defendant Father by giving gross details of sexual acts she endured over a period of many years at a Preliminary Hearing; a traumatic history of family incestual abuse that was also shared by M.H. deceased who was under severe duress to avoid testifying herself based on threats outlined below from the Guardian ad Litem, Defendant Williams. Threats that had proximity to the cause of death of M.H. **See older sister M.S.H. Transcript of testimony Exhibit 5 attached to the Amended Complaint for Damages.** It is reported that Defendant Williams discounted the testimony of the older sister M.S.H. and failed to investigate M.S.H.'s abuse that occurred in the same home.

Defendant Father was charged criminally on December 1, 2013 (also noted November 23, 2013 on other charges) and sentenced after being out on bond for five years on December 12, 2018 with the following:

> Statutory Sodomy-1st Degree-Deviate Sexual Intercourse with a person less than 14 years old (Felony Unclassified RSMo: 566.062), and
>
> Child Molestation-1st Degree(Felony B RSMo: 566.067), and
>
> Statutory Sodomy-2nd Degree (Felony C RSMo: 566.064), and
>
> Statutory Sodomy-2nd Degree (Felony C RSMo: 566.064). **See Exhibit 42 attached to the Amended Complain for Damages.**

**PLAINTIFF'S EXHIBIT C - 002**

In review of the earliest pieces of evidence that was available to Defendant Williams were two video recordings of Defendant Father admitting his sexual abuse of older sister M.S.H. It shocks the senses of this reporter that the entire case is not predicated on recommending NO contact between him and any child to protect them from further abuse and neglect. The standard of care is to believe the children first, investigate fully and recommend a safety plan upon fulfilling your duties and proceeding through court processes.

The videos I reviewed were both dated May 29, 2014. **Exhibit 7 Plaintiff Mother Amended Complaint for Damages.** Defendant Williams GAL, upon any review would know that Defendant Father admitted to and gave detailed descriptions that he had sexual contact with the older sister M.S.H. whereby he discuses multiple sexual contact between him and the child, his blame of the child and his comments that the child is very experienced in sexual acts (age 9-13). It is important to note that minors legally cannot consent to sexual contact of any kind.

Defendant Williams would know from these videos that Defendant Father was a sexual abuser of a minor child. He interjects unsolicited statements "but she's the one who initiated it and I didn't say no" and "did I start it? No, I did not". He blames his wife Plaintiff Mother and others. He asks if the minor child was a lesbian and whether the Plaintiff Mother confronted her about her sexual identity. He states, "who would believe the minor child?" and adds that he believes the child is not an amateur and believed the child had been doing this for quite a while. From his statements and admissions, he believes the child is "evil" and "ought to be killed", telling Plaintiff Mother that "she is to burry that [child] by painting a picture of the monster she is". **Exhibit 7 Plaintiff Mother Amended Complaint for Damages.**

There is a subpoena in the court file that Defendant Williams requested 2014 Juvenile Records for the older sister M.S.H.'s case, and her siblings, but no further action is noted. M.H. deceased herself wrote a letter to DFS disclosing abuse at the grandmother's home in 2017. Defendant Williams did not act in a manner within a reasonable standard of care to protect the children having personal knowledge of the juvenile records.

Other red flags from the early evidence are the insight you receive about the character of Defendant Father in listening to the video dated May 29, 2014. Defendant Father does not use proper English, or full sentences, he is immature and has reactive responses and rages. He also uses abusive language towards his wife and children.

From the case file it is reported that Defendant Williams refused to watch/listen to the videos or believe their contents. I received no evidence that a hotline was made by Defendant Williams. There is no evidence that he was kept isolated from minor children in the divorce case. I received no evidence that the Defendant Williams believed that due to sexual abuse in the family that services were needed, safe exams were needed, forensic interviews were needed, counseling were needed, education on abuse need and that no contact with the abuser was needed.

On May 8, 2014 there is a specific note that the Missouri Department of Social Services, Children's Division worker in a Family Assessment summary regarding allegations of sexual abuse and bruises, welts, red marks of M.H. deceased and S.H. surviving sister. Defendant Williams repeatedly and continuously advocated contact between the Defendant Father and the two children. The worker notes in 2014, "they are still really concerned about [older sister

GAL's reasonable standard of care were missing. In fact, Defendant Williams continued throughout the case to attempt reunification for Father with the children. She also recommended more supervised contact knowing Defendant Father had unsupervised interactions with the children the last time supervised contact was attempted. The minor children were not safe in the residence they were placed in, as recommended by Defendant Williams, for a temporary schedule.

Later, beyond her role, the evidence is undisputed that Defendant Williams threated the minor child M.H. deceased, acted as a lawyer for Defendant Father and testified for him to have probation in his criminal case-all actions that caused this child extreme emotional duress and was a proximate cause to death. Any standard of care for a reasonable person in this role is missing.

A mother, father or babysitter would have a gut feeling for a reasonable standard of care to offer protection, and here the Guardian ad Litem was appointed by the court to provide such care and more as a professional. This assignment is similar to a parent assigning a child's care to a bus driver, day care personnel, teacher, coach, etc. there is an expectation of reasonable care for the safety and welfare of the child and when there are problems the assigned adult is to take reasonable actions to protect the child. Here there is inaction, and actual words and deeds by the children's own Guardian ad Litem that fail a reasonable standard of care, fail to provide a professional level of care and within and beyond her role as Guardian ad Litem harmed the children indicating a proximate cause to a child's death.

The **Order for Appointment of Guardian ad Litem** is attached to the Amended Complaint for Damages as **Exhibit 2** which sets forth the initial appointment duties for Defendant Jennifer Williams. The Order States in part, paraphrasing from the Order, **Exhibit 2**, (emphasis added in bold) that Defendant Williams is appointed to:

### (Paragraph 1 Order for Appointment)
### "Represent *the interests of the minor children*"

In layman's terms, the GAL is not the attorney for the child, like a mother or father's attorney to argue a parenting schedule, child support or property division in a divorce. In rare cases, the court can appoint or require the parents to hire an attorney to advocate for a child as the child's legal counsel. The GAL represents the Best Interests of the minor children and has two basic roles (1) **to inform the court of the child's wishes** (**RSMo. 453.375**- factor for custody determination, the wishes of the children). This role protects the children from having to testify in custody disputes where the GAL or other expert witnesses such as a counselor can testify to the Court instead. And, (2) to **represent to the court what is in the best interest** of the minor child. For example, to recommend a schedule for weekly contact between the children and the parents.

An example of the duality of the role to represent the interests of the minor children is explained by telling the court that the child prefers to eat only ice cream and stay up on the computer gaming all night, or telling the Court that the older teens want to live in a home where they are allowed overnight guests of the opposite sex or laxed rules. The Guardian ad litem may inform the court regarding the child's wishes upon interviewing the child, but has the duty to inform the court that the child's personal wishes are not in the best interests of the child and recommend a

**PLAINTIFF'S EXHIBIT C - 004**

4

healthy diet, reasonable bedtime and safe sleeping arrangements.

A layman's example of Standard of Care is to use common sense: protect minor children from sexual perpetrators, and if your interests are for a third party not the children, common sense would dictate that you protect the third party from further allegations that they are abusing a child by again keeping the alleged perpetrator from any contact with minors.

Here, the Defendant Williams asserts that she owed no duty or obligation to M.H. deceased and S.H. surviving sister and that she only had a duty to the Court. This assertion is in violation of her Order Appointing her to the role of GAL. Under a mandatory appointment due to abuse, it is clear in her Order that she is to represent the interests of the minor children and those interests are in part to protect these children from abuse. Abuse that was sexual in nature and actually happened to their older sister in the same home. To assert that there is no duty to the girls M.H. deceased and S.H. surviving sister is a gross misrepresentation of the first duty in which she is appointed.

In review of the documentation there are countless incidents where there is a blind eye or disregard of the children's best interests to have a safe environment outside the presence of an alleged sex offender, and later convicted sex offender. M.H. deceased was abused while placed in the care of Defendant Father's mother, a home recommendation advocated by the Guardian ad Litem with knowledge of his supervisor, his mother, failing to provide supervision for the girls in the past, and continued evidence of failing to supervise Defendant Father who came into M.H. deceased's room in the middle of the night to sexually abuse her. The child, M.H. deceased, reported in February of 2017, she "never knew when Dad would come in [to her bedroom]" **PLT DFS 0965 dated February 2017**. A reasonable standard of care for Defendant Williams to represent the best interests of these children was not evident here.

Plaintiff Mother asserts that she offered her daughters' educational records to Defendant Williams in the summer of 2016 and fall of 2016 and Defendant Williams refused to look at them. Defendant Williams through her Guardian ad Litem Court Order of Appointment (**Exhibit 1 Plaintiff Mother's Amended Complaint for Damages.**) could at any time request and receive any records whether medical, educational or mental health with complete access under her GAL Order regardless of her communication with the parents.

The minor child's wishes were not adhered to by Defendant Williams in her recommendation to place the minor children with Defendant Father's mother. On December 7, 2016, the minor child, M.H. deceased, testified under oath in a temporary hearing with the following statements:

      a.     "I want to live with my mother."

      b.     "Grandmother is not able to take care of me."

      c.     "I will not feel safe in her [Grandmother Haynes] care."

      d.     "Grandmother cannot get up in the morning to take us to school and she cannot drive at night."

      e.     "Grandmother allowed us to be alone with Charles and she did not go with us to see what we were doing. I

**PLAINTIFF'S EXHIBIT C - 005**

was left with Charles alone in his house by grandmother."

      f.     "I do not want to see my dad more. I don't want to

see him at all."

      g.     "He [Charles] made me not like mom. He made me
not like M.S.H. I kind of see what he does, and if you hear
something for a long time you start believing it."

      h.     "I don't hate him [Charles] but I dislike the things
that he does."

      i.     "No, it did not occur to me that he didn't do what
M.S.H. was claiming," "Don't we have evidence in the
court?"

      j.     "He did more than hurting M.S.H. I have seen him
hurting my mom."

      k.     "He [Charles] and Grandma asked me to keep things
from my mom."

      l.     "I am happy where I am and I, I love my mom."

Later, the minor child would report to her CASA worker Angela Champion that *"Jennifer is
really my dad's lawyer."* -M.H..

The minor child M.H. deceased spoke in a DFS meeting in July of 2017 of "having no intentions
of sharing what happened between me and my dad, even if it means being forced to have visits
with him", yet Defendant Williams advocated for supervised visits with this child and Defendant
Father.

It is important to note that M.H. deceased disclosed to Dr. Bost in July 2017 that her father,
Defendant Father, sexually abuse her. **Exhibit 27 Plaintiff Mother's Amended Complaint for
Damages.**

The record contains multiple threats from Defendant Williams to the Mother not to challenge the
denial of educational testing for S.H. surviving sister, and not to testify against Defendant Father.
Not testing a child on the primary concern for Children's Division's placement of the child into
State Custody at the recommendation of the Guardian ad Litem is below the Standard of Care for
investigating an allegation of neglect. The threats made by Defendant Williams are beyond the
Scope of her duties to the minor children.

It appeared from the records that educational neglect was disproven early in the matter, however,
Defendant Williams continued to pursue other placement with the minor children than returning
them home with their Mother. Defendant Williams's investigation of the Mother as a placement
option once Defendant Father was out of the home is unknown.

It shocks the senses to place the children in harm's way through the recommendations made by

**PLAINTIFF'S EXHIBIT C - 006**

Defendant Williams for custody placement, juvenile litigation over unfounded educational
neglect and other harmful and neglectful acts within her role as GAL. Acts that included failing
to hotline abuse, failure to change supervision or residential placement, failure to report the
sexual abuse to the court, failure to recuse her services, failure to address the minor child's
sexual activity or letters regarding same, threats and negative comments to the family support
team, threats and comments to the minor children, and undue pressure upon M.H. deceased that
was a proximate cause to her continued sexual abuse by her father and her death. All of these
actions listed above by Defendant Williams are in the documents and court records reviewed by
myself. It was of special note the statements made specifically from M.H. deceased's own
journal, notes and verbal statements asking for help. All are below the standard of care of a
reasonable person and negligent of a professionally licensed Guardian ad Litem.

### (Paragraph 1 Order for Appointment)
**"shall be the legal representative of the *minor children*
throughout the proceedings."**

Here, the court made a judicial finding of fact that during the course of her appointment:

> "Defendant Williams acted as Charles's Lawyer. In
> addition, she threatened M.H. that if she, M.S.H., or
> Plaintiff testified against Charles in his criminal case,
> Williams would recommend that the children be returned to
> foster care. Williams advocated for Charles to spend time
> with S.H. and M.H. through visits and reunification
> therapy. Williams also falsely alleged that Plaintiff was
> guilty of educational neglect. Relying on Williams
> allegations of educational neglect, the divorce court placed
> M.H. and S.H. into the custody of the Department of
> Family Services ("DFS")…"

Defendant Williams did not address a letter from M.H. deceased at a DFS meeting that described
graphic sexual activity with her father, and again continued to raise concerns instead of
educational neglect. It is important to note that the children were above their age and
intelligence having been home schooled by Plaintiff Mother. The minor child repeatedly and
continually expressed concerns about her relationship with her Guardian ad Litem and stated
herself that "Williams was really Charles's Lawyer". **See Court Memorandum and Order,
Family Support Team Meetings, Court records on Juvenile case and Criminal Case, Minor**

Here, a reasonable standard of care by the Guardian ad Litem was missing. She failed to
recognize a direct conflict of interest, actually advocated for Defendant Father, acted as
Defendant Father's lawyer and testified on his behalf in his criminal sentencing hearing. She
threatened the minor child to extreme duress with her agenda regarding Defendant Father's
pending court hearing to pressure the minor child not to testify, and threatened the minor child
M.H. deceased to extreme trauma to be returned to foster care if she did testify against her father.

### (Paragraph 2 Order for Appointment)
**"shall file such pleadings and reports, and move or
petition the Court for such relief, as she deem**

### PLAINTIFF'S EXHIBIT C - 007

appropriate or necessary in the premises....*affecting*

*the interest(s) or welfare of the minor children*."

There is little to no evidence that I have received to indicate any court filings by the Guardian ad Litem other than the disputed agreement of her and the parties to move the case to the jurisdiction of the juvenile court and place the children into foster care for approximately 18 months.

**(Paragraph 3 Order for Appointment)**

**"The Guardian ad Litem shall conduct all interviews with persons having contact with or knowledge of the children in order to ascertain the children's wishes, feelings, attachments, and attitudes. If appropriate, the children should be interviewed."**

Here, there is evidence that the Guardian ad Litem's failed to interview the minor child M.H. deceased at that child's request, failed to interview their older sister who was sexually abused, failed to interview witnesses, failed to communicate by phone, email or in person with the Plaintiff Mother, failed to communicate or interview the children's multiple therapists counselors and doctors, failed to meet with the foster mother and child M.H. deceased when they came to the GAL's office, failed to communicate with the school counselor, and failed to interview the foster mother. Defendant Williams did interview the two younger children in the presence of Defendant Father at a Burger King on October 9, 2016 and coached the children not to discuss the meeting with their Mother in exchange for food and ice cream.

I have read and reviewed the records summarized by Plaintiff Mother which indicate that Defendant Williams knew or had reason to know the children should have had a **higher** degree of protection. The following conduct showed a low standard of care by the Defendant Williams, that caused emotional duress to the minor children, deterioration of the minor children's health and further risk of harm:

a. M.H. reported to Williams that her father was in M.H.'s bed-room in the middle of the night. (Doc. #6, ¶86 and ¶113).

b. M.H. was hospitalized twice in a psychiatric ward to treat self-mutilation after her father sexually abused M.H. M.H. was diagnosed with depression and put on medication. (Doc. #6, ¶¶94-96, ¶104, ¶104, ¶¶116-118).

c. M.H.'s foster parents reported to DFS that Charles sexually abused M.H. after the foster parents found a "Fuck my pussy Daddy," note and M.H.'s diary, both of which the foster parents presented at an FST meeting. (Doc. #6, ¶¶121-126).

d. The foster parents reported to the DFS that "M.H. is scared of Charles" and "she can't see him [Charles]." (Doc. #6, ¶134).

e. On June 7, 2017, M.H.'s court-appointed therapist, Scott Foster, informed Williams that it was not in M.H.'s best interest to have contact with her father and "seeing Charles

**PLAINTIFF'S EXHIBIT C - 008**

was not an option for M.H. and that neither M.H. nor S.H. should be reunified with Charles. (Doc. #6, ¶¶135-136).

f. On July 24, 2017, Angelina Champion, M.H.'s CASA representative reported that M.H. told CASA that "Williams is really my dad's lawyer." (Doc. #6, ¶142).

g. On July 27, 2017, M.H.'s pediatrician diagnosed M.H. with depression because "her dad was sexually molesting her and she [M.H.] stayed in her room to avoid her dad." (Doc. #6, ¶143-144 and Exhibit 27).

h. In October 2017, M.H. told her sister M.S.H. that M.H. "was scared because Williams told M.H. that "your dad won't go to jail" and "if we [M.S.H., M.H., and Plaintiff] testify against him, Williams will put me and S.H. back in foster care." (Doc. #6, ¶¶153-154).

i. On December 15, 2017, Dr. Marks stated that M.H. experienced "trauma in the moves to foster homes and the various schools" and "she admits that she had a very hard time trying to adjust to the different homes and to comfort her sister." (Doc. #6, ¶157).

j. On February 6, 2018, M.H.'s pediatrician Dr. Bost noted that M.H. "has been really stressed since last Tuesday one week ago when the GAL has been questioning her and wanting her [M.H.] to testify in state custody case " against her mom "causing M.H. educational neglect." Dr. Bost further states "the GAL put her [M.H.] in harm's way having her M.H. in dad's care." (Doc. #6, ¶163).

k. On March 30, 2018, Dr. Marks reported that Williams came to M.H.'s school several times "to put pressure on M.H. that she could be going back into foster care if she testifies against her father." (Doc. #6, ¶164 and Exhibit 37).

l. Plaintiff provided a plethora of evidence showing that Williams knew or should have known that her conduct was causing M.H. significant emotional distress, that M.H. wanted her father imprisoned, that M.H. feared her father being on probation, that M.H. only felt safe at her mother's home, that M.H. feared being returned to foster care and desperately did not want that to occur, and that M.H. dreaded the idea of even seeing her father or his mother. (Doc. #6, ¶¶158-159).

Each and every point made above shows the minor child's voice, perception and long history of abuse. Defendant William's conduct was below the standard of care set for professionals and

outside the scope of her GAL duties regarding the best interests of the children to whom she was appointed to protect.

**(Paragraph 5 Order for Appointment)**

**"The Guardian ad Litem shall have an attorney-client relationship with the minor children, and all communications between the Guardian ad Litem and the minor children shall be privileged, and shall not be disclosed by the minor children or the Guardian ad Litem" with exceptions…"**

Here, the minor child's own words that she hates her GAL, that she wants the GAL to recuse herself arguing with the GAL in team meetings, being refused to visit with the GAL in person, feeling threatened by multiple in person visits to influence her court testimony, continuing to recommend the placement of the minor children with Defendant's Mother who allowed unsupervised access and abuse to occur at the hands of their father, are all below the standard of care for an appointed Guardian ad Litem to develop a repour and relationship with the minor children.

Also present in the exhibits I reviewed were statements by the Defendant Father's mother repeating the threats that the Guardian ad Litem made to the children, indication that the communication between the minor children and Guardian ad Litem were not confidential, but actually shared with their sexual predator. This breach of confidentiality is below the standard of care in which the Guardian ad Litem was Court Ordered.

**(Paragraph 6 Order for Appointment)**

**"shall faithfully discharge those duties. If she is in doubt at anytime as to the scope or limitation of this authority, she may apply to the Court on an emergency basis if necessary for clarification or ratification of the authority and her acts as Guardian ad Litem" -Signed 1/30/2017, John H. Shock, Associate Circuity Judge, Ripley County.**

There is no evidence that the Guardian ad litem requested assistance from the court during the divorce or juvenile appointment when she had a conflict of interest with her duties or when the minor child requested her to be rescued.

The standard of care to ask for assistance from the court by the Guardian ad Litem acting within her role as GAL was below a reasonable expectation and against the Court Order of appointment.

**PLAINTIFF'S EXHIBIT C - 010**

### Beyond the Scope of Representation

First, where there is a direct Conflict of Interest between Defendant Williams advocating for Defendant Father and against her duties to the minor children for their Best Interest, Defendant Williams is performing beyond the Scope of Representation as the Guardian ad Litem for the minor children.

Missouri Supreme Court Rule 4-Rules Governing the Missouri Bar and the Judiciary-Rules of Professional Conduct regarding Conflicts of Interest for Current Clients states:

> **RULE 4-1.7: CONFLICT OF INTEREST: CURRENT CLIENTS**
>
> (a) Except as provided in Rule 4-1.7(b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be directly adverse to another client; or
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.

Second, Defendant Williams's direct threats to Plaintiff Mother, direct threats to M.H. deceased are noted in the case file and the child's own statements. Threats and discussions outside your appointed role regarding upcoming court is considered tampering of a witness. Tampering of a sexually abused, vulnerable, minor child victim is performing acts beyond the Scope of Representation as the Guardian ad Litem for the minor children.

Third, Defendant Williams acted as the lawyer for Defendant Father and later testified on his behalf in his criminal sentencing hearing. During her testimony Defendant Williams stated that the children were "highly sexualized" which is an inference to excuse Father's conduct because the children are at fault for the abuse. Defendant Williams also adopted the Defendant Father and grandmother's statements that M.S.H. was a villain. These direct acts are a conflict of interest with the Order for Appointment to represent the children's best interests. When the relationship between the GAL and minor children is broken the correct action is to recuse your position or have the court appoint a separate attorney for the children when you and your clients disagree on what their best interest should be. With these acts that were a conflict of interest, Defendant Williams was performing beyond the Scope of Representation as the Guardian ad Litem for the minor children. **See Plaintiff Mother Amended Complaint for Damages Exhibit 41, Defendant Williams testimony transcript.**

It is important to note that a significant number of incidents between the minor children and their Guardian ad Litem Defendant Williams happened out side of the scope of her representation as their GAL.

I have reviewed the records and have confirmed the following acts that I agree that Defendant Williams violated her Court Order for Appointment, violated her duties and was performing outside of the Scope of her Representation. Noted in the Plaintiff Mother's Amended Complaint for Damages are as follows:

        a.     Threatening M.H. that if her mother, her stepsister, and/or M.H. testified against Charles in his pending sexual abuse criminal case, M.H. and S.H. would be returned to foster care;

        b.     Threatening to cut M.H. and S.H.'s visitation time with Plaintiff, if M.H., Mellissa, or Plaintiff testified against Charles in his criminal case;

        c.     Threatening M.H. that if her mother, stepsister, and/or M.H. testified against Charles at his sentencing, M.H. and S.H. would be returned to foster care;

        d.     Placing M.H. in a double bind by threatening that if she, her stepsister and/or her mother testified against Charles at his criminal trial, M.H. would be placed in foster care, but if she did not testify against her father, and her father was released or placed on probation as Williams advocated, that M.H. would be placed in her father's custody or required to spend time with her father, who had sexually abused M.H.;

        e.     Testifying at Charles' sentencing favorably to Charles seeking to have Charles placed on probation;

        f.     Testifying at Charles' sentencing hearing that Charles was not at fault because M.H. and S.H. were "highly sexualized;"

        g.     Failing to realize that her perception that S.H. and M.H. were "highly sexualized" was the direct result of sexual abuse by their father;

        h.     Failing to protect M.H. from sexual abuse at Grandmother Haynes' house;

        i.     Failing to report to the Divorce and Juvenile Courts that M.H. was sexually, physically, and emotionally abused by Charles;

        j.     Failing to hotline sexual, physical, and emotional abuse M.H. suffered in the custody of Grandmother Haynes as was required by R.S. Mo. §210.115;

**PLAINTIFF'S EXHIBIT C - 012**

k.  Willfully insisting on M.H.'s interaction with her father and Grandmother Haynes knowing that both of them abused or allowed the abuse of M.H. sexually, emotionally, and/or physically;

l.  Advocating for M.H.'s reunification with her sexual abuser;

m.  Threatening M.H. that if she did not reunify with Charles, M.H. would be placed back in foster care or, worse, in the custody of Charles, her sexual abuser;

n.  Not reporting to the Divorce and Juvenile Courts M.H.'s physical and mental condition;

o.  Failing to seek appropriate healthcare personnel to help M.H. combat depression, PTSD, and sexual abuse trauma;

p.  Promoting false allegations of "educational neglect even while M.H. and S.H. were excelling at school;" and

q.  Failing to protect M.H. from false allegations of educational neglect, *Taylor v. Taylor,* 60 S.W.3d 652 (Mo. App. E.D. 2001).

I support Plaintiff Mothers' claim that all of these acts and/or omissions are outside of the scope of Defendant Williams's duties (and by agency Williams Law and Williams and Spain, Miller) caused or contributed to cause M.H. deceased to suffer sexual abuse, severe and excruciating emotional pain, loss of dignity, and deterioration of her mental health which resulted in her suicide, her wrongful death.

Other than the undisputed facts, documents and court records reviewed, this reporter has not received the Defendant Williams' case file, itemized work log, her notes, emails, text messages or other communications to have any understanding of the relation between her and the Defendant Father. The record is very clear that she had refused to communicate with Plaintiff Mother and specifically to the minor children to whom she owed a Court Ordered duty.

The standard of care performed by the Guardian ad Litem during the case and where she was acting beyond her role as GAL was willfully negligent, harmful and blatantly disregarded the health and safety of the minor children, specially to M.H.'s physical health and emotional wellbeing. The performance of the Defendant Williams acting beyond her Scope of Representation caused extreme emotional trauma to the minor children and was a proximate cause of the minor child, M.H.'s death.

## Summary of Standards for Guardian ad Litems

The Supreme Court of Missouri has issued Standards with Comments for Guardians ad Litem in Missouri. **Exhibit 3, Plaintiff Mother's Amended Complaint for Damages**. Upon review of the Standards the following summary is presented to support my opinions herein.

**PLAINTIFF'S EXHIBIT C - 013**

## Standard 1.0 Appointment of Guardians ad litem

The first Standard deals with the appointment of a guardian ad litem **for a child.** When appointing a lawyer, this Standard requires that attorney to be licensed and trained as set forth in the Standards. It is assumed that Defendant Williams was a licensed attorney with training to become a Guardian ad Litem.

This rule also requires the appointed Guardian ad Litem to "act in accordance with lawyer's Missouri Bar Rules of Professional Conduct. The comments state, "Lawyers appointed to act as Guardians ad Litem **shall** act in accordance with the rules of professional conduct." One of the main rules of professional conduct that is violated in this case is the rule to avoid conflict of interests. Additionally, there are rules of diligence, duty to your client and advocacy that were also violated with Defendant Williams actions listed above.

Clearly Defendant Williams had the appearance of a conflict of interest and did not perform her duties owed to the children only.

## Standard 2.0 Caseloads

This rule requires a Guardian ad Litem to notify the court if the caseload reaches a level bearing upon the Guardian's ability to meet these standards or to comply with the ethical Standards of the Missouri Bar's Rules of Professional Conduct. It concerns the ability of a GAL to meet or comply with these standards, and the Missouri Bar ethics of an attorney, as well as the ability to meet the obligations owed to the child.

The comments in this rule specifically state that "the appointing court is responsible for making certain each lawyer appointed [Defendant Williams in this case] is able to meet his or her obligations **to the child**". This duty **is to child** by representing the child's best interests. There is no duty to the Court's best interests or to other opposing parties in the litigation.

Defendant Williams did not comply with the this standard where she did not display an ability to meet her obligations to this child through her lack of investigation of abuse and neglect. My notes indicate many questions on where is Defendant Williams's investigation on the abuse and neglect of M.H. deceased? And where is Defendant William's investigation on the abuse and neglect towards S.H. surviving sister?

## Standard 3.0 Independent Judgment of Guardian ad Litem

This rule requires a GAL to be "guided by the best interests **of the child**" and states that the GAL "shall exercise independent judgment **on behalf of the child in all matters.**" To be guided by the best interests of the child is not neutral, it is a position to advocate and protect the child. The exercise of independent judgment **on behalf of the child** is not to be influenced by the opposing parties, but to investigate the allegations in the case.

The comments stated that "The Guardian ad Litem must recommend only what is in the best interests **of the child** on each issue and most maintain an objectivity that preserves a **clear focus on the child's** best interests." Defendant Williams did not recommend placement or protection of these children to prevent them from further harm, knowing that there were allegations of a

**PLAINTIFF'S EXHIBIT C - 014**

sexual nature in the home. Defendant Williams blur of duties showed no clear focus of the children's best interests in the cases in which she was appointed. Her actions were indicative of negligence. Further, by acting outside of her role as Guardian ad Litem, her actions were willful and hurtful to the minor children. This standard also distinguishes the role separate from an attorney appointed for a child which is described above in more detail.

### Standard 4.0 General Duties and Responsibilities

This standard has multiple parts. First, the Guardian ad Litem shall not only provide factual information to the court, but also shall diligently advocate a position in the best interests of the child. Here, in the court records, DFS records and case file there are indications that the Guardian ad Litem was not factual on her continued report that the children were educationally neglected, that the parties all agreed to a state custody and foster situation or the manner of supervising Defendant Father, or the reasons for advocating reunification and constant contact with Defendant Father.

The court has the ability to "require the guardian ad Litem to perform the Guardian ad Litem duties faithfully and upon failure to do so, shall discharge the guardian ad Litem and appoint another." Here, there is evidence from the Plaintiff Mother and minor child M.H. deceased that the Guardian ad Litem's representation was deteriorated so much that there was no longer a relationship between them, that the Guardian ad Litem was advocating for another opposing party, legally represented the Defendant Father and threatened the Plaintiff Mother and minor child M.H. deceased: all actions in which the court could have discharged her. Upon multiple requests from the Plaintiff Mother and minor child (M.H. deceases) there were even threats made by Defendant Williams regarding her position not to recuse herself.

The Comments to this Standard state specific duties:

> "Prior to the commencement of a hearing, the Guardian ad
> Litem should conduct all necessary interviews with persons
> having contact with or knowledge of the child in order to
> ascertain the child's wishes, feelings, attachments, and
> attitudes. The Guardian ad Litem should conduct
> interviews with the child except when the child is too
> young or some other legitimate circumstance prevents an
> interview."

Here, Defendant Williams failed to conduct all necessary interviews with the parties, professional counselors, doctors, family, siblings and specifically did not interview the sister who was abused by the same person alleged to have abused these minor children. She did meet with M.H. at her school on many occasions prior to Defendant Father's court appearance, violating the rules of professional conduct, violating conflict of interest rules and violating this standard to conduct interviews. These children were old enough to gain knowledge upon interviewing them and there is no other legitimate circumstance in the records reviewed to prevent an interview.

Another specific comment is that:

> "The Guardian ad Litem should conduct regular face-to-
> face meetings with the child, to the extend appropriate, to
> observe the child's physical, mental, social, educational,
> and familial well-being and to form opinions concerning
> the child's best interests. The Guardian ad Litems should
> not diagnose or work therapeutically with the child, but

**PLAINTIFF'S EXHIBIT C - 015**

regular, face-to-face contact will ensure information
observations when conferring with other specialists."

Here, the interviews did not happen when the children were in foster care, in the care of their mother, or in the care of the grandmother through statement placement. The only evidence that I have reviewed that showed interviews with the child M.H. deceased was leading up to her testimony in Defendant Father's criminal case for the abuse against her older sister. Those interviews showed an agenda regarding the outcome of Defendant Father's criminal case, threatened the minor child to testify and go back to juvenile court/foster care, or to not testify and be exposed again to a deviant child sex offender. Interviews did not happen between the Defendant Williams and the minor child's doctors, counselors, teachers, Plaintiff Mother, or Siblings, specifically the older sister who was abused in the home. Without meeting frequently with the minor children Defendant Williams would not be able to confer with the experts providing care for these minor children. Without such interviews Defendant Williams acted outside the standards of care for a GAL and failed to act in the best interests of the minor children.

## Standard 5.0 Access Between Guardian ad Litem and Child

This standard states the Guardian ad Litem and child shall have access to each other. Evidence from the child M.H. deceased, Foster Mother, S.H. surviving child, older sister, and Plaintiff Mother as well as M.H. deceased counselors indicated that the minor children in this case were not allowed and physically denied the ability to speak with their GAL. They did not have any certainty that she read their letters or knew their wishes.

The comments specifically state "Establishing and maintaining a relationship with the child is the foundation of effective guardian ad litem representation." Here, there is clear evidence that the relationship, if established in the past, was not maintained, and further harmed with threats and witness tampering, lawyering for the Defendant Father and testifying on his behalf in a Court of law for him to have probation, and therefore, access to the minor children.

The comments also state that the child shall be readily accessible to the GAL and that "It is equally important that the Guardian ad Litem be easily accessible to the child. The child should be provided with the name, telephone number, and address of the Guardian ad Litem immediately upon the appointment of the Guardian ad Litem and the opportunity, at reasonable times, to initiate contact with the Guardian ad Litem." There is information in this record that the Guardian ad Litem specifically turned away the Foster mother and the minor child M.H. deceased when they reached out to personally appear at Defendant Williams's office. In review of the records here, there were so many denials of access to the GAL, negative or infrequent communication to the minor child, in addition to harmful communication to the child, that this standard was clearly not followed. Defendant Williams acted against this standard and against the best interests of the children. Defendant Williams did not maintain independent representation of the minor children she was appointed to by advocating for, lawyering for and testifying for Defendant Father. I am particularly concerned with the Guardian's access to the child at her school prior to the Defendant Father's criminal case that added undue influence on her and caused her extreme emotional duress which lead to her death.

## Standard 6.0 Guardian ad Litem Access to Reports and Records

This standard allows the Guardian to have access to "all reports relevant to the case and shall entitled to all reports relevant to the case and shall have access to all relevant records, child,

**PLAINTIFF'S EXHIBIT C - 016**

placement of child or child's family members." There no records in the file that I reviewed that the Defendant Williams subpoenaed any records from the school, medical facility, counselors, psychiatrists, casa workers, teachers or family members. There is a record of requesting prior Juvenile records.

The comments to this Standard state that the Guardian ad Litem must personally review the information. The comments state:

> "A key aspect of representing a child is to obtain and
> review all documents to be submitted to the court as well as
> relevant agency and party case files, educational records,
> medical records, mental health records, and law
> enforcement reports. The information contained in such
> records may provide a more complete contest for the
> current problems experienced by the child and family, may
> suggest additional professional and lay witnesses that can
> provide testimony necessary to a full hearing of the issues
> before the court, and may reveal alternate potential
> placement resources."

In review of the case file and the court records all indications are that this standard was not met. I have no information as to what records, if any, Defendant Williams subpoenaed, received, read or reviewed. In fact the opposite is reported in the record that the counselors were not communicated with or reached out to. The only record I found was a notation from a nurse on 3/21/2017 where the note from Twin Rivers Regional Medical Center stated that the provider:

> "contacted guardian to discuss progress and discharge planning.
> Guardian reported dad's trial was scheduled 3/20/2017 and it
> caused sadness. Guardian reported concerns related to dad not
> having any contact with them [minor children]" **Exhibit 18, pg.
> 17, attached to Plaintiff Mother's Amended Complaint for
> Damages.**

### Standard 7.0 Confidentiality and Privilege

This standard protects the minor children's confidential or privileged information received within the Guardian ad Litem's duties. Based on the lack of information in the case file of what if any documentation Defendant Williams had in her control or possession I cannot comment on compliance with this standard as to medical and counseling records handled and retained.

It is notable that the grandmother and Defendant Father repeated threats to Plaintiff Mother and the children that were made by Defendant Williams to the Plaintiff Mother and children. It is also noted that the minor children both advocated for themselves stating at various times that they didn't trust their Guardian ad Litem. M.H. deceased words were that she 'fxxking hated the GAL'. **See file Exhibits form Minor Child Journal.** These comments were made during the time that the Juvenile court was still involved and the state still had custody of the children with permissive placement with either grandmother and later back with Plaintiff Mother. During the same period of time that Defendant Williams was continuing to raise educational neglect by Plaintiff Mother and continuously advocating that the children be reunited with and have supervised visits with their father in grandmother home or therapeutic sessions to 'force' contact [minor children's words] for a continued relationship with Defendant Father if he were to receive probation for his criminal sexual abuse charges. From the children's statements and journals, it appeared that minor children didn't believe their dealings with Defendant Williams was

**PLAINTIFF'S EXHIBIT C - 017**

## Standard 8.0 Progress of the Case Through the Court Process

This standard requires the Guardian ad Litem to review the progress of the case, advocate for timely hearings, and to provide services and compliance with court orders.  The comments specifically state:

"The harmful effects of prolonged foster care and lack of permanency planning for children are serious and well documented. (Foster Children in the Courts, edited by Mark Hardin, 1083; Addressing the Impact of Foster Care on Biological Children and Their Families, by Maha Younes, 2007.)"

Here, the continued argument to promote educational neglect and not return the minor children home with Plaintiff Mother is unfounded.  The focus should have been on the minor children's likely and known sexual abuse and the duty to protect their best interests.

I have read and reviewed the records from the medical facilities, counselors, doctors, psychologist, CASA workers, Children's Division Workers and agree with all of their treatment plans that the children's case has been ongoing too long with too many exposures to harm than what is expected by following a reasonable standard of care.  In this case the Defendant Williams had compelling reasons presented to her to remove the minor children from her initial recommended placement which was in the children's best interest to protect them from sexual abuse.

## Standard 9.0 Relating the Court process to the Child

This Standard sets out that the Guardian ad Litem shall explain the court process and role of the Guardian ad Litem to the child in an age appropriate manner.  The Guardian ad Litem is to ensure that the child is informed of the purpose of each court proceeding as the case progresses.

Here, the threats to Plaintiff Mother that the children were aware of, and the specific direct threats to the minor child M.H. deceased indicate that this Standard was not met.

In reviewing the case file, there were several times the minor child M.H. deceased spoke out regarding her fear of court:

    a. Report by Angelina Champion, CASA of the 36th Judicial Circuit- " In talking with the girls, M.H. let it be known that she has felt "left out" of the case by her guardian ad litem, Jennifer Williams. M.H. said that Jennifer told her "It wasn't her job to talk to her".  She stated that she felt as if "Jennifer is really my dad's lawyer"... "Because M.H. and S.H. aren't communicating with their GAL and have confused feelings about their GAL, this raises a concern for me.  I understand that the GAL represents the best interests of the children, while a CASA volunteer represents the voice of the children, which might not be the same thing at times in a particular case.  Because the girls have expressed a concern about the relationship they have with their GAL, I feel it need to be brought to the attention of the Court" …. "My recommendation is the girls begin to transition back into the home with their mother by having unsupervised visitation with her.  I also feel that it is in the best interest of M.H. and S.H., if the continue to have no contact with their father." **Exhibit 26, Plaintiff Mother's Amended Complaint for Damages.**

    b. Report by Jerry L. Marks, PhD, LCSW, stated regarding M.H. "She says that she

**PLAINTIFF'S EXHIBIT C - 018**

doesn't want to go through what her sister has been through with the courts as she has disclosed that their father was sexually abusive with her. She doesn't deny that she has been sexually abused in the interview but doesn't confirm it either." **Exhibit 31, Plaintiff Mother's Amended Complaint for Damages.**

c.  Report by Roger Kingsley Bost, MD, 2/6/2018. M.H. "has been real stressed since last Tuesday 1 week ago when the guardian ad litem (gal) has been questioning her and wanting her to testify in state custody because they don't like biological home schooling her most her life and claimed mom was causing educational neglect. The GAL has put her in harms way having her in dad's care in 2017 where there is suspicion of sexual abuse." **Exhibit 36, Plaintiff Mother's Amended Complaint for Damages.**

d.  Report by Jerry L. Marks, PhD, LCSW, 3/30,2018 states M.H. "reports to me that the GAL has been coming to see her at school. She tells me that it seems odd to her as she did not see this much of her when she was places in foster care. She also tells me that the GAL has brought two rounds of gifts to her school from her paternal grandmother and from her DAD. She is not sure what that is about but she finds it unusual. She also reports that the GAL has been asking her about her mother's psychological testing. I find these to be more than unusual. Perhaps this is just me being cynical, but it seems to me that she is using her access to M.H. to put pressure on her about the upcoming trial of her Father related to the sexual abuse of her sister M.S.H. It seems that I am the one who keeps reporting to you the irregularities of the process. I do not think it would be a jump in logic to say that the gifts are a way to send M.S.H. a message about her testimony in the case. I also think it is a way to put pressure on M.H. that she could be going back into foster care if she testifies against her Father. … I have to be on the record saying that I think what has happened in the last two months with M.H. and the GAL is a form of witness tampering." **Exhibit 37, Plaintiff Mother's Amended Complaint for Damages.**

e.  M.H. deceased's own words in **Exhibit 44, Plaintiff Mother's Amended Complaint for Damages.** Texting March 8, 2018 "Jennifer just came. She said if I testify against Chuck [Defendant Father] she is going to put me back in foster care I'm  .  scared. … I need to get my goals done today. It's so hard to focus and my neck hurts again now and I can hardly do my math now. How much longer is this going to go on Mom?"

f.  M.H. states on August 28, 2017 "Why are they taking SO LONG to put Dad in jail? I SO sick and TIRED of him being out of jail!. … I'm sooo sick of the GAL not helping me ever. She's definitely on Dad's side NOT MINE!" **Exhibit 44, Plaintiff Mother's Amended Complaint for Damages.**

g.  The day before her death M.H. says "Mom I'm so scared of what Jennifers doin to me in court". [The child died on Friday prior to a court appearance scheduled that next Monday] **Exhibit 44, Plaintiff Mother's Amended Complaint for Damages.**

This Standard specifically states that the purpose is to decrease the trauma to the child. The reasonable level of care is that the GAL shall explain to the child what is happening and what expectations the child should have about court processes.

**PLAINTIFF'S EXHIBIT C - 019**

The actions of Defendant Williams were in conflict with this Standard of Care causing emotional duress to the child. When Defendant Williams acted in a conflict of interest with the best interests of the minor children she was acting outside of her scope of representation. Defendant Williams' actions that were also outside the Scope of her Court Ordered Appointment, such as the witness interference, threats to the minor child, lawyering for Defendant Father and testifying on Defendant Father's behalf all caused trauma and proximate cause to the minor child's death.

## Standard 10.0 Participation in Case-Related Activities

Standard ten states that the Guardian ad Litem "shall participate, when appropriate, in the development and negotiation of any service plans, parenting plans, proposed orders, and staffing that affect the best interests of the child as they relate to the case at hand." And "shall monitor implementation of service plans and court orders while the case is pending to determine whether services ordered by the court are being provided in a timey manner."

Here, Defendant Williams participated in family court hearings and juvenile court hearings as well as team meetings. What is in conflict of interest is where she testified in Defendant Father's criminal case advocating for Defendant Father. When asked about concerns with abuse repeating itself to S.H. Defendant Williams testifies that "It has been my opinion since I entered this case that both of these children were highly sexualized for their age. ... In the course of my investigation there's a long history of sexual abuse in Mother's Family." Defendant Williams also expresses that "I do however have concerns that father and his family have not seemed to be able to have any access to the children for quite some time" **Exhibit 41, Plaintiff Mother's Amended Complaint for Damages.** These statements appear to make an excuse or justification of abuse because the children were "highly sexualized".

Statements made by Defendant Williams advocating for more contact with the children's father and his family at Defendant Father's after he was accused and later plead guilty to statutory sodomy with deviate sexual intercourse with a person less than 14 years old, child molestation and two additional counts of statutory sodomy is not in the best intertest of the minor children. Testimony by Defendant Williams in a non-related case is beyond the scope of her duties, a direct conflict of interest to her duty to represent the best interest of the minor children, and beyond the scope of her Court Ordered representation. All of these actions are below the standard of care a reasonable professional would have for these children and negatively affected their safety and well-being.

## Standard 11.0 Participation in Court Proceedings

This standard states that the Guardian ad Litem shall appear at all court proceedings. Part of this standard requires the Guardian to present evidence, file pleadings, and call witnesses "when appropriate to ensure all information relevant to the child's best interests is presented to the court for consideration." Here, there are several instances where a motion to remove the minor children from their placement with Defendant Father's mother would be appropriate where Defendant Father had unsupervised access to the children. The older sister M.S.H. could have been GAL's witness in the divorce case to support why Defendant Father should have no contact with the younger minor children. Instead, Defendant Williams withheld particular information about abuse from the court in regards to Defendant Father's computer. Additional information could have been gained from M.S.H. to advocate for the two younger children to support their desire to not see the Defendant Father in forced therapy, phone calls or supervised visits. The GAL is to ensure the court's receipt of all information relevant to the child's best interests and because she did not, this standard is not fully met.

**PLAINTIFF'S EXHIBIT C - 020**

## Standard 12.0 Protecting the Child as Witness

Standard 12 states that the "guardian ad litem in a pending case shall protect the interests of the child who is a witness in any judicial proceeding in which the guardian ad litem has been appointed." The GAL is also tasked to protect the child from "multiple depositions and repetitive examinations that are not in the child's best interests."

Here, the initial educational neglect concern was not developed, however it was continually held by Defendant Williams that the children were to remain in foster care due to their educational level. The evidence of Defendant Williams meeting the minor child M.H. deceased at her school weekly to discuss the upcoming sentencing hearing for Defendant Father was correctly stated by Dr. Marks and Dr. Bost to be unusual and emotionally damaging to the minor child. These meetings with the minor child to discuss the child's testimony was tampering with a minor, vulnerable witness. This conduct is a direct conflict of interest where Defendant Williams is advocating for her belief of what a successful outcome would be for Defendant Father regarding jail or probation. Defendant Williams's conflict of interest places her conduct beyond the scope of her representation and below the standard of care for a reasonable professional.

## Standard 13.0 Recommendations to the Court

Standard 13 sets out the duty of the Guardian ad Litem to make a recommendation to the court based on the evidence presented and consistent with the best interests of the child.

Defendant Williams's duty is to inform court of the minor children's wishes, fears and share their concerns with the Court; instead, the advocacy for Defendant Father put the two minor children under real stressors that they are not equipped at their ages to process, causing a severe and negative impact on their mental health and emotional wellbeing.

The comments to this standard state "to make a recommendation to the court that serves the child's best interests, the guardian ad litem should have knowledge of the child's circumstances from all sources, which may include, but are not limited to, the parents, caseworker, deputy juvenile officers, teachers, treatment providers, and court appointed special advocate volunteers." The comments go on to state that "If the guardian ad litem determines there is a conflict between advocating for the best interests of the child and representation of the child's preferences, the guardian ad litem shall continue to perform as the guardian ad litem for the child and may request that the court appoint another lawyer to represent the child's preferences". The evidence supports that the children did not agree with the current placement plan or reunification efforts by the Guardian for Defendant Father. The evidence did not support supervised visits with mother without allegations of abuse, drugs or alcohol.

The recommendations to proceed to juvenile court and continue to represent to the court educational neglect is below the standard of care for a reasonable professional. The recommendation to place the children in their grandmothers home where she allowed unsupervised access to the children by Defendant Father is below the standard of card for a reasonable professional and dangerous to the health and safety of the minor children, whom by the evidence were being sexually abused.

In addition, the treatment of M.H. deceased with threats about her testimony put pressure on her to testify and go back to foster care, or not testify and be exposed to her abuser if he received probation. This child was not protected as a child witness, in fact her death was proximately

**PLAINTIFF'S EXHIBIT C - 021**

21

caused by the child's experience in being a witness where her own advocate was representing Defendant Father, the abuser's interest. Defendant Williams acted below the standard of care for a reasonable professional where she threatened the minor child regarding her testimony, lawyered for and testified for Defendant Father, the child's sexual abuser.

**Standard 14.0 Training**

This standard sets forth the initial 8 hours, and three additional hours each year, for licensure and continuing education. No information was received to know the status of the Guardian ad Litem's training.

As the standards state, the Guardian ad Litem's role is unique and complex. It requires specialized education, training, and experience to represent the best interests of minor children.

In this case sexual abuse was always present and should have been addressed with a different custodial, visitation and treatment plan. The conflict of interests grew over the years of representing the minor children ending in the Defendant Williams advocating for, lawyering for and testifying in a court for Defendant Father. I am of the opinion that all areas where Defendant Williams acted in conflict with the minor children's interests were beyond the scope of her duties. The standard of care was not met for a reasonable professional. Defendant Williams failed in her duties specifically owed to the minor children. By not representing their best interests the Defendant Williams harmed the physical health and emotional well-being of M.H. and S.H.. In my opinion there is evidence of severe emotional duress which by the totality of the circumstances was a proximate cause of M.H.'s death.

Sincerely,

Shelly Renee' Reece, JD, MBA
Attorney at Law
sreece@reecefamilylaw.com